**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL SALAZAR, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-07935-JLR |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| NATIONAL BASKETBALL ASSOCIATION, | |
| Defendant. | |

**NATIONAL BASKETBALL ASSOCIATION'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

**VINSON & ELKINS L.L.P.**

Hilary L. Preston
Palmina M. Fava
Marisa Antonelli
1114 Avenue of Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
pfava@velaw.com
mantonelli@velaw.com

*Counsel for National Basketball Association*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

      A.    The NBA Offers a Wide Variety of Content to Users. ...........................2

      B.    The NBA Clearly Discloses Data Collection and Disclosure in Its Privacy Policy. .....................................................................................................3

      C.    The User's Device and Browser Control the Mechanics of the Alleged Disclosure. .................................................................................................6

LEGAL STANDARD................................................................................................................7

ARGUMENT ............................................................................................................................9

    I.    Mr. Salazar Lacks Article III Standing. ..............................................................9

    II.    Mr. Salazar Fails to Allege Facts to Support a VPPA Claim. .........................13

      A.    Mr. Salazar Fails to Allege Facts that Qualify Him as a VPPA "Consumer." .................................................................................................13

      B.    The NBA Did Not "Knowingly Disclose" Any PII....................................16

          1.    Mr. Salazar's Device, Not the NBA, Disclosed the Alleged PII. ...........16

          2.    The NBA Did Not "Knowingly" Disclose PII...........................................18

      C.    Mr. Salazar Consented to the Complained-of Disclosures. ...................19

          1.    Mr. Salazar Admits He Consented to the NBA's Privacy Policy................20

          2.    The NBA's Privacy Policy Specifically Addresses the Alleged Disclosure. .................................................................................................20

          3.    The NBA's Privacy Policy Satisfies the VPPA..........................................21

              a.    *Distinct and Separate.* ........................................................21

              b.    *Timing Requirements.* ..........................................................22

              c.    *Opt-out Optionality.*.............................................................22

    III.    The Court Should Dismiss the Complaint's Class Allegations. .......................23

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullayeva v. Attending Homecare Servs. LLC*,
  928 F.3d 218 (2d. Cir. 2019) ................................................................................. 23

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) .................................................................................... 7

*ASARCO LLC v. Goodwin*,
  756 F.3d 191 (2d Cir. 2014) .................................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 7, 9

*Austin-Spearman v. AMC Network Ent. LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) ........................................................ 14, 15, 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 7

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016) ...................................................................................... 8

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*,
  790 F.3d 411 (2d Cir. 2015) .................................................................................... 7

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ................................................................... 10, 17, 18

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) .............................................................15, 22

*Faehner v. Webcollex, LLC*,
  No. 21-1734-cv, 2022 WL 500454 (2d Cir. Feb. 18, 2022) ............................... 9, 10

*Glick v. CMRE Fin. Servs., Inc.*,
  No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022) .................................12

*Harty v. W. Point Realty, Inc.*,
  28 F.4th 435 (2d Cir. 2022) ...................................................................................12

*Horton v. Dow Jones & Co.*,
  804 F. App'x 81 (2d Cir. 2020) .........................................................................23, 24

*Hunstein v. Preferred Collection & Mgmt. Services*,
  48 F.4th 1236 (11th Cir. 2022) ................................................................ 10, 11, 12

*In re Hulu Priv. Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015) .............................................................17, 18

*In re Hulu Priv. Litig.*,
  No. 11-cv-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)............................18

*In re Nickelodeon Consumer Priv. Litig.*,
   827 F.3d 262 (3d Cir. 2016) ........................................................................ 10

*In re Thelen LLP*,
   736 F.3d 213 (2d Cir. 2013) ........................................................................ 8

*In re UBS Auction Rate Secs. Litig.*,
   No. 08-cv-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ...................... 8

*Kim v. McDonald's USA, LLC*,
   No. 21-cv-05287, 2022 WL 4482826 (N.D. Ill. Sept. 27, 2022) ................... 12

*Kola v. Forster & Garbus LLP*,
   No. 19-cv-10496, 2021 WL 4135153 (S.D.N.Y. Sept. 10, 2021) .................. 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................... 7

*Maddox v. Bank of N.Y. Mellon Trust Co.*,
   19 F.4th 58 (2d Cir. 2021) .......................................................................... 10

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000) ..................................................................... 7, 8

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002) .......................................................... 8

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d. Cir. 2017) ................................................................. 20, 23

*Mollett v. Netflix, Inc.*,
   795 F.3d 1062 (9th Cir. 2015) ....................................................... 13, 17, 18

*Orozco v. Fresh Direct, LLC*,
   No. 15-cv-8226, 2016 WL 5416510 (S.D.N.Y. Sept. 27, 2016) .................... 8

*Perry v. Cable News Network, Inc.*,
   854 F.3d 1336 (11th Cir. 2017) ............................................................ 10, 16

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) .................................................................................... 11

*Roman v. Spirit Airlines, Inc.*,
   482 F. Supp. 3d 1304 (S.D. Fla. 2020) ....................................................... 24

*SEC v. Rosenthal*,
   650 F.3d 156 (2d Cir. 2011) ....................................................................... 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................................... 10

*Sputz v. Alltran Fin., LP*,
   No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ................ 10, 12

*Staehr v. Hartford Fin.  Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) ......................................................................... 8

*T.K. Through Leshore v. Bytedance Tech. Co.*,
    No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) .................................... 25

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................................................... *passim*

*Tsadilas v. Providian Nat'l Bank*,
    786 N.Y.S.2d 478 (1st Dep't 2004) .......................................................................... 25

*U1it4Less, Inc. v. FedEx Corp.*,
    No. 11-cv-1713, 2015 WL 3916247 (S.D.N.Y. June 25, 2015) ................................ 24

*Wilson v. Veritas Consulting Grp. Inc.*,
    No. 21-cv-8318, 2022 WL 4227145 (S.D.N.Y. Sept. 13, 2022) .................................. 9

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016) ..................................................................................... 16

## Statutes

10 U.S.C. § 949p-5 ........................................................................................................... 16

15 U.S.C. § 6821 ............................................................................................................... 16

18 U.S.C. 2710 ............................................................................................................ 13, 25

18 U.S.C. 2710(a) ............................................................................................................. 14

18 U.S.C. 2710(a)(1) ......................................................................................................... 13

18 U.S.C. 2710(b)(1) .................................................................................................... 16, 18

18 U.S.C. 2710(b)(2) ......................................................................................................... 13

18 U.S.C. 2710(b)(2)(B) ................................................................................................... 19

18 U.S.C. 2710(b)(2)(B)(i) ............................................................................................... 21

18 U.S.C. 2710(b)(2)(B)(ii)(I) .......................................................................................... 22

18 U.S.C. 2710(b)(2)(B)(iii) ............................................................................................. 22

18 U.S.C. App. 3 § 5 ......................................................................................................... 16

## Rules

Fed. R. Civ. P. 12(b)(1) ................................................................................................... 1, 7

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 1, 7

## Other Authorities

34 Cong. Rec. H10409-01, 1988 WL 178796 (daily ed. Oct. 19, 1988) ...................... 15

David A. Elder, *Privacy Torts* § 3:5 (Dec. 2021 Update) ....................................... 12, 13

NBA.com, https://nba.com ............................................................................................ 4

NBA.com, Watch: Featured, https://www.nba.com/watch/featured ............................................ 3

Restatement (Second) of Torts § 652F cmt. b (Am. Law Inst. 2022 Update) ............................ 13

Defendant National Basketball Association ("NBA") submits this memorandum of law in support of its motion to dismiss the putative class action complaint filed by Michael Salazar ("Mr. Salazar"), *see* Dkt. 1 (the "Complaint" or "Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Mr. Salazar's lawsuit seeks to impose potentially enormous liability under the Video Privacy Protection Act ("VPPA")—a 1988 law intended to prevent "video tape service providers" from disclosing their customers' records without consent—for utterly routine internet browsing activities. Mr. Salazar claims that he is entitled to hefty statutory damages because he accessed freely available online video content and his own device's browser sent information about his browsing behavior to Facebook. Mr. Salazar does not allege any actual damages from his choice to watch videos on the NBA's website. Nor could he, given, among other defects, that he expressly consented to the precise information-sharing of which he now complains. Mr. Salazar nonetheless asks this Court to find a violation of the VPPA for which he, and potentially numerous other individuals who engaged in similarly banal browsing activity (and who similarly consented to the routine and harmless information-sharing that followed) should purportedly be compensated. The Court should reject this effort.

Dozens of virtually identical class action VPPA suits are currently pending around the country, including at least ten nearly identical pending complaints filed by Mr. Salazar's attorneys alone, with cookie-cutter allegations that lack any meaningful tailoring to the website at issue. Mr. Salazar's Complaint, in particular, suffers from several fatal defects.

First, he fails to allege any injury in fact and thus lacks Article III standing. *See infra* Section I. Second, the Complaint fails to plausibly state a claim. VPPA claims are available only: (i) to "consumers" (i.e., "renter[s], purchaser[s], or subscriber[s]" of a provider's "video tape

1

service[s]"); (ii) against a defendant who knowingly disclosed "personally identifiable information" ("PII"); (iii) without plaintiff's consent. But Mr. Salazar is *not* a "renter, purchaser, or subscriber" of "video tape services" from the NBA (*see infra* Section II.A); the NBA did *not* knowingly disclose PII about him (*see infra* Section II.B); and Mr. Salazar *did* consent to the disclosures alleged (*see infra* Section II.C). No factual discovery will alter these fatal legal flaws. Mr. Salazar's allegations, even taken as true, fall outside any plausible interpretation of the statute.

Additionally, counsel's effort to pursue these claims on a class basis must be rejected. Mr. Salazar consented to the NBA's Terms of Use, which include an enforceable agreement that any disputes will be resolved on an individual basis and neither Mr. Salazar nor the NBA will bring any claims as part of a "purported class . . . proceeding." *See infra* Section III. Plaintiff has waived the ability to bring claims on a class basis, and the class allegations should be dismissed.

## FACTUAL BACKGROUND

A.    The NBA Offers a Wide Variety of Content to Users.

The NBA operates a men's professional basketball league in North America. The NBA's website, NBA.com, features a broad selection of video content and non-video offerings, including digital news, league standings and analysis, and team updates. *Cf.* Compl. ¶ 13; *see also id.* ¶ 39. Mr. Salazar does not allege that any of this content is restricted to any "subscriber," nor could he, as the NBA offers the content described in the Complaint freely to all internet visitors. Instead, Mr. Salazar alleges that he recently became a "digital subscriber of NBA.com," by which he means that he "sign[ed] up for an online newsletter." *Id.* ¶¶ 20, 46. This sign-up consisted merely of providing his email address to a mailing list. *Id.* Signing up did not even provide Mr. Salazar the ability to create a password, or allow him to log into anything. Nor does Mr. Salazar allege that he registered for an actual video content subscription account on NBA.com, such as NBA League Pass (which is separately available for a fee). Rather, the only goods and services Mr. Salazar

2

identifies as receiving through his "subscription" are "emails and other communications from NBA.com"—none of which are alleged to include the delivery of any video content. *Id.* ¶ 46.

Critically, the video content Mr. Salazar alleges to have viewed on NBA.com is freely accessible (at no cost and requiring no registration, subscription, or account login) to any casual site visitor.[1]  The content has nothing to do with his purported newsletter "subscription."  Mr. Salazar does not allege any subscription or registration is necessary to access the video content he viewed.  Indeed, the open-access nature of the video content at issue is explicitly acknowledged in the Complaint.  In the screenshot depicted in paragraph 39, which Mr. Salazar admits is "publicly available evidence," a general "user" (i.e., not a "subscriber" of any kind) visits NBA.com and clicks a link to watch a video titled "How will pieces come together for the Lakers?"  *Id.* ¶ 39.  The screenshot includes in the top right corner a link labeled "Sign In," making clear the user is not signed in to any account or subscription, yet may nevertheless view video content.  *Id.*

B.       The NBA Clearly Discloses Data Collection and Disclosure in Its Privacy Policy.

All NBA.com users consent to the league's Privacy Policy when they navigate to NBA.com.  A pop-up banner immediately appears that states:  "If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use."  Preston Decl. ¶ 3, Ex. A (screenshot of pop-up).  This pop-up banner does not leave the screen until a user affirmatively clicks "I Accept" or the "X" in the upper right-hand corner of the pop-up.  If a user closes the pop-up, it will automatically reappear the next time the user visits the site.  The Privacy Policy, which exists in a standalone document on NBA.com, is hyperlinked in the banner, allowing all users to review the disclosure terms prior to accessing any

---

[1]      *See*, *e.g.*, videos accessible through NBA.com, Watch: Featured, https://www.nba.com/watch/featured (last accessed Nov. 30, 2022).

videos or navigating to any other content on NBA.com.  Screenshots of this notice, as seen on desktop and mobile browsers, respectively, are below:



*(Banner on Desktop Browser)*



*(Banner on Mobile Browser)*

*See id.*  Moreover, a user who signs up for an email newsletter, as Mr. Salazar alleges to have done, is *again* given notice of the same Privacy Policy and Terms of Use at the point they submit their email address and in doing so, agrees to both.[2]

---

[2] The email sign-up widget—captioned "Want every headline right at your fingertips? Sign up to receive NBA emails!"—is visible on the lower righthand side of the NBA.com homepage.  *See* NBA.com, https://nba.com (last accessed 11/30/22).

Obviously aware of its existence and contents, Mr. Salazar directly cites to the NBA's operative Privacy Policy in the Complaint.  Compl. ¶¶ 27-28.  As the Complaint itself calls out, the Privacy Policy affirmatively discloses that the use of NBA.com by any user may result in the collection of "[u]sage data, such as the programs and features you access" regardless of whether the user is, by any definition, a "subscriber."  Compl. ¶¶ 27-28.  And despite Mr. Salazar's statement that "nowhere . . . is it disclosed" that his "Personal Viewing Information" will be shared "with third parties, including Facebook" (*id.* ¶ 29), Sections 4 and 8 of the Privacy Policy do precisely that.  Section 4 conspicuously states:

> **With Partners and Third Parties.**  We may share your information with certain business partners so that they can provide you with special offers, promotional and other materials that may be of interest to you.  *We share personal data with partners and third parties as part of marketing and advertising on and off of the Services.*  We may use third-parties to serve advertisements on the Services.  *These third parties may set their own cookies or similar web technologies to collect information about users' online activities over time and across websites.*  For more information about how these third parties use your data and how you can manage these technologies, please see the "Cookies and Similar Technologies" section of this Policy below.

Preston Decl. ¶ 6, Ex. D at 3 (emphasis added).  Moreover, in Section 8, Facebook is specifically identified as a potential recipient of the user activity data:

> **Social Media Providers (e.g., Facebook, Twitter).**  We offer you the ability to share your experience on our Services with your friends and followers on certain social media platforms.  *These social media providers may collect information about you, including your activity on our Services.*  These social media providers may also notify your friends, both on our Services and on the social media platforms, that you are a user of our Services or about your use of our Services.  *If you choose to access or use third-party social media platforms, we may receive information about you that you have made available to those social media providers*, including information about your contacts on those social media platforms.  Your interactions with those social media providers and platforms are governed by the privacy policy of the third party providing that service.

*Id.* at 7 (emphasis added).

Again, Mr. Salazar (like any user browsing NBA.com) consented to this Privacy Policy and the site's Terms of Use. The disclosure of which Mr. Salazar complains falls squarely within the uses described in the Privacy Policy: a "social media provider[]" (i.e., Facebook) "may collect information about [him], including [his] activity" on NBA.com. *Id.*; *see also* Compl. ¶¶ 31-33, 39-40.

      C.    <u>The User's Device and Browser Control the Mechanics of the Alleged Disclosure.</u>

The Complaint alleges that PII is disclosed when the Facebook ID ("FID") and URL video link are combined and shared with Facebook. But the Complaint acknowledges that a user's FID is stored only (if at all) in a cookie on the user's own device browser. Compl. ¶ 33. The Privacy Policy explains that "[c]ookies are small text files that are unique to [a user's] device or browser" and that third parties (such as Facebook) may use such technology when users access the services on NBA.com. Preston Decl. ¶ 6, Ex. D at 5 (Section 6). Indeed, the Complaint does not allege that the NBA ever actually *possesses* FID information. *Cf.* Compl. ¶ 36 (alleging "database" of certain information, without mention of FIDs).

Nor does the Complaint assert that the alleged disclosure itself was made *by Defendant*. To the contrary, the disclosure is alleged to originate with a user's browser and to be sent by that browser directly to Facebook. *Id.* ¶ 33. This is allegedly the result of the "Facebook tracking pixel," which as the Complaint explains, consists of "code from Facebook," not the programming of the NBA. *Id.* ¶ 31. Further, the Complaint makes clear that the information is "sent *from the device* to Facebook," not from the NBA to Facebook. *Id.* ¶ 40 (emphasis added). At no point does the Complaint allege (nor could it) that the disclosure shown in paragraph 40 originates from, or is transmitted to, the NBA. Notably, the Complaint does not allege that the pixel-generated disclosure includes any personal information possessed by the NBA—no names, email addresses, IP address data, or any other information purportedly collected when Mr. Salazar signed up for the

6

newsletter. *Id.* ¶¶ 20, 36, 46. The alleged identifying information is simply the "c_user" field—a string of numbers ("100003190670927")—sent from a user's device. *Id.* ¶ 40. No further disclosure occurs or is alleged.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed "for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (citation omitted) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "[T]o establish standing, [Mr. Salazar] must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Mr. Salazar bears "the burden of demonstrating that [he has] standing" at the pleading stage and "must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 2207-08 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory allegations are not entitled to the presumption of truth on a motion to dismiss, and a plaintiff "armed with nothing more than conclusions," "labels," or "[t]hreadbare recitals of the elements of a cause of action" fails to state a claim. *Id.* at 678-81 (citation omitted). Claims that are merely possible or conceivable are subject to dismissal. *Id.* at 679-80.

"In resolving a motion to dismiss . . . , a district court . . . may refer" to appropriate "evidence outside the pleadings," *Makarova*, 201 F.3d at 113; *accord Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016), including "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)).  When allegations in a complaint are contradicted by documents attached thereto, documents incorporated by reference therein, or matters of public record, such allegations are not entitled to the presumption of truth on a motion to dismiss.  *See, e.g.*, *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 399-400 (S.D.N.Y. 2002) (rejecting allegations in a complaint that plainly contradicted a release and waiver incorporated into the complaint).  "Matters judicially noticed by the District Court are not considered matters outside the pleadings."  *In re Thelen*, 736 F.3d at 219 (alteration omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008)).

Here, the Court can consider all of NBA.com's content because it is incorporated by reference into the Complaint, is central to Mr. Salazar's allegations, and its authenticity is not in question.[3]  The Privacy Policy and Terms of Use, attached for ease of reference as exhibits to the accompanying declaration, are explicitly incorporated by reference in, or are integral to, the Complaint, *see* Compl. ¶¶ 27-29, and are considered part of the pleadings for purposes of a Rule

---

[3] *Orozco v. Fresh Direct, LLC*, No. 15-cv-8226, 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016) (assessing the "totality" of a website "incorporated by reference" into a complaint "at the center of Plaintiff['s] allegations" in resolving a motion to dismiss); *see In re UBS Auction Rate Secs. Litig.*, No. 08-cv-2967, 2010 WL 2541166, at *15 (S.D.N.Y. June 10, 2010) ("The Second Circuit, and several district courts in this Circuit, have found it appropriate to take judicial notice of the contents of a party's website for the fact of its publication.").

12(b)(6) motion.  *See Wilson v. Veritas Consulting Grp. Inc.*, No. 21-cv-8318, 2022 WL 4227145, at *1 (S.D.N.Y. Sept. 13, 2022).

**ARGUMENT**

**I.     Mr. Salazar Lacks Article III Standing.**

Mr. Salazar lacks standing under the Supreme Court's recent *TransUnion* decision.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203-07 (2021).  A plaintiff lacks standing absent an actual injury in fact, and the Complaint is bereft of any allegations that the complained-of disclosures caused Mr. Salazar any discernible real-world injury.  *See id.*  The handful of scattered, boilerplate references to "injur[y]," "harm[]," and undefined "benefits" of which Mr. Salazar was allegedly "deprived," Compl. ¶¶ 49, 53, 56, are "unadorned, the-defendant-unlawfully-harmed-me accusation[s]"—which fail to satisfy well-established standards.  *Iqbal*, 556 U.S. at 678.

Nor can Mr. Salazar meet the Supreme Court's test for standing by alleging a bare statutory violation.  As the Second Circuit has recognized, *TransUnion* significantly "narrowed the grounds for asserting standing where the [purported] injury is primarily statutory," *Faehner v. Webcollex, LLC*, No. 21-1734-cv, 2022 WL 500454, at *1 (2d Cir. Feb. 18, 2022) (summary order), holding that Congress "may not simply enact an injury into existence."  *TransUnion*, 141 S. Ct. at 2205 (citation omitted).  Under *TransUnion*, a plaintiff must show that they personally suffered either tangible harms (generally physical or monetary), or an "intangible harm[]" that has "a *close relationship* to harms traditionally recognized as providing a basis for lawsuits in American courts."  *Id.* at 2204 (emphasis added).  Mr. Salazar does not claim a physical or monetary harm, and thus must identify "a close historical or common-law analogue for [his] asserted injury" that has been "traditionally recognized" as a basis for suit.  *Id.*

Crucially, *TransUnion* "clarified" that it is of "little (or no) import" whether the "*type* of harm that a statute protects against" has a relationship to harms traditionally regarded as providing

9

a basis for suit. *Maddox v. Bank of N.Y. Mellon Trust Co.*, 19 F.4th 58, 64 n.2 (2d Cir. 2021) (emphasis added). Instead, the analysis is plaintiff-specific: "what matters is 'whether the alleged injury *to the plaintiff* has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Id.* (quoting *TransUnion*, 141 S. Ct. at 2204) (internal quotation marks omitted). Thus, after *TransUnion*, it is black-letter law "that, where a key element of the analogous common-law or historical harm is missing, the plaintiff lacks standing." *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) (quoting *Kola v. Forster & Garbus LLP*, No. 19-cv-10496, 2021 WL 4135153, at *6 (S.D.N.Y. Sept. 10, 2021)).

Any effort by Mr. Salazar to rely on pre-*TransUnion* cases drawing broad-brush analogies to common-law privacy torts to undermine this analysis should be rejected.[4] Whatever the state of the law may have been prior to *TransUnion*, the Second Circuit has recognized that *TransUnion* represents a significant "change in standing doctrine," which "narrowed the grounds for asserting standing where the injury is primarily statutory." *Faehner*, 2022 WL 500454, at *1. To the extent pre-*TransUnion* cases have relied on broad analogies between the VPPA and traditional privacy torts—without asking whether the *plaintiff* suffered *specific* injuries with a "close relationship" to those redressed by such torts—they are superseded by *TransUnion*. Thus, Mr. Salazar "must show that the [alleged] statutory violation caused" him actual harm, concretely and in fact. *Maddox*, 19 F.4th at 64 & n.2. Mr. Salazar does not—and cannot—satisfy this requirement.

---

[4] *E.g.*, *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016). Some pre-*TransUnion* cases relied on distinctions between "procedural" and "substantive" statutory violations, rooted in a particular interpretation of *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). But, as the Second Circuit held in *Maddox*, *TransUnion* "eliminated" the entire "substantive" vs. "procedural" analytic framework. *Maddox*, 19 F.4th at 64 & n.2. And *Hunstein v. Preferred Collection & Management Services*, 48 F.4th 1236 (11th Cir. 2022) (en banc), eviscerated the Eleventh Circuit's opinion in *Perry*.

Mr. Salazar falls well short of *TransUnion*'s standards.  He alleges no *tangible* harm, such as monetary loss, and does not offer a credible theory of intangible harm, such as reputational damage or embarrassment.  Rather, he merely alleges that his use of NBA.com while logged into Facebook resulted in Facebook learning something truthful about him.  Even if true, that allegation does not bear a passing resemblance, let alone a "close relationship," to any harm traditionally recognized as a basis for a lawsuit, nor does it demonstrate any actual harm.  It is not "traditionally recognized" that there is a legally cognizable injury-in-fact whenever one person communicates truthful information about another (with or without consent).

On the contrary, it has been "traditionally recognized" that such communication is generally lawful.  *Cf. Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (restrictions on "truthful speech" are constitutionally allowable only in rare and extraordinary circumstances (citation omitted)).  Accordingly, under *TransUnion*, Congress could not allow a plaintiff to sue in federal court simply because someone truthfully told a third party—through a mechanism to which he consented—that he watched Knicks highlights.  If such banal activity could be "enact[ed]" into the status of an injury-in-fact, Article III's standing requirements would be robbed of all meaning. *TransUnion*, 141 S. Ct. at 2205 (citation omitted).

While certain narrowly defined "disclosure[s] of private information" have traditionally constituted a basis for suit, *id.* at 2204, none bears any relationship to the disclosures Mr. Salazar alleges, let alone a "close" relationship.  Here, Mr. Salazar alleges that his information was disclosed "to Facebook"—not to other Facebook users—which "then uses [it] to show [him] targeted ads."  Compl. ¶ 30*; accord id. ¶* 37 (referring to "Facebook" as "*the*" (singular) "recipient of the Personal Viewing Information" (emphasis added)).  He does not allege the information was shared to the broader "public," or that there is any substantial risk it might be, as torts for disclosure of private facts require.  *Hunstein*, 48 F.4th at 1245-46.  Indeed, he does not even allege that "*any*

11

human being"—as opposed to an "automated system[]"—"ever saw his private information." *Sputz*, 2021 WL 5772033, at *4 (emphasis added).  The Eleventh Circuit's recent *en banc* decision in *Hunstein* held that the plaintiff lacked standing under *TransUnion* because, while he alleged *disclosure*, he had not alleged "publicity."[5]  *Id.* at 1245-48.  Although *Hunstein* involved a different statute (the Fair Debt Collection Practices Act), its standing analysis is directly relevant and would dictate dismissal here, where Mr. Salazar's injury-related allegations are materially indistinguishable from those in *Hunstein*.[6]  Recent decisions in this District have reached the same conclusion on similar facts.  *See, e.g.*, *Glick v. CMRE Fin. Servs., Inc.*, No. 21-cv-7456, 2022 WL 2475690, at *3 (S.D.N.Y. July 6, 2022); *Sputz*, 2021 WL 5772033, at *2-6.  For this reason, among others, any analogy to traditional privacy torts plainly fails under *TransUnion*.

Mr. Salazar's references to his "right to privacy" or "loss of privacy" are empty labels.  Compl. ¶¶ 67-68.  They cannot conjure standing any more than generic references to a "right to [be] free from discrimination" can do so in the absence of a concrete injury.  *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443-44 (2d Cir. 2022) (applying *TransUnion* to find lack of ADA standing).  Moreover, here, Mr. Salazar *actually consented* to the disclosure of his viewing activity.  Notably, he consented to the NBA's Privacy Policy, which alerts users to the disclosures at issue.

---

[5] Mr. Salazar may assert that the disclosure here would qualify as "publication" as that term of art is used in *defamation* law.  Even if true, any attempt to analogize his "harms" to those that give rise to a defamation action would fail:  he does not allege any of the disclosures were false or misleading, nor that they could harm his reputation.  *Cf. TransUnion*, 141 S. Ct. at 2209.

[6] In addition, public disclosure torts traditionally require that the disclosure concern "*private* facts," i.e., those that a plaintiff has "kept hidden from the public eye."  David A. Elder, *Privacy Torts* § 3:5 (Dec. 2021 Update) (citation omitted) (emphasis added).  Here, Mr. Salazar has not alleged that the disclosures revealed anything *substantively* "private," or that he has "kept hidden" information about his basketball-related media consumption.  *Cf. Kim v. McDonald's USA, LLC*, No. 21-cv-05287, 2022 WL 4482826, at *6-7 (N.D. Ill. Sept. 27, 2022) (dismissing claims asserting negligent release of personal information on similar reasoning).  Of course, even if Mr. Salazar added such allegations, his failure to allege publicity that caused him harm would be independently fatal to standing.

*See infra* Section II.C (regarding consent provided on NBA.com). Disclosure to which an individual gave consent is not traditionally recognized as a basis for a tort suit. *See* Elder, *Privacy Torts* § 3:9; Restatement (Second) of Torts § 652F cmt. b (Am. Law Inst. 2022 Update).

**II.    Mr. Salazar Fails to Allege Facts to Support a VPPA Claim.**

To plead a plausible claim under the VPPA, a plaintiff must allege facts to support that (1) he qualifies as a "consumer" of the defendant "video tape service provider"; (2) the defendant disclosed "personally identifiable information"; (3) the disclosure was made "knowingly"; and (4) the disclosure was not covered by one of the exceptions listed in Section 2710(b)(2), including those related to consent. 18 U.S.C. § 2710; *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Mr. Salazar fails in multiple ways: (A) he fails to allege facts that qualify him as a protected consumer; (B.1) he fails to allege facts showing the NBA disclosed PII; (B.2) or did so knowingly; and even if it did, the facts alleged indicate the disclosures were subject (C) to a consent exception.

**A.      Mr. Salazar Fails to Allege Facts that Qualify Him as a VPPA "Consumer."**

The VPPA's protections apply only to "consumers" of video services, where "consumer" is defined as a "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Mr. Salazar is not a "renter" or "purchaser" of any goods or services from NBA.com, and does not allege otherwise. And while he characterizes himself as a "subscriber," he does not actually subscribe to any video goods or services from NBA.com.[7] At most, he has requested email newsletters from NBA.com—none of which are alleged (i) to have contained video content or (ii) to have resulted in any third-party disclosures. In short, Mr. Salazar's "subscription" to an email newsletter bears no connection to the video services at issue,

_____

[7] The Complaint includes limited allegations about video content hosted on a mobile application, but Mr. Salazar does not allege he downloaded any such application, or even specify what application he is referring to. This discussion thus concerns only Mr. Salazar's alleged sign-up for online newsletter communications from NBA.com.

which were freely accessible to any casual site visitor, without any subscription or purchase. Therefore, Mr. Salazar is not a protected "consumer" under the plain terms of the VPPA.

Mr. Salazar does not fit the definition of a "subscriber" of "prerecorded video cassette tapes or similar audio visual materials" from NBA.com, as the term "subscriber" is ordinarily understood.  18 U.S.C. § 2710(a).  As Judge Buchwald explained in *Austin-Spearman v. AMC Network Entertainment LLC*, a "subscription" to a good or service "entails an exchange between subscriber and provider whereby the subscriber imparts money and/or personal information" to obtain the content at issue. 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015).  Such a relationship simply is absent here.  Mr. Salazar at most subscribed to an email *newsletter*, not the freely available video content he allegedly viewed on NBA.com.  That resolves this case under the VPPA's plain text.

Indeed, Judge Buchwald contemplated with skepticism the very form of remote relationship alleged here.  *Austin-Spearman* concerned a plaintiff who browsed the AMC website that used a similar Facebook tracking tool as the one Mr. Salazar alleges.  98 F. Supp. 3d at 664. The court held that "[s]uch casual consumption of web content"—simply visiting AMC's website to view videos—did not suffice to create a subscription relationship under the VPPA.  *Id.* at 669. This is precisely how the alleged video content on NBA.com is accessed; there is no requirement to log in, register, create a user ID, download any program, or take any action to associate with the NBA.  Nor does Mr. Salazar allege to have taken any such action.

In seeking leave to amend, the *Austin-Spearman* plaintiff reported in a post-briefing letter that she also signed up for an AMC newsletter.  *Id.* at 671.  The court granted leave to amend, but did so with "great reluctance," stating that it was "skeptical" the email newsletter would enable Plaintiff to state a claim.  *Id.*  (Plaintiff ultimately chose not to amend the Complaint.)  Judge Buchwald described as a "troubling question[] and implication[]" that "a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are

14

distinct and set apart from its provision of videos." *Id.* Judge Buchwald's skepticism was warranted: the statute's text-based manifest purpose is to protect renters, purchasers, or subscribers (as opposed to casual viewers) of video content, not to arbitrarily grant protections to viewers based on whether they incidentally "subscribed" to wholly unrelated materials with no connection to video content. *Cf. SEC v. Rosenthal*, 650 F.3d 156, 163 (2d Cir. 2011) (statutory interpretation must "comport[] with the statute's primary purpose" and "not lead to anomalous or unreasonable results" (alterations and citation omitted)). The legislative history of the VPPA likewise indicates that Congress considered businesses engaged in multiple types of services and intended to segregate the non-video services for purposes of the statute's application. 134 Cong. Rec. H10409-01 (daily ed. Oct. 19, 1988), 1988 WL 178796 ("simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill"). The VPPA cannot credibly be interpreted to apply where a plaintiff's only purported "subscription" relationship is distinct and set apart from a defendant's video services.

Consistent with the above, courts generally require a "deliberate and durable" ongoing commitment, relationship, or association between a person and the provider to qualify as a subscriber under the VPPA. *Austin-Spearman,* 98 F. Supp. 3d at 669; *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015). Mr. Salazar's request for email newsletters fails to satisfy any ongoing commitment or relationship. While courts may differ on the threshold for establishing such a relationship, the relevant rulings universally support the foundational concept that the subscription relationship must have been formed *in exchange for* the video services at issue. *Austin-Spearman,* 98 F. Supp. 3d at 669; *Ellis*, 803 F.3d at 1256. As discussed, "'subscription' entails *an exchange* between subscriber and provider whereby the subscriber imparts money and/or personal information *in order to receive a future and recurrent benefit*."

*Austin-Spearman*, 98 F. Supp. 3d at 669 & n.3 (emphasis added); *see also Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (acknowledging subscriber relationship because plaintiff "ha[d] to provide [defendant] with personal information" as "access was not free of a commitment to provide consideration"); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1343 (11th Cir. 2017) (finding no subscriber relationship where the purported relationship was not necessary "in order to gain access to" the content in question).

Mr. Salazar may have provided an email address to Defendant, but he certainly did not do so in exchange for the already freely accessible video content on NBA.com. The Complaint itself makes this clear, as its screenshot shows a user accessing video content without signing in. *See supra* Factual Background; Compl. ¶ 39 (with screenshot of video page demonstrating that the user has not used the website's "Sign In" function). The commitment-free nature of the NBA.com video content Mr. Salazar alleges to have viewed obviates any necessary exchange, thereby precluding that it was part of any VPPA-protected "subscription."

B.   **The NBA Did Not "Knowingly Disclose" Any PII.**

1.   **Mr. Salazar's Device, Not the NBA, Disclosed the Alleged PII.**

The plain text of the statute makes clear that VPPA claims may only be brought against a defendant "who knowingly discloses" the PII at issue (18 U.S.C. § 2710(b)(1))—i.e., the defendant must be *the party doing the disclosing*. Should Congress have wanted to extend VPPA liability to those who merely *cause* a disclosure, it could have crafted the statute that way. Indeed, it has done so before. *See, e.g.*, 15 U.S.C. § 6821 (prohibiting any person to "*cause to be disclosed . . . customer information of a financial institution*" (emphasis added)).[8] Theories that a defendant has

---

[8] *See also* 18 U.S.C. App. 3 § 5 ("defendant reasonably expects to disclose *or to cause the disclosure* of classified information" (emphasis added)); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, *or to cause the disclosure of*, classified information" (emphasis added)).

done some act that may lead to a PII disclosure *by someone else* cannot, as a matter of law, state a VPPA claim.  *See Mollett*, 795 F.3d at 1066-67 (rejecting VPPA claim where disclosure was controlled by plaintiff, not defendant).  Nor can a defendant be liable for a VPPA violation where the defendant never in fact possessed the PII alleged to have been disclosed.  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (rejecting VPPA claim where defendant never possessed the information necessary to actually identify plaintiff).  Both deficits are present here.

First, the NBA does not disclose the alleged PII.  As the Complaint explains, "code from Facebook" causes "the digital subscriber['s] identity and viewed Video Media to be transmitted to Facebook *by the user's browser*."  Compl. ¶¶ 31, 33 (emphasis added).  This point is clarified by the Complaint's own exemplar web session.  *Id*. ¶¶ 39-40.  Mr. Salazar shows an HTTP request allegedly demonstrating the disclosure of "the content name of the video" and the FID.  *Id.* ¶ 40.  As the caption explains, this HTTP request is "sent *from the device* to Facebook," not from the NBA.  *Id.* (emphasis added).  No other example is given in the Complaint of alleged conduct that violates the VPPA.  Mr. Salazar's own example shows the complained-of disclosure is made by his device's browser, not the NBA.

Second, as also made clear by the Complaint, the NBA never has access to a user's FID, and thus cannot have disclosed it to Facebook.  Compl. ¶ 12.  The disclosure of PII under the statute requires proof of at least "[1] the consumer's identity; [2] the video material's identity; and [3] the connection between them."  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095-96 (N.D. Cal. 2015).  The VPPA does not prohibit all disclosures of video viewing data—only data that connects that information to a specific user.  *Id.*  Because, as the Complaint makes clear, the NBA never had FID information, the NBA *cannot* disclose the viewer's identity, and Plaintiff's claim fails.  *Cf.* Compl. ¶¶ 5, 62.  To be clear, the only source of FID information about a user alleged in the Complaint is "one or more personally identifiable FID cookies *on [the user's] browser*."  *Id.*

17

¶ 33 (emphasis added); *see supra* Factual Background, Section C.  This information only exists on a user's browser, where it is placed when the user logs on to Facebook, not the NBA's website. *See* Compl. ¶ 12 ("During the relevant time period [Mr. Salazar] has used his NBA.com digital subscription to view Video Media through NBA.com and/or App [sic] *while logged into his Facebook account*." (emphasis added)).  Nowhere does the Complaint allege that Mr. Salazar provided a FID to the NBA.

In short, Mr. Salazar's device, not the NBA, disclosed the alleged PII at issue, and the NBA never even had access to that PII.  That is dispositive here.  The situation is factually analogous to the Ninth Circuit's decision in *Eichenberger*, rejecting a VPPA complaint against ESPN because ESPN "never disclosed and apparently never even possessed" PII.  876 F.3d at 986.  Similarly, as in *Mollett*, where the disclosure was controlled by plaintiff's own conduct and occurred on their own device, Mr. Salazar's *own actions*—signing into Facebook and visiting NBA.com—triggers his *own device browser* to make the disclosure.  795 F.3d at 1066-67.  The plain text of the VPPA does not permit such loose theories of liability.

### 2. The NBA Did Not "Knowingly" Disclose PII

Even if the NBA disclosed PII to Facebook (which it did not), such a disclosure was not done "knowingly."  To violate the VPPA, a defendant must "knowingly disclose[]" PII.  18 U.S.C. § 2710(b)(1).  As explained in *In re Hulu Privacy Litigation*, "'knowingly' means consciousness of transmitting the private information.  It does not merely mean transmitting the code."  86 F. Supp. 3d at 1095.  Therefore, "[i]f [defendant] did not know that it was transmitting both an identifier and the person's video watching information, then there is no violation of the VPPA." *In re Hulu Priv. Litig.,* No. 11-cv-03764, 2014 WL 1724344, at *15 (N.D. Cal. Apr. 28, 2014).

Here, the Complaint alleges that the NBA's knowledge is evidenced by "the functionality of the pixel," because it "enabled NBA.com and [the] accompanying app to show targeted

advertising." Compl. ¶ 35. But these allegations read the knowledge requirement out of the VPPA entirely. While Facebook (and apparently Plaintiff) may know what data is contained in the "c_user" cookie, nothing is alleged to suggest that *the NBA* had any idea what was contained there, or even that the NBA was capable of accessing it. Nor is it alleged that the NBA knew a FID was specifically being transmitted by virtue of the Pixel's operation. Even if the NBA did know that FIDs were sent by the Meta Pixel generally, Mr. Salazar does not allege that the NBA is able to see whether a user is logged in to Facebook, and thus know whether any content served by NBA.com may cause a person's FID to be sent to Facebook. As discussed, the NBA did not receive or store FIDs, and did not transmit any PII. *See supra* Section II.B.1. The bare allegation that the NBA knows the end result of Meta Pixel's operation (i.e., targeted advertising) cannot suffice to show that the NBA was knowingly disclosing PII.

C.   **Mr. Salazar Consented to the Complained-of Disclosures.**

Even if the NBA knowingly disclosed Mr. Salazar's PII (which it did not), Mr. Salazar's claim still fails because he consented to the disclosures in the manner set forth in Section 2710(b)(2)(B) of the VPPA. The VPPA allows disclosure of a consumer's PII when the disclosures are made with a consumer's "informed, written consent." 18 U.S.C. § 2710(b)(2)(B). Under Section 2710(b)(2)(B), the written consent must (1) be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," (2) be given at the time disclosure is sought or given in advance for a set period of time not to exceed two years, and (3) provide the consumer with the ability to opt out from disclosures "in a clear and conspicuous manner." *Id.* Here, Mr. Salazar acknowledges the existence of and cites to the NBA's "operative Privacy Policy." Compl. ¶ 27. Because (1) Mr. Salazar consented to the terms of the Privacy Policy and (2) the Privacy Policy complies with the statutory consent requirements of Section 2710(b)(2)(B), his VPPA claim necessarily fails.

### 1.     Mr. Salazar Admits He Consented to the NBA's Privacy Policy.

Mr. Salazar alleges to have signed up for email newsletters and other communications from NBA.com, which necessarily required him to agree to the NBA's Terms of Use and Privacy Policy. Compl. ¶ 46; *see supra* Factual Background, Section B.  In addition, when a user visits NBA.com, they are faced with a prominent cookie banner.  *See* Preston Decl. ¶ 3, Ex. A (screenshot of pop-up); *see also supra* Factual Background, Section B.  In order to view the site unobstructed, a user must either agree to the Cookie Policy, Terms of Use, and Privacy Policy, or close the banner.  *See* Preston Decl. ¶ 3, Ex. A.  The cookie banner states in no uncertain terms:  "We use cookies to provide you with the best online experience.  If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use."  Each policy referenced in the cookie banner is presented via hyperlink.  This banner persists, reappearing each time a user visits the site until the user selects "I Accept."  When Mr. Salazar visited the site, he either (i) accepted the policy by selecting "I Accept" or (ii) affirmatively pressed forward in his use of the site despite being on clear notice of the Privacy Policy.  Either option amounts to consent to the Privacy Policy.

Courts have frequently upheld agreements of the sort used in both the newsletter signup and cookie banner as valid and enforceable across a wide range of contexts.  *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d. Cir. 2017).  Thus, by engaging with NBA.com in the manner alleged, Mr. Salazar consented to the NBA's Privacy Policy—a point which Mr. Salazar does not appear to dispute.  *See* Compl. ¶ 27.

### 2.     The NBA's Privacy Policy Specifically Addresses the Alleged Disclosure.

The Complaint points to specific language in the Policy itself as evidence that NBA.com tracks "[u]sage data, such as the programs and features you access," for all users.  Compl. ¶¶ 27-

28.  And Sections 4 and 8 of the Privacy Policy ("How We Share and Disclose Data," and "Third

Party Sites and Sections") describe precisely the type of disclosure alleged by Mr. Salazar.  *See*

*supra* Factual Background, Section B.  This includes disclosing that:

- "personal data" (including the data programs and features users access on the site) may be shared "with partners and third parties as part of marketing and advertising on and off of the Services";
- "These third parties may set their own cookies or similar web technologies to collect information about users' online activities over time and across websites";
- "social media providers may collect information about you, including your activity on our Services."

Preston Decl. ¶ 6, Ex. D at 3, 7.  Thus the Privacy Policy—to which Mr. Salazar consented and

which he incorporated by reference into his Complaint—discloses that:  (1) his usage data may be

tracked, including content; (2) such data may be shared with third parties, including social media

platforms, for advertising outside of the NBA.com environment; and (3) third-party social media

platforms may collect information (such as a FID) about Mr. Salazar's particular activity on

NBA.com.  This is precisely the disclosure alleged in the Complaint.  Compl. ¶ 32.

### 3.      The NBA's Privacy Policy Satisfies the VPPA.

#### a.      *Distinct and Separate.*

The VPPA requires consent "in a form distinct and separate from any form setting forth

other legal or financial obligations of the consumer."  18 U.S.C. § 2710(b)(2)(B)(i).  Here, Mr.

Salazar consented to both the NBA's Terms of Use and the Privacy Policy when he signed up to

receive "emails and other communications from NBA.com."  Compl. ¶ 46; *see supra* Factual

Background, Section B.  These are two distinct documents.  While the Terms of Use may impose

other "obligations" on the user (such as an obligation not to pursue class claims, *see infra* Section

III), the Privacy Policy focuses solely on how data is managed and potentially disclosed.  Thus,

the NBA obtained Mr. Salazar's consent in a distinct and separate form under Section

2710(b)(2)(B)(i).

b.      *Timing Requirements.*

The NBA also satisfied the requirement that consent be "given at the time the disclosure is sought" under Section 2710(b)(2)(B)(ii)(I).  As Mr. Salazar acknowledges, the Privacy Policy is not limited to those who register with the site, but applies broadly to all users.  *See* Compl. ¶ 27 ("operative Privacy Policy for NBA.com states that it collects 'Personal Information' from its users").  And, indeed, all NBA.com users consent to the Privacy Policy when they initially navigate to NBA.com, where a pop-up banner appears that states:  "If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use."  Preston Decl. ¶ 3, Ex. A (screenshot of pop-up).  Thus, the NBA obtains the user's consent at the point the disclosure—caused by visiting the site—is sought.  And the opportunity to opt out exists at any point thereafter.  *See infra* Section II.C.3.c.  This approach is consistent with normal industry practice regarding the way websites display their privacy policies and obtain consent— practices that Congress was surely aware of when it amended the VPPA in 2012 to allow "consumers greater flexibility to share their video viewing preferences."  *Ellis*, 803 F.3d at 1253.

c.      *Opt-out Optionality.*

Finally, the NBA's Privacy Policy provides users with the ability to opt out of the collection and sharing of their data in a "clear and conspicuous manner."  18 U.S.C. § 2710(b)(2)(B)(iii).  Any visitor to any webpage on NBA.com will see a link entitled "Do Not Sell My Personal Information" in the footer.  This link is provided among other legal notices, is present on every page on NBA.com, and is therefore "clear and conspicuous."  Preston Decl. ¶ 4, Ex. B.  Any user clicking that link will be presented with a menu, from which they can disable Meta Pixel under "Information Associated with Your Device."  As the notice below the slider switch states:

> Our partners use technologies, such as pixels, to collect information associated with your device.  Our partners use these technologies to document how you engage with our site or app and may use this information for advertising and other purposes.

*Id*.  It then explains that users may "opt out" of allowing "partners to use this information for advertising purposes" by simply switching the provided toggle to "off."  *Id.*  With a simple swipe of the slider, the Meta Pixel will be disabled for the user across all pages on NBA.com, thereby opting out of any disclosures to Meta.

Additionally, users receive a pop-up notice of the Privacy Policy and Terms of Use the moment they visit the website, and again at the point of registering for emails from NBA.com, where notice of the applicable Privacy Policy is given just beneath the "Submit" button.  *See supra* Factual Background, Section B.  Because notice of the NBA's Privacy Policy is given just below the "Submit" button, the Policy and its contents are clear and conspicuous.  *See Meyer*, 868 F.3d at 78-79 (holding "clear and reasonably conspicuous" notice established where user did "not need to scroll beyond what is immediately visible to find notice of the Terms of Service" when creating account).  The portion of Section 4 of the Privacy Policy cited above (concerning "How We Share and Disclose Data" "With Partners and Third Parties") hyperlinks to additional information in Section 6 about "Cookies and Similar Technologies" that includes specific instructions for how to opt-out of data collection, sharing, and internet advertising.  Preston Decl. ¶ 6, Ex. D at 3, 4-6.

## III.    The Court Should Dismiss the Complaint's Class Allegations.

Even if the Court declines to dismiss the Complaint in its entirety, it should nevertheless dismiss the class claims with prejudice.  Mr. Salazar consented to the NBA's Terms of Use, *see supra* Section II.C, which provide that the claims he now asserts must be pursued exclusively on an individual basis.

A "complete, clear, and unambiguous" contractual provision "must be enforced according to the plain meaning of its terms."  *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d. Cir. 2019) (citation and alterations omitted).  That includes class action waivers.  *See, e.g.*, *Horton v. Dow Jones & Co.*, 804 F. App'x 81, 84 (2d Cir. 2020) (summary

order).  The class action waiver found in the NBA's Terms of Use is unambiguous.  The Terms of

Use state in bold text and all caps "**CLASS ACTION WAIVER**."  Preston Decl. ¶ 5, Ex. C at 21.

Under that heading, the Terms of Use provide that the parties agree to "resolve any disputes, claims

or controversies on an individual basis, and that any claims brought under these Terms of Use in

connection with the Site *will be brought in an individual capacity, and not on behalf of, or as part*

*of, any purported class, consolidated, or representative proceeding*."  *Id.* (emphasis added).

Courts frequently uphold class action waiver provisions employing similar language.  *See, e.g.*,

*Horton*, 804 F. App'x at 84 (2d Cir. 2020) (upholding class action waiver in which plaintiff agreed

that "class arbitrations and class actions are not permitted and, by entering into this Agreement,

you are giving up the ability to participate in a class action"); *U1it4Less, Inc. v. FedEx Corp.*, No.

11-cv-1713, 2015 WL 3916247, at *1, 6 (S.D.N.Y. June 25, 2015) (upholding class action waiver

in which Plaintiff agreed not to sue "as a class plaintiff or class representative" or "participate as

an adverse party in any way in a class action lawsuit"); *see also Roman v. Spirit Airlines, Inc.*, 482

F. Supp. 3d 1304, 1309, 1315 (S.D. Fla. 2020) (upholding class action waiver in which plaintiff

agreed that any case brought under the operative contract "must be brought in a party's individual

capacity and not as a plaintiff or class member in any purported class or representative

proceeding"), *aff'd*, No. 20-cv-13699, 2021 WL 4317318 (11th Cir. Sept. 23, 2021) (per curiam).

One court in this District has held that "principles of contract law strongly support

enforceability" of class action waivers unless (1) "the class action waiver at issue is unconscionable

under the applicable state law"; or (2) "the statutory scheme . . . suggests legislative intent or policy

reasons weighing against enforcement of such a waiver."  *U1it4Less*, 2015 WL 3916247, at *4.

Neither exception is present in this case and therefore the NBA's class action waiver should be

enforced.  Courts have held that "[u]nder New York law, . . . 'a contractual proscription against

class actions is neither unconscionable nor violative of public policy.'"  *Horton*, 804 F. App'x at

84 (quoting *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (1st Dep't 2004)). Moreover, nothing about the VPPA's statutory scheme weighs against enforcement of a class action waiver.  There are no provisions within the VPPA that contemplate a congressional command in favor of class action lawsuits.  *See* 18 U.S.C. § 2710.  Nor does case law decided under the VPPA suggest any such a command.  *See T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-cv-7915, 2022 WL 888943, at *13 (N.D. Ill. Mar. 25, 2022) (granting final approval of a class action settlement of VPPA claims and state law claims and stating, in *dicta*, that a class would "likely have little success challenging the arbitration and class action agreement, given the strong presumption in favor of enforceability"), *appeal dismissed*, No. 22-1686 (7th Cir. Aug. 22, 2022). Mr. Salazar consented to the NBA's unambiguous and enforceable class action waiver; the Court should dismiss Mr. Salazar's class claims with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated:  December 2, 2022

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

By: */s/ Hilary L. Preston*

Hilary L. Preston
Palmina M. Fava
Marisa Antonelli
1114 Avenue of Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
pfava@velaw.com
mantonelli@velaw.com

*Counsel for National Basketball Association*

25