# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL SALAZAR, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

NATIONAL BASKETBALL ASSOCIATION,

     Defendant.

Case No. 1:22-cv-7935-JLR

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### (FILED IN RESPONSE TO ECF NOS. 21, 22)

# **TABLE OF CONTENTS**

Introduction ................................................................................................................1

Argument ...................................................................................................................2

   A.  Mr. Salazar has standing to pursue the VPPA claims..........................................3

   B.  Plaintiff Has Plausibly Pleaded His VPPA Claim. ...............................................7

       1.  Mr. Salazar has plausibly plead that he is a "consumer" of a "good or service" under the VPPA .........................................................................7

       2.  Plaintiff Has Pleaded a Knowing Disclosure of Personally PII.....................9

           a.  The NBA knowingly held the door open for Facebook to walk in and access Mr. Salazar's PII ......................................................9

           b.  The Facebook ID – on its own – constitutes PII ....................................10

   C.  Nothing in the record demonstrates Plaintiff's unambiguous consent ..............11

       1.  The NBA's cookie banner is a browsewrap contract of adhesion ..............11

       2.  The NBA's cookie banner makes no effort to impress upon its users of the importance of the binding contract or that the user's legal rights are being impacted by continuing to browse ........................................13

       3.  No Reasonable Person Is Put on Inquiry Notice By NBA's Email Newsletter Language ...................................................................15

   D.  The alleged Privacy Policy does not comply with the VPPA...........................21

       1.  The Privacy Policy Impermissibly Contains Multiple Legal Obligations .................................................................................21

       2.  The Privacy Policy Does Not Contain a Set Time Period, or Statutorily Compliant Default..................................................................22

       3.  Neither The Privacy Policy Nor The NBA Website Have a Clear and Conspicuous Manner of Consent Withdrawal ..........................................23

Conclusion ...............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ambrose v. Boston Globe Media Partners LLC*,
  No. 21-cv-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022)................................2, 9

*Applebaum v. Lyft, Inc.*,
  263 F.Supp.3d 454 (S.D.N.Y. 2017)..........................................................................15 n.4, 20

*Austin-Spearman v. AMC Network Entm't LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015).................................................................................4, 8

*Bassett v. Elec. Arts, Inc.*,
  93 F. Supp. 3d 95 (E.D.N.Y. 2015) .............................................................................15 n.14

*Belozerov v. Gannett Co.*,
  No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022).......................................2 n.3

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................................. *passim*

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ...............................................................................................17

*Bohnak v. Marsh & McLennan Cos., Inc.*,
  580 F. Supp. 3d 21, 30 (S.D.N.Y. 2022) ...............................................................................5

*Cappello v. Walmart Inc.*,
  No. 3:18-cv-6678, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019)...........................................22

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
  No. 22-cv-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022)................................... *passim*

*Doe v. Meta Platforms, Inc.*,
  No. 3:22-cv-03580 (N.D. Cal.) .......................................................................................1 n.1

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979, 983 (9th Cir. 2017) .......................................................................................3

*Faehner v. Webcollex, LLC*,
  No. 21-1734, 2022 WL 500454 (2d Cir. Feb. 18, 2022) ....................................................5 n.5

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020)............................................................11, 12 n.11

*Glick v. CMRE Fin. Servs., Inc.,*
   No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022)...........................................6 n.6

*Hunstein v. Preferred Collection & Mgmt. Servs.,*
   48 F.4th 1236 (11th Cir. 2022) ...........................................................................................7 n.6

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
   2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013),
   *vacated in part on other grounds,*
   2016 WL 1574118 (S.D.N.Y. Apr. 15, 2016)...................................................................16 n.16

*In re Nickolodeon Consumer Privacy Litig.,*
   827 F.3d 262 (3d Cir. 2016).....................................................................................................4

*Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC,*
   No. 17-cv-5526, 2018 WL 4284279 (S.D.N.Y. Sept. 7, 2018) .............................................12

*Kai Peng v. Uber Techs., Inc.,*
   237 F. Supp. 3d 36 (E.D.N.Y. 2017) ....................................................................................14

*Lebakken v. WebMD, LLC,*
   No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022) .......................................... *passim*

*Lee v. Intelius Inc.,*
   737 F.3d 1254 (9th Cir.2013) ...............................................................................................20

*Louth v. NFL Enters. LLC,*
   No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) ...........................................2 n.3

*Maddox v. Bank of New York Mellon Trust Co.,*
   19 F.4th 58 (2d Cir. 2021) ......................................................................................................5

*Meyer v. Uber Techs., Inc.,*
   868 F.3d 66 (2d Cir. 2017)............................................................................................. *passim*

*Morrell v. WW Int'l, Inc.,*
   551 F. Supp. 3d 173 (S.D.N.Y. 2021).....................................................................................11

*Nguyen v. Barnes & Noble Inc.,*
   763 F.3d 1171 (9th Cir. 2014) ...............................................................................................18

*Nicosia v. Amazon.com, Inc.,*
   834 F.3d 220 (2d Cir. 2016)....................................................................... 13 n.12, 14-15

*Perry v. Cable News Network, Inc.,*
   854 F.3d 1336 (11th Cir. 2017) ...............................................................................................3

*Plazza v. Airbnb, Inc.*,
  289 F. Supp. 3d 537 (S.D.N.Y. 2018)................................................................12 n.11

*Pond Guy, Inc. v. Aquascape Designs, Inc.*,
  2014 WL 2863871 (E.D. Mich. June 24, 2014)...............................................16 n.16

*Pratt v. KSE Sportsman Media, Inc.*,
  586 F. Supp. 3d 666 (E.D. Mich. 2022)..................................................................6

*Rand v. Travelers Indem. Co.*,
  No. 21-cv-10744, 2022 WL 15523722 (S.D.N.Y. Oct. 26, 2022)............................5

*Reed v. Town of Gilbert*,
  576 U.S. 155, 172 (2015).................................................................................4 n.4

*Salameno v. Gogo Inc.*,
  No. 16-CV-0487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016)............................19

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ...............................................................................20

*Specht v. Netscape*,
  306 F.3d 17 (2d Cir. 2002)............................................................................. 11-14

*Sputz v. Alltran Fin., LP*,
  No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ...........................6 n.6

*Starke v. Squaretrade, Inc*,
  913 F.3d 279 (2d Cir. 2019)........................................................................4 n.4, 11

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).......................................................................................... 2-6

*Zachman v. Hudson Valley Fed. Credit Union*,
  No. 20-cv-1579, 2021 WL 1092508 (S.D.N.Y. Mar. 22, 2021)............................16

Statutes

18 U.S.C. § 2710.................................................................................................... *passim*

Other Authorities

NBA.com, https://nba.com ...................................................................................... *passim*

Internet Archive (*aka*, Wayback Machine)..............................................16, 16 n.16, 17

**INTRODUCTION**

This case presents a straightforward privacy claim based on a straightforward privacy statute. Defendant National Basketball Association ("NBA") is a $10 billion a year behemoth, making it the third wealthiest professional sports league. As part of its business, NBA operates the website www.nba.com.

NBA installed on its website a tracking product developed by Meta Platforms Inc., formerly known as Facebook Inc., called "the Pixel." The Pixel is a small bit of computer code that collected and disclosed[1] to Meta personally identifiable information about the subscribers using NBA's website and the actions that they take on it. Among other things, the Pixel transmits the titles of videos users request or obtain, together with the viewer's "Facebook ID," a unique identifier anyone can use to look up the viewer's Facebook profile, which contains detailed information about the subscriber. While Defendant characterized this matter as one of "utterly routine internet browsing activities," Judge Orrick recently commented in another Pixel matter dealing with the sharing of internet browsing data that "I think that is a kind of thing that a reasonable Facebook user, would be shocked to realize."[2] The same is true here, reasonable users of nba.com do not expect that their personal information is being shared with third parties.

"The VPPA prohibits video tape service providers from knowingly disclosing 'personally identifiable information concerning any consumer of such provider[.]" *Czarnionka v. The Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, *2 (S.D.N.Y. Nov. 17, 2022). "To state a claim under the VPPA, 'a plaintiff must allege that '[a] video tape service provider . . . knowingly disclose[d], to any person, personally identifiable information concerning any

---

[1] The NBA appears to have recently removed the Pixel from www.nba.com.
[2] *Doe v. Meta Platforms, Inc.*, No. 3:22-cv-03580 (N.D. Cal.).

consumer of such provider.'" *Ambrose v. Boston Globe Media Partners LLC*, No. 21-cv-10810-RGS, 2022 WL 4329373, *2 (D. Mass. Sept. 19, 2022) (citation omitted).[3]

Just as the plaintiffs in *Epoch Times* and *Boston Globe* did, here Plaintiff Salazar has plausibly plead the following:

- Plaintiff Michael Salazar was an NBA newsletter subscriber and, during that time, was also a Facebook user. ECF No. 1, ¶¶ 20, 46-47.

- Whenever he watched a video on NBA.com, NBA transmitted to Facebook via the Pixel the video's title and Salazar's Facebook ID. *id.*, ¶¶ 32-35, 39-43, 48, 62, 66.

- The ("NBA") is a "video tape service provider." *id.*, ¶¶ 2, 13, 25, 59-60.

- The NBA "knowingly disclosed" Mr. Salazar's "personal identifiable information" by installing the Facebook Pixel on its web properties and allowing the Facebook Pixel to capture and share Salazar's personally identifiable information with third parties. *id.*, ¶¶ 4, 32, 62, 66.

- Mr. Salazar is a "consumer" of a "good of service." *id.*, ¶¶ 46-47, 58, 63.

Through its unlawful conduct, NBA violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits anyone in the business of selling, renting, or delivering videos from disclosing information capable of identifying its subscribers and the video materials they request or obtain without their informed, written consent. Try as it might, nothing in NBA's motion to dismiss changes these straightforward facts. As such, Defendant's motion must be denied in full so that the parties can begin discovery in earnest.

### ARGUMENT

This case is materially identical to a number of cases that recently survived defendants' attempts to have the cases dismissed at this early stage. *See* n.3. Defendant's arguments rely on

---

[3] *See also Belozerov v. Gannett Co.*, No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022); *Epoch Times*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD*, LLC, No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022); *Boston Globe Media Partners LLC*, 2022 WL 4329373. *See also Louth v. NFL Enters. LLC*, No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) (Google Pixel).

inapplicable and outdated caselaw, seek inferences to be drawn in Defendant's favor, and overlook Plaintiff's well-pleaded allegations. As discussed below, Plaintiff has plausibly pleaded a concrete and particularized injury via his claim for damages due to Defendant's unlawful disclosure of his personal information without written consent.

A.    **Mr. Salazar has standing to pursue the VPPA claims.**

In arguing that Mr. Salazar lacks Article III standing, Defendant relies on a misguided and contorted interpretation of *TransUnion,* 141 S. Ct. 2190 (2021).

There can be no doubt that Plaintiff has pleaded cognizable harm and Article III standing. Mr. Salazar alleges, *inter alia,* Defendant (i) violates the VPPA by disseminating Plaintiff and putative class members' Personal Viewing Information such that they "cannot exercise reasonable judgment to defend themselves against the highly personal ways NBA.com has used and continues to use data is has about them to make money for itself"; (ii) to the "detriment of their legally protected privacy rights," in a manner which (iii) "undeniably reveals their identity and the specific video materials they requested from Defendant's website." ECF No. 1, ¶¶ 7, 11, 43. These allegations more than satisfy standing requirements, particularly at the pleading stage, and Defendant's Rule 12(b)(1) argument must be rejected.

It has long been settled that VPPA claims provide Article III standing. In so holding, courts around the country have uniformly recognized that claims brought under the statute are brought to remedy concrete, particularized injuries because VPPA claims require the disclosure of personal information. *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) (holding a plaintiff satisfies the concreteness requirement of Article III standing where he alleges a violation of the VPPA for a wrongful disclosure, because "Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing *disclosure* of personal information). (emphasis in original); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983

(9th Cir. 2017) ("the VPPA identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information"); *In re Nickolodeon Consumer Privacy Litig.*, 827 F.3d 262, 273-74 (3d Cir. 2016) ("the purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her online behavior. While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.,* the unlawful disclosure of legally protected information.")[4]

Specifically, Judge Buchwald considered the issue and likewise observed that "every court to have addressed this question" has found the "VPPA creates a right to the privacy of one's video-watching history, the deprivation of which–through wrongful disclosure, or statutory violation, alone–constitutes an injury sufficient to confer Article III standing." *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666-67 (S.D.N.Y. 2015) (collecting cases).

Defendant does not cite a single case holding otherwise, but nevertheless seeks to persuade the Court that a sea change in the world of Article III standing occurred with the Supreme Court's issuance of *TransUnion*, such that Plaintiff does not have standing to pursue his VPPA claim on behalf of a putative class. Defendant radically overstates the significance of *TransUnion*. To be sure, *TransUnion* drew a bright line between those claims alleging a mere *risk* of future harm and the actual separate concrete harm itself; the Supreme Court held that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm – at least unless the exposure to the risk of future harm itself causes a *separate concrete*

---

[4] Defendant's attempt to bring in *First Amendment* principles with its citation to *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015), a case involving a government entity and its attempt to govern speech, is simply misplaced. This case involves civil parties and a civil claim, and the Constitutional regulation of speech does not apply. To the extent Defendants seeks to challenge the constitutionality of the VPPA, Plaintiff incorporates the United States Department of Justice's recently filed brief in *Starke v. Patreon*, No. 3:22-cv-3131 (Dec. 6, 2022) (ECF No. 49-1), as if fully set forth herein.

harm." *Rand v. Travelers Indem. Co.*, No. 21-cv-10744, 2022 WL 15523722 (S.D.N.Y. Oct. 26, 2022) (quoting *TransUnion*, 141 S. Ct. at 2210-11) (emphasis added). Materially, in *TransUnion*, the Court carefully parsed out class members whose credit reports containing alerts were disseminated to third-party businesses as those who had suffered a concrete injury in fact as required for Article III standing, as opposed to those consumers who had misleading alerts in their credit files that were *not disseminated* to third-party businesses. 141 S. Ct. at 2209. The Court concluded that the plaintiffs whose misleading information was not disseminated did not suffer a concrete harm and held: "[n]o concrete harm, no standing." *Id.* at 2213; *see also Maddox v. Bank of New York Mellon Trust Co.*, 19 F.4th 58, 64 (2d Cir. 2021) (citing *TransUnion* and finding no concrete harm when mortgage borrowers did not allege they suffered any harm when misleading information was apparently not read by anyone).[5]

Here, Plaintiff has identified a concrete harm, just like all the VPPA plaintiffs to precede him where courts in the pre-*TransUnion* era concluded Article III standing had been pled. Defendant routinely violates the VPPA by knowingly disclosing Plaintiff's and putative class members' Personal Viewing Information to Facebook, a third party, thereby revealing their identities and the specific video materials they requested from Defendant's website. This is precisely the type of concrete, particularized harm of which the Supreme Court approved in *TransUnion* when it drew its bright line on standing. And not only has no court ever *not* found VPPA standing, this Court found precisely this sort of concrete harm sufficient in the post-*TransUnion* era to provide standing. *See Bohnak v. Marsh & McLennan Cos., Inc.*, 580 F. Supp.

---

[5] The parties differ in their view of the degree of the change in the Article III standing analysis wrought by *TransUnion*. The Second Circuit stated in *Faehner v. Webcollex, LLC*, 2022 WL 500454 (2d Cir. Feb. 18, 2022), that *TransUnion* presented a "change in standing grounds" which "narrowed the grounds for asserting standing where the injury is primarily statutory," but it did not describe the change as "significant" as Defendant argues here. ECF No. 21 at 9.

3d 21, 30 (S.D.N.Y. 2022) (plaintiffs had standing in data-breach case because "disclosing [private] information to third parties without authorization or consent could plausibly be offensive to a reasonable person").

And again, while no court has yet considered VPPA standing in the post-*TransUnion* era, courts considering analogous statutes and applying *TransUnion* have concluded that plaintiffs asserting a claim for the nonconsensual dissemination of their private information inflicts a concrete and particularized harm that confers Article III standing.

Persuasively, in *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022), the district court discussed the analogous Michigan Preservation of Personal Privacy Act which, like the VPPA, had always conferred Article III standing. *Id.* at 677 (citing cases). The court found defendant's reliance on *TransUnion* "misplaced":

> In *TransUnion*, the Supreme Court considered whether two groups of class members bringing claims under the Fair Credit Reporting Act suffered a concrete injury in fact under Article III. *Id.* at 2208-13. The first group of class members had a misleading credit report "disseminated to third parties." *Id.* at 2208-09. The second group merely had a misleading remark on their credit files that was not disseminated to a third party. *Id.* at 2209. The *TransUnion* Court held that the first group suffered a concrete injury in fact under Article III. *Id.* ("In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").
>
> Likewise, Plaintiffs allege that their "Private Reading Information" was disclosed to third parties without their consent. . . . In this way, *TransUnion reinforces that Plaintiffs' PPPA claims have Article III standing*.

*Pratt*, 586 F. Supp. 3d at 677 (emphasis added).[6]

_____

[6] The two cases Defendant cites from this district dismissing claims post-*TransUnion* are readily distinguishable and in fact demonstrate why Plaintiff here has Article III standing. Both *Glick v. CMRE Fin. Servs., Inc.,* No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022); and *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) involved FDCPA claims premised on defendants' sharing of plaintiffs' debt information with, respectively, a third-party vendor and outside commercial mail house in the process of collecting the debts. Those courts found that the allegations simply did not give rise to the kind of harm against which the invasion of privacy tort protects, given that plaintiffs did not allege that anyone

By contrast, Plaintiff here plainly alleges that, because of Defendant's conduct, Facebook was able to use their data to the detriment of their privacy rights, ECF No. 1, ¶¶ 7-8, leaving no doubt that their private information is not only seen but used in ways they would not have allowed and which caused concrete and particularized harm.

Accordingly, Plaintiff has plainly alleged standing under Article III and *TransUnion.*[7]

**B.    Plaintiff Has Plausibly Pleaded His VPPA Claim.**

**1.    Mr. Salazar has plausibly plead that he is a "consumer" of a "good or service" under the VPPA.**

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). As noted above, Mr. Salazar has plead both that he is a "consumer," ECF No.1, ¶¶ 1-2, 31, 12, 22-26, 63, 66, and that the NBA is a "video service provider." *Id.* 1, ¶¶ 2, 13, 25, 58-60. The NBA attempts to evade this language by arguing that while Mr. Salazar "characterizes himself as a 'subscriber,' he does not actually subscribe to any video goods or services from NBA.com." ECF No. 21, at 13. This argument, as discussed below, has been expressly rejected. *Belozerov*, 2022 WL 17832185, at *3; *WebMD*, 2022 16716151, *3.

As a threshold matter, the NBA does not expressly argue it is not a "video service provider" under the VPPA.[8] Rather, it chooses to argue exclusively that Mr. Salazar is not a

---

*even read* their information. *See Glick*, 2022 WL 2475690, at *3; *Sputz*, 2021 WL 5772033, at *5. Likewise, the Eleventh Circuit's decision in *Hunstein v. Preferred Collection & Mgmt. Servs.,* 48 F.4th 1236 (11th Cir. 2022)*,* another FDCPA case, involved the same facts – the hiring of a commercial mail vendor by a debt collector – and is likewise distinguishable.

[7] Defendant's references to consent at the conclusion of its argument are not relevant to standing; in any event, Plaintiff expressly alleges that the privacy disclosure excludes any reference to Defendant sharing private information with Facebook. *See* ECF No. 1, ¶¶ 27-29.

[8] In *WebMD*, the court noted that defendant's references to the VPPA legislative history were sufficient to "suggest that it believes it is not a video tape service provider, as contemplated by the VPPA." 2022 16716151, *3 n.3. Notwithstanding this argument by implication, the court found that the plaintiff "adequately alleged that WebMD is a video tape service provider because she alleges that WebMD is engaged in the business of delivering prerecorded audio-visual

"subscriber" of "any video good or services." ECF No. 21, at 13. The *WebMD* court expressly rejected this very argument:

> The Court agrees with [plaintiff] on this point. To constitute a "consumer" under the VPPA, the plaintiff must subscribe to "goods Or services from a video tape service provider," not a video service as WebMD attempts to frame the issue. Thus, the question here is whether WebMD's e-newsletter constitutes a good or service of a video tape service provider.

*WebMD*, 2022 16716151, *3 (record citations omitted). The court went on to conclude that Lebakken has plausibly pleaded that WebMD's e-newsletter constitutes a good or service under the VPPA." *Id*. Defendant is aware of these related VPPA cases,[9] yet has chosen to ignore these strong opinions forming the body of Pixel-VPPA caselaw. *See supra* n.3. Instead, Defendant cites years-old cases that are distinguishable from the facts of this matter and relies on recently-rejected arguments.

For example, the NBA relies heavily on *Austin-Spearman*, for the proposition that the "VPPA cannot credibly be interpreted to apply where a plaintiff's only purported 'subscription' relationship is distinct and set apart from a defendant's video services." ECF No. 21, at 15. This is the identical argument the *WebMD* court rejected:

> WebMD essentially argues that Lebakken providing her email address to WebMD to subscribe to the e-newsletter in 2017 is too attenuated from her viewing of any WebMD videos to state claim under the VPPA. Specifically, WebMD argues that although the First Amended Complaint alleges that WebMD "frequently features its video content through its email newsletter," Lebakken never actually alleges that she ever accessed any of the videos featured in the e-newsletter. *The question here, however, is not whether Lebakken alleges that she viewed the videos embedded within the e-newsletter but rather whether the e-newsletter constitutes a good or service to which Lebakken subscribed.*

---

materials to consumers via its e-newsletter and its website." *Id*. (citation omitted). The same holds true here. ECF No. 1, ¶¶ 13, 60.
[9] ECF No. 21, at 1 (referring to "dozens of cases" and "cookie cutter" allegations).

*WebMD*, 2022 16716151, *3 (emphasis added) (internal citations omitted). Mr. Salazar is

positioned identically to the *WebMD plaintiff*. *See* ECF No. 1, ¶¶ 20, 46-47, 58, 63. *See also*,

*e.g., Boston Globe*, 2022 WL 4329373, *2. Mr. Salazar has adequately plead he is a consumer.

   **2.    Plaintiff Has Pleaded a Knowing Disclosure of Personally PII**

   **a.    The NBA knowingly held the door open for Facebook to walk in and access Mr. Salazar's PII.**

The NBA next argues that "Mr. Salazar's device, not the NBA, disclosed the alleged

PII." ECF No. 21, at 16. This argument improperly disregards the Plaintiff's pleading, the

requirement that inferences therefrom be drawn in Plaintiff's favor, and attempts to raise merits

arguments at the pleading stage. As the Complaint makes clear, ECF No. 1, ¶¶ 4, 32, 62, 66, and

the *Epoch Times* court makes plain, "[b]y installing the Pixel, Defendants opened a digital door

and invited Facebook to enter that door and extract information within. *Epoch Times*, 2022 WL

17069810, *3 (citation omitted).

   With this argument, Defendant yet again presses an argument that has already been

rejected by this Court without making any reference to (or any attempt to distinguish) the *Epoch*

*Times* decision. The NBA's efforts here, just as in *Epoch Times*, to treat Mr. Salazar's device as

a sentient being must be rejected.

   Additionally, it is implausible that NBA – a multibillion-dollar enterprise – did not know

how the Pixel operated when installing it on its website. Plaintiff has pleaded as much. ECF

No. 1, ¶¶ 4-5, 13, 37-38, 41-43, 62. However, NBA invites the Court to assume that NBA, a

sophisticated business, simply has no idea what it installs on its website or how it works. ECF

No. 21, at 19. Even if that assumption were not directly contradicted by the Complaint's well-

pleaded allegations, it would amount to no more than speculation in NBA's favor untethered

from all ordinary expectations and common sense. It is implausible that profit-generating

enterprises operate without any notion of what it is they are doing. Because the Court's review is

confined to the Complaint's well pleaded allegations and all reasonable inferences to be drawn

from them in Plaintiff's favor, the Court must decline NBA's invitation to ignore Plaintiff's

allegations and speculate unreasonably in NBA's favor.

### b.    The Facebook ID – on its own – constitutes PII.

As demonstrated above, and plausibly plead in the Complaint, the NBA opened a "digital

door" by installing the Pixel and freely permitting Mr. Salazar's video viewing history paired

with his Facebook ID to be transmitted to Facebook, an unauthorized third party. ECF No. 1,

¶¶ 4-5, 32-35, 40, 62. Courts have repeatedly found that the Facebook ID constitutes PII. For

example, in *Epoch Times,* Judge Hellerstein provided a concise summary of the state of the law

directly undermining what the NBA argues here:

> Unlike the anonymized device serial numbers disclosed in *Robinson*, Facebook
> need not link the disclosed FID to personal information obtained elsewhere. The
> FID itself represents a particular individual. Indeed, Defendant fails to
> acknowledge that *Robinson* itself distinguished FIDs from the sort of device serial
> number disclosed by Disney in *Robinson*: "Nor is the information disclosed by
> Disney equivalent to a Facebook ID. . . . A Facebook ID . . . is thus equivalent to
> a name—it stands in for a specific person, unlike a device identifier." This view is
> consistent with courts in other district that have considered the very same
> question.

*Epoch Times,* 2022 WL 17069810, *3 (citations omitted).[10]

Just as in these other Pixel-VPPA cases, Mr. Salazar has plausibly plead that the NBA

knowingly disclosed his PII to a third party in violation of the VPPA. ECF No. 1, ¶¶ 32-35, 39-

43, 48, 62, 66. The NBA is a sophisticated entity that "operates a men's professional basketball

league in North America," ECF No. 1, ¶¶ 2, 13. While a fully-developed record may demonstrate

that the NBA was an unwitting dupe of Facebook, at this juncture the plausibly plead allegations

are adequate "to state a viable claim under the VPPA." *Boston Globe*, 2022 WL 4329373, *2.

---

[10] *See also id.* at *4; *Gannett*, ECF No. 33, at 9-10 (Dec. 20, 2022); *WebMD*, 2022 16716151, *5;
*Patreon,* 2022 WL 7652166, *8; *Boston Globe*, 2022 WL 4329373, *2.

**C.    Nothing in the record demonstrates Plaintiff's unambiguous consent.**

In evaluating electronic contracts of adhesion, court in this district apply a two-step analysis of first classifying the agreement (*e.g.*, browsewrap, clickwrap, etc.). *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-401 (E.D.N.Y. 2015) (Weinstein, J.) (defining the various types "Electronic Adhesion Contracts"). After classifying the contract of adhesion, the court should then evaluate whether the notice was "reasonably conspicuous." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). And, as is the case here, where there is "no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer*, 868 F.3d at 74-75. This this is a "fact-intensive analysis," *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020), which considers the "totality of the circumstances," *Starke v. Squaretrade, Inc*, 913 F.3d 279, 297 (2d Cir. 2019).

As demonstrated below, the NBA's cookie banner is a browsewrap contract of adhesion and thus subject to the "reasonable communicativeness" test. *See Berkson*, 97 F. Supp. 3d at 381-82 (citing *Specht v. Netscape*, 306 F.3d 17, 30-32 (2d Cir. 2002)).

**1.    The NBA's cookie banner is a browsewrap contract of adhesion.**

Despite the relevance of classifying the electronic contract of adhesion at issue, as this classification directly impacts its enforceability and the test applied to determine the effectiveness of the notice given to the consumer, Defendant's motion is careful to avoid disclosing that its purported contract is "browsewrap," *Berkson*, 97 F. Supp. 3d at 394-401. Courts in this district regularly admonish parties for relying on readily distinguishable cases when challenging or bolstering the notice given.[11] Defendant attempts to brush past this issue

---

[11] *See Morrell v. WW Int'l, Inc.*, 551 F. Supp. 3d 173, 185 (S.D.N.Y. 2021) ("The plaintiff's reliance on cases in which courts have found 'browsewrap agreements' to be unenforceable is misplaced because, in this case, the plaintiff was required actively to manifest assent to the

because "[b]rowsewrap agreements are typically only enforced in cases that 'have involved users who are businesses.'" *Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC*, No. 17-cv-5526, 2018 WL 4284279 (S.D.N.Y. Sept. 7, 2018) (Allison, J.) (citation omitted).

In brief, a "browsewrap" agreement is one where "merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Berkson*, 97 F. Supp. 3d at 395 (quoting *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009)). "Because of the passive nature of acceptance in browsewrap agreements, courts closely examine the factual circumstances surrounding a consumer's use." *Id*. Courts in this district have unambiguously found that "[f]or an internet browsewrap contract to be binding, consumers must have reasonable notice of a company's 'terms of use' and exhibit '*unambiguous assent*' to those terms. *Id*. (quoting, *inter alia*, *Specht*, 306 F.3d at 35). On the other hand, a "clickwrap" agreement requires the user "to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Berkson*, 97 F. Supp. 3d at 397 (citation omitted). As the *Berkson* court noted, "[b]y requiring a physical manifestation of assent, a user is said to be put on inquiry notice of the terms assented to." *Id*.

Here, by its own acknowledgement, the NBA seeks to impose a browsewrap contract on its users. As Defendant makes clear, the contract of adhesion purports to form a contract by the subscriber's "continue[d] browsing." ECF No. 22-1, at 2-3. And, while the disclosure has an "I Accept," Defendant acknowledges it has little, if any, functionality as the user can simply "X" it

---

Terms and Conditions of the transaction."); *Feld*, 42 F. Supp. 3d at 832 (S.D.N.Y. 2020) (noting "[t]he [browsewrap] cases plaintiff cites to the contrary are factually distinguishable."); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 553 (S.D.N.Y. 2018) ("These facts are easily distinguishable from those cases where browsewraps have been deemed invalid.").

out or leave it alone to "continue browsing."[12] Thus, under the NBA's chosen construct, users

form a contract simply by continuing to browse irrespective of whether they click "I Accept,"

click the "X" (presenting a material factual dispute concerning "unambiguous assent") or simply

passively ignore the pop-up (same).

The Second Circuit, in *Meyer*, acknowledged there are "infinite ways to design a

website," 868 F.3d at 75, between a "clickwrap" and a "browsewrap." Here, the NBA chose to

impose its contract of adhesion through a browsewrap that begins "[The NBA] use[s] cookies to

provide [the user] with the best online experience." ECF No. 22-1. Such a meager disclosure

warrants significant scrutiny under the applicable law of this district.

> **2.     The NBA's cookie banner makes no effort to impress upon its users of the
> importance of the binding contract or that the user's legal rights are being
> impacted by continuing to browse.**

In *Berkson*, the court summarizes the "reasonable communicativeness test" and how it

relates to inquiry notice as follows:

> (1) The burden is on the offeror to impress upon the offeree the importance of the
> binding contract being entered into by the latter; and

> (2) The duty is on the offeror to explain the relevance of the critical terms
> governing the offeree's substantive rights contained in the contract.

97 F. Supp. 3d at 381-82 (citing, *inter alia*, the Second Circuit's decision *Specht* for the

proposition that the reasonable communicativeness test applies to browsewrap contracts).[13]

---

[12] ECF No. 22, at 3 ("This pop-up banner does not leave the screen until the user affirmatively clicks "I Accept" or the "X" in the upper right-hand corner of the pop-up."); and at 20 ("This banner persists, reappearing each time a user visits the site until the user selects "I Accept."). While much of NBA's argument is provided outside the record, statements regarding the particular functionality of the website exemplify why this argument is ill-suited for briefing at the motion to dismiss stage, especially considering no discovery has occurred. NBA's latter statement, intentionally or otherwise, fails to address the level of persistence of the cookie banner if a user hits the "X." This will undoubtedly be a topic of discovery moving forward.

[13] The Second Circuit's more recent in *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) and *Meyer*, 868 F.3d 66, while generally instructive, are also readily distinguishable from the

In *Meyer*, the Second Circuit reiterated the nature of the court's determination concerning whether a reasonably prudent user had inquiry notice of the terms of the contract of adhesion:

> Whether a reasonably prudent user would be on inquiry notice turns on the "[c]larity and conspicuousness of arbitration terms," in the context of web-based contracts, as discussed further below, clarity and conspicuousness are a function of the design and content of the relevant interface.

868 F.3d at 75. (quoting *Specht* and citing *Nicosia*).

In *Berkson*, the court noted that "'terms of use' will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage." 97 F. Supp. 3d at 401 (citation omitted). Here, the NBA cookie banner accompanies its hyperlinks a single statement: "We use cookies to provide you with the best online experience." ECF No. 22-1. Rather than encouraging a reasonably prudent user to click the hyperlinks, the NBA's disclosure that cookies are employed only to provide the user with "the best online experience" appears designed to dissuade a user from delving into hyperlinks that are provided. *See*, *e.g.*, *Nicosia*, 384 F. Supp. 3d at 278 ("It could be argued that the purpose of providing "reasonably conspicuous" notice of the hyperlinked terms is not merely to notify the user that these terms exist, but to encourage him or her to read them."); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 48-49 (E.D.N.Y. 2017) (noting user was "clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing").

There is no guidance in the NBA's cookie banner – which does little more than profess the benefits of cookies – that would tip off a reasonably prudent internet user "is subjecting

---

case at bar as neither *Meyer* nor *Nicosia* dealt with browsewrap contracts. *See Meyer*, 868 F.3d at 75-76; *Nicosia*, 834 F.3d at 236.

herself to a one-sided contract that purports to modify her basic legal rights and remedies."
*Berkson*, 97 F. Supp. 3d at 380.[14]

Finally, contrary to NBA's unsupported statement regarding Plaintiff's knowledge (which impermissibly conflates counsel's explanation of the matter with what a plaintiff knew), there is nothing in the record demonstrating actual notice,[15] and there is nothing in the content of the NBA's browsewrap that would tilt it towards enforceability. ECF No. 22-1. Likewise, there are certain design elements that cause it to fall short of enforceability, *See, e.g.*, *Berkson*, 97 F. Supp. 3d at 404 (noting "[t]he hyperlink to the 'terms of use' was not in large font, all caps, or in bold."). *Id*. The same principles also scuttle the NBA's "opt out" link which appears nowhere in "visual proximity" of the browsewrap and requires a user to scroll to the bottom of the page and look for it in miniature font among a sea of links. ECF No. 22-2. At the very least, "reasonable minds could disagree" whether the NBA's browsewrap is sufficiently "clear and conspicuous" by "content and design" that it demonstrates "unambiguous assent." *See Nicosia*, 834 F.3d 220; *Meyer*, 868 F.3d 66.

### 3.    No Reasonable Person Is Put on Inquiry Notice By NBA's Email Newsletter Language

Similar to the cookie banner, no reasonable person would be put on inquiry notice when signing up for NBA's email newsletter. First, and importantly here, NBA does not provide the

---

[14] *See also Applebaum v. Lyft, Inc.*, 263 F.Supp.3d 454, 468 (S.D.N.Y. 2017) ("There is also no reason to believe that 'Terms of Service' is self-defining for reasonable consumers as equivalent to 'Binding Contract' or 'Final Contract.'"). *Cf. Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 99 (E.D.N.Y. 2015) (upholding a contract where user clicked "I Accept" after being "presented with a screen prompting [him] to read the Terms of Service and privacy policy carefully, noting that the documents may affect [his] rights, and presenting links by which a registrant may access the full text of each agreement.").

[15] *See Meyer*, 868 F.3d 66, 77 (2d Cir. 2017) ("[A]s the district court observed, the pleading is not obviously a concession in that it makes no reference to Meyer's knowledge. *See Meyer*, 200 F. Supp. 3d at 413.") (record citation omitted)

Court with any visual evidence of the "email sign-up widget." *See*, *e.g.*, *Zachman v. Hudson Valley Fed. Credit Union*, No. 20-cv-1579, 2021 WL 1092508, at *7 (S.D.N.Y. Mar. 22, 2021). *See also* ECF Nos. 21, 22, 22-1 to 22-4. Instead, NBA relies solely on a textual description of the location of the widget as "visible on the lower righthand side of the NBA.com homepage" (ECF No. 21, at 2 n.2) and invites the Court to peruse the internet in its own search for evidence not otherwise provided stating, "the Court can consider all of nba.com's content because it is incorporated by reference into the Complaint, is central to Mr. Salazar's allegations, and its authenticity is not in question." ECF Nos. 21, at 8, *see also* ECF No. 21 at 8 n.3 (citations by NBA supporting Court's assessing "totality" of websites at issue and taking judicial notice of the contents of a party's website). However, Defendant fails to note that the appearance of the widget – specifically the appearance of hyperlinks contained within the widget – have materially changed between the time of filing of the Complaint and the filing of NBA's motion to dismiss. Murphy Decl. ¶ 3. The table below compares the current version of the email widget to the version contained in the Internet Archive (*aka*, Wayback Machine) on November 2, 2022.[16]

---

[16] "As a resource the accuracy of which cannot reasonably be questioned, the Internet Archive has been found to be an acceptable source for the taking of judicial notice." *Pond Guy, Inc. v. Aquascape Designs, Inc.*, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014). Thus, "[c]ourts have taken judicial notice of the contents of internet archives." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2013 WL 6869410, at *4 n.65 (S.D.N.Y. Dec. 30, 2013), *vacated in part on other grounds*, 2016 WL 1574118 (S.D.N.Y. Apr. 15, 2016).



| Compare NBA's description: | With Internet Archive version: |
|---|---|
| Email widget on Dec. 23, 2022 from <u>nba.com</u> | Email widget from archive.org, snapshot dated Nov. 2, 2022, 01:32:08 of *nba.com* |

In evaluating inquiry notice for the sign-up wrap widget, the Court must find (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (also noting "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" (quoting *Meyer,* 868 F.3d at 74 (additional citations omitted)). The email widget here fails both required elements.

*First*, the email widget does not provide reasonably conspicuous notice. To be conspicuous in this context, the notice must have been displayed "in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it" *Id*. Similar to *Berman*, NBA's text disclosing terms and conditions "is the antithesis of conspicuous"

as it is "printed in tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Id*. at 856-57, Murphy Decl. ¶ 3. Furthermore, against just like *Berman*, the NBA's website uses "comparatively larger font …in all of the surrounding text" and that "naturally directs the user's attention everywhere else." *Id*. at 857. "[T]he textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Id*. At least, nba.com displays a plethora of pictographic thumbnails, bold and capitalized article headings, sports standings (with traditional blue hyperlink text), and sports matchups with scores or games times. "Far from meeting the requirement that a webpage must take steps 'to capture the user's attention and secure her assent,'" the design and content of NBA's website "draw[s] the user's attention away from the most important part of the page." *Id*. (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178 n.1. (9th Cir. 2014)). The *Berman* court noted that:

> Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because "online providers have complete control over the design of their websites," "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[.]" The designer of the webpages at issue here did not take that obligation to heart.

*Id*. (citations omitted). NBA, like numerous websites before it, "did not take [its] obligation to heart" in designing a website that deemphasizes, via both overall design and other visual elements, its purported contractual provisions.

However, NBA's shortcomings do not stop there. Numerous cases hold that hyperlink disclosure of terms and conditions must make "the fact that a hyperlink is present … readily apparent." *Id*. The *Berman* court found that hyperlink text that was underlined, but in the same color as other surrounding text is "often insufficient" as it would not alert a reasonably prudent

user that a clickable link exists because the relevant standard "demands conspicuousness tailored to the reasonably prudent Internet user, not the expert user" and so the "design of hyperlinks must put such a user on notice of their existence." *Id*. (citation omitted). Here, at relevant times, NBA's hyperlinks were even less conspicuous than those in *Berman*, as the "Terms of Service" hyperlink was in the same color font as surrounding text, same size font as surrounding text, not capitalized, and not even underlined.[17] "The failure to clearly denote hyperlinks" means that NBA's email widget fails the "conspicuousness test" as "[c]onsumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" *Id*. (quoting *Nguyen*, 763 F.3d at 1179).

Moreover, a user's one-time general interaction with the email widget further supports finding that there is not conspicuous notice. In *Salameno v. Gogo Inc.*, the court noted that the plaintiffs in *Berkson* would have only seen the terms of use hyperlink "once or a few times" and then contrasted the plaintiffs "in the instant case" who purchased the same online product "many more times." No. 16-CV-0487, 2016 WL 4005783, at *5 (E.D.N.Y. July 25, 2016). Here, Plaintiff would only be expected to sign up for the email newsletter once, weighing – again – against finding the NBA's email widget provides a conspicuous notice. The lack of reasonably conspicuous notice dooms NBA's argument that Plaintiff consented to the Terms of Service via the email widget.

*Second*, Defendant has not carried its burden to demonstrate an unambiguous manifestation of asset by Plaintiff. NBA's presentation of conflicting language in the email widget dooms any argument that Plaintiff unambiguously consented to the non-conspicuous

---

[17] Also notable is that in multiple versions of the nba.com webpage email widget, the "Privacy Policy" is not a hyperlink. Murphy Decl. ¶ 3, Exs. A-E, Group Ex. F.

Terms of Service or non-hyperlinked Privacy Policy. This is because it is reasonable to infer that a reasonable consumer would understand NBA's multiple listed "You agree" statements to encompass the totality of what the user would be agreeing to. By adding, "You agree that your personal information will be used to send you messages about NBA related products and services, and share your personal information with NBA partners and affiliates so that they can also contact you about products and services that might be of interest to you." it is reasonable to infer that a user of NBA's site would understand that by signing up for the email newsletter, he was agreeing to sharing of his information so that NBA or related affiliates could promote other products of services via email. Just as in *Applebaum v. Lyft, Inc.*, "[a] reasonable consumer may have understood that the consumer had agreed to something, but not to the lengthy [] Terms of Service." 263 F. Supp. 3d 454, 468 (S.D.N.Y. 2017), *see also Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035-36 (7th Cir. 2016) ("One of Illinois's sister courts came to the sensible conclusion that where a website specifically states that clicking means one thing, that click does not bind users to something else." (citing *Lee v. Intelius Inc.,* 737 F.3d 1254 (9th Cir.2013)). Nor does the naming convention "Terms of Service" provide any evidence of assent because "[t]here is also no reason to believe that 'Terms of Service' is self-defining for reasonable consumers as equivalent to 'Binding Contract' or 'Final Contract.'" *Id.*

Accordingly, NBA cannot show any purported agreement to the Terms of Service by Plaintiff via either the cookie banner or the email widget, and, therefore, there is no basis for application of the "Class Action Waiver" contained within the Terms of Service. As such, the Court should reject NBA's request to "dismiss Mr. Salazar's class claims."[18]

---

[18] While selectively invoking its purported "Class Action Waiver," the NBA ignores its arbitration clause.

**D.**     **The alleged Privacy Policy does not comply with the VPPA.**

A thorough review of NBA's Privacy Policy (ECF No. 22-4) reveals that it is deficient in numerous respects. The VPPA requires that a consumer's written consent meet certain threshold criteria. 18 U.S.C. § 2710(b)(2)(B). As discussed below, NBA's Privacy Policy fails to meet all three VPPA written consent requirements.

**1.**     **The Privacy Policy Impermissibly Contains Multiple Legal Obligations**

The VPPA requires that a consumer's written consent be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). A simple reading of the Privacy Policy reveals that it is rife with "other legal obligations" of the consumer. While not intended to be an exhaustive list, a short review of the Privacy Policy reveals that it is a multi-faceted amalgamation of the following purported legal obligations:

- General consent to the "terms of this Policy" (ECF No. 22-4, ¶ 1);

- Consent to the collection of a variety of data, including "identifiers," "User credentials," "Protected classifications and demographic data," "Payment data," "Location data," "Commercial information," and "Communications" (*id.* ¶ 2);

- How collected data is used, including, at least, "to create and maintain accounts…," "Communicating with you," "Marketing and advertising" and "Security, compliance and enforcement" (*id.* ¶ 3);

- An agreement by consumers that there is no limit on what NBA can "do with aggregated, pseudonymized or anonymized data." (*id.*);

- Consent to third party data collection and disclosure (*id.* ¶¶ 4, 8);

- Additional information and rights afforded to California residents in accordance with the California Consumer Privacy Act ("CCPA") (*id.* ¶ 11);

- A Notice of Financial Incentive, and related rights and responsibilities related to creating and NBA ID, including a list of data collection obligations related to the creation of the NBA ID and the value of Personal Information (*id.* ¶ 12);

- European and Brazilian Privacy Rights (*id.*, ¶ 13); and

- An agreement that any continued use of NBA services constitutes continued acceptance of revisions to the Privacy Policy (*id.* ¶ 14).

Clearly, the Privacy Policy has failed to comply with the VPPA's requirement that a consumer's written consent be *distinct and separate* from any form setting for other legal obligations of the consumer. Furthermore, while NBA points out that the Terms of Service and the Privacy Policy are separate documents, NBA does not even attempt to argue that the Privacy Policy is solely dedicated to informing consumers of NBA's intent to share consumers' personally identifiable information with Facebook. ECF No. 21, at 21. This comingling runs afoul of the VPPA, which:

> does indeed require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the purchase

*Cappello v. Walmart Inc.*, No. 3:18-cv-6678, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019).

As noted in *Cappello*, "[t]he fact that such consent may be obtained over the Internet does not negate the statute's 'distinct and separate' form requirement. *Id*. Nor is designing a VPPA compliant website be a burden, as NBA could have chosen to have a separate confirmation for consumers to assent to disclosures involving video services. *Id*. For a $10 billion a year business, this is not a Herculean task. In short, NBA's Privacy Policy fails to comply with the "distinct and separate" requirement for written consent pursuant to the VPPA.

## 2. The Privacy Policy Does Not Contain a Set Time Period, or Statutorily Compliant Default

NBA's Privacy Policy also runs afoul of the timing requirement for VPPA consent. Consent may be given either at the time disclosure is sought or given in advance of disclosure, for a set period of time not to exceed two years. 18 U.S.C. § 2710(b)(2)(B)(ii)(I)-(II).

Defendant does not argue that the Privacy Policy attempts compliance with the 2-years outside limit for advance consent, nor can it. *See* ECF No. 22-4 (no two-year limitation of consent). Instead, Defendant relies on the theory that simply visiting the nba.com site is a sufficient affirmation of consent. ECF No. 21, at 22 ("the NBA obtains the user's consent at the point of disclosure–*caused by visiting the site*–is sought" (emphasis added). However, this theory must be rejected because the act of loading a webpage cannot be deemed proper consent.

As an illustration of the nonsensical nature of this theory, if the Court visited the webpage referenced in the Complaint ("How Will Pieces Come Together For the Lakers?") (ECF No. 1, ¶ 39), according to NBA, the Court would have consented to NBA's disclosure of information to Facebook upon the page loading and NBA disclosing PII to Facebook.

The cookie banner language is inapplicable at this point, as there is no continued browsing required, and therefore no method to manifest assent to any policy. Instead, NBA's own argument reveals that it believes that simply loading a webpage – with nothing more – provides timely consent.

As such, NBA's Privacy Policy fails to comply with the VPPA for a second reason.

### 3.    Neither The Privacy Policy Nor The NBA Website Have a Clear and Conspicuous Manner of Consent Withdrawal

Next, neither the NBA website nor the NBA Privacy Policy provides a clear and conspicuous opportunity for a consumer to withdraw consent to disclosure of PII. NBA takes the liberty of declaring that "[a]ny visitor to any webpage on NBA.com will see a link entitled 'Do Not Sell My Personal Information' in the footer." ECF No. 21, at 22. *First*, this statement is made based on NBA's own self-serving speculation about how every user interacts with the nba.com website and is wholly improper at the pleading stage. *Second*, this argument assumes that the "Do Not Sell My Personal Information" link, which is located in the footer of the site

and is set forth in the smallest font apparently used on the nba.com site would qualify as "clear and conspicuous." This is simply not so. *Third*, assuming a user could even locate the "Do Not Sell My Personal Information" link, the "Information Associated with Your Device" tab does not clearly and conspicuously a method for withdrawing from ongoing disclosures of PII. Instead, this dialogue box misleadingly states that:

> Our partners use technologies, such as pixels, to collect information associated **with your device**. Our partners use these technologies to document how you engage with our site or app and may use this information for advertising and other purposes.
>
> Under some state privacy laws, allowing our partners to use this information for advertising purposes is considered a "sale." *To opt out of these "sales," switch this toggle from "On" to "Off."* If you switch this toggle to "Off," you will still receive online advertising, but this advertising may not be personalized.

ECF No. 22-2, at 3 (emphasis added).

Conflating what type of information is being collected and what a consumer is opting out of (according to NBA, apparently only "sales") is not a clear and conspicuous opportunity to withdraw from the sharing of VPPA protected PII. *Fourth*, even assuming "Do Not Sell My Personal Information" was clearly and conspicuously presented, it fails to provide the opportunity to "withdraw on a case-by-case basis or to withdraw from ongoing disclosures" as required by the VPPA. 18 U.S.C. § 2710(b)(2)(B)(iii). Instead, the dialogue box only allows for opting out of all "sales." ECF No. 22-2.

NBA's Privacy Policy fares no better in providing consumers a clear and conspicuous opportunity to withdraw consent. *First*, liked the "Do Not Sell My Personal Information" dialogue box, the Privacy Policy fails to provide the ability to withdraw on a case-by-case basis *or* from ongoing disclosures as required by § 2710(b)(2)(B)(iii). *Second*, even finding the potentially relevant information, as described by NBA, requires a consumer to locate the Privacy Policy, navigate to an initial section of the Privacy Policy, and then select a hyperlink in that

section to another section of the Privacy Policy. ECF No. 21, at 23. Even assuming a consumer

can locate the section that alerts a consumer that "You also have the following options to manage

Tracking Technologies and op out of interest-based advertising" the information related to "opt-

out" relates to "Flash cookies," "interest-based advertising" by companies participating in the

Digital Advertising Alliance or the Network Advertising Initiative, "Nielsen proprietary

measurement software" and "WarnerMedia News & Sports'" interest-based advertising. ECF

No. 22-4, at 6. Nowhere does the Privacy Policy provide consumers information as to how to

withdraw consent to the sharing of PII related to the VPPA.

In short, the Privacy Policy fails to comply with the withdraw of consent requirements set

forth in the VPPA. Because the Privacy Policy fails to comply with multiple sections of the

VPPA, NBA never had the written consent of consumers required for the lawful disclosure of

PII.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied in its entirety and the

stay of discovery should be lifted.[19]

Dated: December 23, 2022                   Respectfully submitted,

                                   By:     /s/ *Michael L. Murphy*
                                           Michael L. Murphy (NY 5084397)
                                           BAILEY & GLASSER LLP
                                           1055 Thomas Jefferson Street NW
                                           Suite 540
                                           Washington, DC 20007
                                           T: 202.463.2101
                                           mmurphy@baileyglasser.com

---

[19] To the extent the Court grants Defendant's motion, Plaintiff respectfully requests that he be permitted to amend his complaint to address any issues the Court raises in its Order.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that *Plaintiff's Opposition To Defendant's Motion To Dismiss* was filed in the court's CM/ECF system and that counsel of record will be served.

By:    /s/ *Michael L. Murphy*

Michael L. Murphy (NY 5084397)

BAILEY & GLASSER LLP