**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL SALAZAR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL BASKETBALL ASSOCIATION,<br><br>Defendant. | Case No. 1:22-cv-07935-JLR |

**NATIONAL BASKETBALL ASSOCIATION'S REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

**VINSON & ELKINS L.L.P.**

| | |
|---|---|
| Matthew X. Etchemendy<br>  (*pro hac vice pending*)<br>2200 Pennsylvania Avenue, NW<br>Suite 500 West<br>Washington, DC 20037<br>Telephone: (202) 639-6740<br>Facsimile: (202) 879-8940<br>metchemendy@velaw.com | Hilary L. Preston<br>Palmina M. Fava<br>Marisa Antonelli<br>1114 Avenue of Americas<br>32nd Floor<br>New York, NY 10036<br>Telephone: (212) 237-0000<br>Facsimile: (212) 237-0100<br>hpreston@velaw.com<br>pfava@velaw.com<br>mantonelli@velaw.com |

*Counsel for National Basketball Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT .............................................................................................................................. 1

I.     Mr. Salazar Lacks Standing Under *TransUnion*. ................................................. 1

II.    Mr. Salazar Fails to Allege Facts to Support a VPPA Claim. ............................. 4

       A.     Mr. Salazar Is Not a VPPA "Consumer." ................................................ 4

       B.     Nothing in Mr. Salazar's Opposition Shows a Knowing Disclosure of PII. .......... 6

       C.     Mr. Salazar Consented to the NBA's Privacy Policy and Terms of Use, Including the Class Waiver. ....................................................................... 7

       D.     The NBA's Privacy Policy Meets Each of the Requirements of the VPPA. ........... 9

CONCLUSION ........................................................................................................................ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin-Spearman v. AMC Network Ent. LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) .................................................................................. 4, 5

*Belozerov v. Gannett Co.*,
  No. 22-cv-10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) ............................................ 4

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  No. 17-cv-4570, 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017) ............................................... 8

*Bohnak v. Marsh & McLennan Cos.*,
  580 F. Supp. 3d 21 (S.D.N.Y. 2022) ......................................................................................... 3

*Cappello v. Walmart Inc.*,
  No. 18-cv-6678, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) ...................................... 9

*Czarnionka v. Epoch Times Ass'n, Inc.*,
  No. 22-cv-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ............................................. 6

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ............................................................................................. 8

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .................................................................................................... 3

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825 (S.D.N.Y. 2020) ...................................................................................... 7

*Glick v. CMRE Fin. Servs., Inc.*,
  No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022) .......................................... 2, 3, 4

*Harty v. W. Point Realty, Inc.*,
  28 F.4th 435 (2d Cir. 2022) ................................................................................................. 1, 4

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  48 F.4th 1236 (11th Cir. 2022) ........................................................................................ 2, 3, 4

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  994 F.3d 1341 (11th. Cir. 2021) ............................................................................................... 4

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016) .................................................................................................. 3, 5

*In re Practicefirst Data Breach Litig.*,
  No. 21-cv-790, 2022 WL 354544 (W.D.N.Y. Feb. 2, 2022) .................................................... 3

*Int'l Council of Shopping Ctrs., Inc. v. Info Quarter, LLC*,
  No. 17-cv-5526, 2018 WL 4284279 (S.D.N.Y. Sept. 7, 2018) ................................................ 7

*Lebakken v. WebMD, LLC*,
  No. 22-cv-644, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ............................................. 4, 5

*Maddox v. Bank of N.Y. Mellon Tr. Co.*,
    19 F.4th 58 (2d Cir. 2021) ............................................................................................... 3

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ........................................................................................... 7, 8

*Peiran Zheng v. Live Auctioneers LLC*,
    No. 20-cv-9744, 2021 WL 2043562 (S.D.N.Y. May 21, 2021) ............................................ 8, 9

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ............................................................................................ 4

*Plazza v. Airbnb, Inc.*,
    289 F. Supp. 3d 537 (S.D.N.Y. 2018) ................................................................................... 9

*Pratt v. KSE Sportsman Media, Inc.*,
    586 F. Supp. 3d 666 (E.D. Mich. 2022) ................................................................................ 3

*Rand v. Travelers Indem. Co.*,
    No. 21-cv-10744, 2022 WL 15523722 (S.D.N.Y. Oct. 27, 2022) ......................................... 3

*Shields v. Pro. Bureau of Collections of Md., Inc.*,
    55 F.4th 823 (10th Cir. 2022) ...................................................................................... 2, 3, 4

*Sputz v. Alltran Fin., LP*,
    No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ..................................... 2, 3, 4

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) ......................................................................................... 7, 8, 9

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................................. 1, 2, 3, 4

*Whitt v. Prosper Funding LLC*,
    No. 15-cv-136, 2015 WL 4254062 (S.D.N.Y. July 14, 2015) ............................................... 7

**Statutes**

18 U.S.C. § 2710(a)(1) .................................................................................................................. 5

18 U.S.C. § 2710(a)(3) .................................................................................................................. 6

18 U.S.C. § 2710(b)(2)(B)(i) ........................................................................................................ 9

18 U.S.C. § 2710(b)(2)(B)(ii)(I) ................................................................................................. 10

**Other Authorities**

*Obligation*, *Black's Law Dictionary* (11th ed. 2019) .................................................................. 9

Defendant National Basketball Association (the "NBA") submits this reply memorandum of law in further support of its motion to dismiss the Complaint filed by Michael Salazar ("Mr. Salazar"), and in response to Mr. Salazar's opposition (the "Opposition" or "Opp.").

## PRELIMINARY STATEMENT

Mr. Salazar's effort to seek a statutory-damages payout because his browser communicated true, harmless facts to Facebook in order to customize online ads served by Facebook to him—a sequence of events that caused no cognizable injury—fails on every level. First, Mr. Salazar lacks standing under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), whose clear requirements are neither acknowledged in his opposition nor satisfied by the Complaint's mere allegation of a statutory violation. Second, Mr. Salazar fails to state a claim, as he does not allege facts sufficient to establish that he is a "consumer" under the VPPA or that the NBA disclosed—knowingly or otherwise—PII about him. Finally, Mr. Salazar consented to the NBA's Privacy Policy and Terms of Use, a fact which bars both his individual claims and those of the class he purports to represent.

## ARGUMENT

**I.   Mr. Salazar Lacks Standing Under *TransUnion*.**

Remarkably—and tellingly—Mr. Salazar does not even reference, much less attempt to satisfy, *TransUnion*'s clear standards for Article III standing. *TransUnion* established a bright-line rule: a plaintiff "bear[s] the burden of demonstrating" an "injury in fact," which requires more than a mere "injury in law." 141 S. Ct. at 2205, 2207. In so doing, *TransUnion* "clarified that . . . standing to bring a claim for monetary damages following a statutory violation" requires "a current or past harm beyond the statutory violation itself." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022). Mr. Salazar tacitly concedes that he does not and cannot meet this standard, choosing instead to double down on the broad assertion that he has "satisf[ied] standing requirements" with his bare allegation that the NBA "violate[d] the VPPA . . . to the detriment of

1

[his] legally protected" rights. Opp. 3 (internal quotation marks omitted). But that allegation merely asserts a pure "injury in law"—a gambit *TransUnion* forecloses. That resolves this case.

Stripped of legally irrelevant rhetoric, Mr. Salazar's allegations boil down to this: the NBA caused the disclosure of true, non-misleading, non-reputationally-damaging information about him to one entity, Facebook—information he does not allege was ever read by a single human being. Even if true, that is not an injury-in-fact. It clearly is not a "tangible" (monetary or physical) injury. *TransUnion*, 141 S. Ct. at 2204. That leaves only the possibility of "intangible" injury. *Id.* But under *TransUnion*, an "intangible" injury-in-fact must have a "close relationship" to the elements of a traditional common-law cause of action. *Id.* Mr. Salazar fails this test, as he does not even attempt to show such a close relationship, and none exists.

The closest common-law analogue of Mr. Salazar's claim (though still far too distant under *TransUnion*) would be a suit for public disclosure of private facts. But that tort requires "publicity" to the "general public" of "private" facts in a manner "highly offensive to a reasonable person," *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245, 1249 (11th Cir. 2022) (en banc), and Mr. Salazar's allegations bear no relationship—let alone a "close" relationship—to any of these elements. Most clearly, he alleges no "publicity," or even that a single human being (as opposed to an automated system) learned any facts about him. That alone is fatal to Mr. Salazar's standing, as held in *Hunstein*, 48 F.4th at 1246, *Glick v. CMRE Financial Services, Inc.*, No. 21-cv-7456, 2022 WL 2475690, at *3 (S.D.N.Y. July 6, 2022), *Sputz v. Alltran Financial, LP*, No. 21-cv-4663, 2021 WL 5772033, at *2-6 (S.D.N.Y. Dec. 5, 2021), and now *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 828-29 (10th Cir. 2022).[1]

---

[1] Beyond Mr. Salazar's failure to plead "publicity," any analogy to public disclosure of private facts would fail because (1) Mr. Salazar does not allege that he otherwise kept his video viewing activities "private," and (2) disclosure of such banal facts to Facebook to assist in serving

Bizarrely, Mr. Salazar seeks to distinguish that line of cases on grounds that the plaintiffs failed to allege that any human being "even read" the disclosed information, Opp. 6 n.6 (emphasis omitted)—passing over the fact that Mr. Salazar's Complaint, too, lacks any such allegation. *See* Mem. in Supp. Mot. to Dismiss 11-12 ("Mot.").[2]

Having failed to satisfy *TransUnion*'s standards, Mr. Salazar falls back on pre-*TransUnion* cases which are no longer good law. Opp. 3-4. Mr. Salazar's quotation from *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017), invokes a distinction between "substantive" and "procedural" rights, a framework "eliminated" by *TransUnion*. *Maddox v. Bank of N.Y. Mellon Tr. Co.*, 19 F.4th 58, 64 (2d Cir. 2021). Similarly, his quotation from *In re Nickelodeon Consumer*

---

customized ads to Mr. Salazar himself is not "highly offensive to a reasonable person." Mr. Salazar cites *Bohnak v. Marsh & McLennan Cos.*, 580 F. Supp. 3d 21, 30 (S.D.N.Y. 2022), *appeal docketed*, No. 22-319 (2d Cir. Feb. 17, 2022), which held that "facilitat[ing] [a] data breach and theft" of social security numbers and similar data to cybercriminals "could plausibly be offensive to a reasonable person" and sufficed for standing. (Mr. Salazar's other cited data-breach case is to the same effect. *See Rand v. Travelers Indem. Co.*, No. 21-cv-10744, 2022 WL 15523722, at *4 (S.D.N.Y. Oct. 27, 2022).) While the analysis in *Bohnak* was subsequently rejected by another district court in this Circuit, *In re Practicefirst Data Breach Litig.*, No. 21-cv-790, 2022 WL 354544, at *7-8 & n.10 (W.D.N.Y. Feb. 2, 2022), *report and recommendation adopted*, 2022 WL 3045319 (W.D.N.Y. Aug. 1, 2022), the facts of that case are completely inapposite. The conduct alleged here is not leaking sensitive government ID information to cybercriminals, but rather disclosure by one computer system to another of Mr. Salazar's video viewing activities for lawful, harmless purposes (i.e., serving better ads to Mr. Salazar himself, *see* Compl. ¶ 30)—facts far closer (indeed, materially identical) to *Hunstein*, *Glick*, *Sputz*, and *Shields*.

[2] The *Pratt* decision from the Eastern District of Michigan does not detract from the point. *Contra* Opp. 6 (quoting *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 677 (E.D. Mich. 2022)). Whether or not that decision (involving a different statute) was correct on its facts, its reasoning is faulty and inferior to that of *Hunstein*, *Glick*, *Sputz*, and *Shields*. In purporting to distinguish *TransUnion*, *Pratt* relied wholly on the fact that information had been disclosed, and reasoned that this sufficed under *TransUnion*. 586 F. Supp. 3d at 677. But *TransUnion* dealt with misleading disclosures, which are closely analogous to common-law defamation due to the associated "reputational harm." 141 S. Ct. at 2208-09. Here, the information at issue is *not* misleading or harmful—eliminating any analogy to defamation. Moreover, even if defamation were the proper benchmark, *TransUnion* held that mere disclosure is insufficient absent "evidence that the document was actually read," i.e., "brought . . . to the perception" of another human, rather than "merely processed"—allegations missing here. *Id.* at 2210 n.6 (citation omitted).

3

*Privacy Litigation*, 827 F.3d 262, 272-74 (3d Cir. 2016), appeals to the notion that "unlawful" disclosures of "legally protected" information constitute a sufficient "*de facto* injury" for standing purposes—the exact kind of bare "injury in law" rejected as insufficient by *TransUnion*, 141 S. Ct. at 2205. Mr. Salazar also cites *Perry v. Cable News Network, Inc.*, 854 F.3d 1336 (11th Cir. 2017), but that case was effectively overruled by the *en banc* decision in *Hunstein*.[3] As for *Austin-Spearman v. AMC Network Entertainment LLC*, that case, too, relied on the now-superseded notion that Congress can conjure injuries by "creating legal rights, the invasion of which creates standing." 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015) (citation omitted); *compare id.* (pre-*TransUnion*, "relevant question [was] not whether the plaintiff has alleged injury beyond violation of the statute"), *with Harty*, 28 F.4th at 443 (post-*TransUnion*, a plaintiff must show "harm beyond the statutory violation itself"). Under *TransUnion* and the post-*TransUnion* consensus reflected in *Hunstein*, *Glick*, *Sputz*, and *Shields*, Mr. Salazar lacks standing and the case should be dismissed.

## II.     Mr. Salazar Fails to Allege Facts to Support a VPPA Claim.

### A.     Mr. Salazar Is Not a VPPA "Consumer."

In arguing that he is a "consumer" under the VPPA, Mr. Salazar ignores the text, history, and purpose of the statute, instead relying on a single district court decision outside the Second Circuit, *Lebakken v. WebMD, LLC*, No. 22-cv-644, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022).[4] But this Court is bound by the statute, not a single Northern District of Georgia decision, which is

---

[3] Indeed, the initial panel decision in *Hunstein* heavily relied on *Perry* as "strong[] support[]" for its incorrect and now overruled holding. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1347-48 (11th. Cir.), *vacated and superseded on reh'g*, 17 F.4th 1016 (11th Cir. 2021), *rev'd en banc*, 48 F.4th 1236 (11th Cir. 2022).

[4] Mr. Salazar also cites *Belozerov v. Gannett Co.*, No. 22-cv-10838, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022), but that case simply held that *payment* was unnecessary to establish that the plaintiff is a "consumer" under the VPPA. It did not address whether signing up for a newsletter with no connection to the video content at issue suffices to establish this element of a VPPA claim.

4

both incorrect and distinguishable. As the NBA demonstrated in its opening Memorandum, the VPPA's purpose is to protect renters, purchasers and subscribers of video content, Mot. 14-15, with the word "subscriber" implying a "durable" relationship involving mutual "exchange" of value. *Austin-Spearman*, 98 F. Supp. 3d at 669. But Mr. Salazar merely alleges that he entered his email into a web form to receive emails with no alleged connection to separately-offered free video content. He is not, under any reasonable interpretation of the VPPA's statutory language, a "renter, purchaser, or subscriber" of goods or services "from a video tape service provider." 18 U.S.C. § 2710(a)(1). To conclude otherwise would substantially and impermissibly broaden its scope, stretching the VPPA to cover facts "far removed from those that motivated its passage." *In re Nickelodeon*, 827 F.3d at 284. Had Congress intended the VPPA to cover casual consumption of free video content by parties with no meaningful business relationship to the defendant (and none at all related to the video content or disclosures at issue), it would not have carefully restricted the law's application to "renter[s], purchaser[s], or subscriber[s]" in the first place, 18 U.S.C. § 2710(a)(1)—text robbed of any practical substance under Mr. Salazar's view. Insofar as *Lebakken* suggested otherwise—in a discussion based on no serious analysis of the statute's text, purpose, or history—it was wrong. Regardless, *Lebakken* is distinguishable. *Lebakken* held that the plaintiff qualified as a "subscriber" under the VPPA because she "exchanged her email address to receive [a] WebMD e-newsletter *and that she also created her own WebMD account*." 2022 WL 16716151, at *2 (emphasis added). Here, Mr. Salazar merely alleges he "sign[ed] up for an online newsletter," Compl. ¶¶ 20, 46, not that he created or logged into any website account, rendering his relationship to NBA.com even more attenuated than in *Lebakken*. He thus asks this Court to significantly *broaden Lebakken*'s already overbroad theory of VPPA "subscriber" status—a contention that should be rejected.

### B. Nothing in Mr. Salazar's Opposition Shows a Knowing Disclosure of PII.

As the NBA has already explained, Mr. Salazar's own allegations show the complained-of disclosures were sent by Mr. Salazar's device, not by the NBA. *See* Mot. 17-18. Mr. Salazar never disputes this point, and indeed quietly concedes it, referring to the NBA (in a telling use of passive voice) as "freely *permitting*" PII about him "to *be transmitted* to Facebook." Opp. 10 (emphasis added). He nonetheless argues that the NBA can be liable for opening a "digital door" to Facebook even if the NBA never itself disclosed the PII. *Id.* at 9-10. This argument-from-metaphor is based entirely on *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022), which this Court should decline to follow. Here, the NBA could not disclose Mr. Salazar's PII because it did not possess that PII (namely, his FID). And under the VPPA's plain text, claims may be asserted only for affirmative acts of disclosure, not for causing (or, as Mr. Salazar puts it, "permitting") disclosures. *See* Mot. 16-17. Had Congress wanted to make "causing" a disclosure an illegal act, it could have done so, as it has in other statutes—but it did not do so in the VPPA. *Id.* at 16-17 & n.8.[5] And even if the NBA disclosed PII to Facebook (which it did not), such a disclosure was not "knowing." Mr. Salazar's contrary argument on this point amounts to no more than the assertion that the NBA was aware of the functionality of the Facebook Pixel. Opp. 9-10. Even if true, that is irrelevant. The VPPA requires knowledge of a specific disclosure of PII (not of the mechanism by which the PII is disclosed), and Mr. Salazar fails to make any such allegation.[6]

---

[5] Contrary to *Czarnionka*'s erroneous reasoning, the use of a Facebook Pixel is not analogous to "[t]hrowing Judge Bork's video watch list in the recycle bin . . . knowing that the Washington Post searches your bin every evening." *Czarnionka*, 2022 WL 17069810, at *3 (citation omitted). Such an analogy assumes the NBA possessed the relevant PII in the first place; it did not. Mot. 17-18.

[6] Mr. Salazar argues that a FID "on its own" constitutes PII. Opp. 10. It does not. PII must include information which identifies specific video materials. 18 U.S.C. § 2710(a)(3). Regardless, Mr. Salazar has not alleged the NBA possessed his FID, so this argument is irrelevant.

### C. Mr. Salazar Consented to the NBA's Privacy Policy and Terms of Use, Including the Class Waiver.

Mr. Salazar consented to, and is bound by, the NBA's Privacy Policy and Terms of Use—requiring, at a minimum, dismissal of the class claims.[7] In fact, Mr. Salazar makes no effort to dispute that the class action waiver requires dismissal of his class claims, save to argue against the enforceability of the Terms of Use generally. *Cf.* Opp. 20. Those arguments are meritless.

Mr. Salazar spills much ink characterizing the cookie banner as a "browsewrap" agreement. *See* Opp. 11-13. That ignores the email widget (which requires affirmative input), but in any case, such empty verbal classifications are not the point. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017) (such classifications "say[] little" (citation omitted)); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 829-30 (S.D.N.Y. 2020) (similar discussion). Courts enforce web-based agreements where (1) notice of the agreement was "reasonably conspicuous" and (2) the user's "manifestation of assent" was "unambiguous." *Meyer*, 868 F.3d at 76-77; *see Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (applying same "inquiry notice" and "assent" test).[8] Courts find "unambiguous" assent where the site provides constructive knowledge that accepting benefits would constitute assent; thus, there is considerable overlap in analysis of these two prongs. *Meyer*, 868 F.3d at 79 (finding assent "in light of the objectively reasonable notice of the terms"). This test applies to any web-based agreement that does not require clicking

---

[7] Contrary to Mr. Salazar's argument that his consent is ill-suited for resolution on a motion to dismiss, Opp. 13 n.12, courts regularly assess the enforceability of web-based agreements at the pleading stage. *See, e.g.*, *Whitt v. Prosper Funding LLC*, No. 15-cv-136, 2015 WL 4254062, at *1 (S.D.N.Y. July 14, 2015).

[8] To the extent Mr. Salazar suggests that a different framework applies to the enforceability of "browsewrap" agreements if the user is not a business, *see* Opp. 11-12, that is wrong. The same notice and assent test applies regardless of the user's identity. *See, e.g.*, *Feld*, 442 F. Supp. 3d at 829-30. The statement Mr. Salazar quotes from *International Council of Shopping Centers, Inc. v. Info Quarter, LLC*, No. 17-cv-5526, 2018 WL 4284279, at *3 (S.D.N.Y. Sept. 7, 2018), was dicta, as that case did involve a business, and did find the relevant agreement enforceable.

a box acknowledging consent before accessing a site—whether deemed "browsewrap," "sign-in wrap," or something else. *Cf. generally, e.g.*, *Starke*, 913 F.3d at 289. Indeed, despite his fixation on terminology, Mr. Salazar appears to agree this notice-and-assent test governs. *See* Opp. 12.

Here, the governing standards are met. The cookie banner, which appears immediately when a user visits the site, hyperlinks the Privacy Policy and Terms of Use in bold, blue, underlined text against an all-white background, embedded in simple text making it abundantly clear that a user agrees to those policies by using the site. Preston Decl. ¶ 3, Ex. A; *see Peiran Zheng v. Live Auctioneers LLC*, No. 20-cv-9744, 2021 WL 2043562, at *5 (S.D.N.Y. May 21, 2021) (finding "plaintiff had reasonable notice" where, among other things, policy links "were capitalized, blue, and underlined, clearly indicating to a reasonably prudent internet user that those terms were hyperlinked"). Mr. Salazar mischaracterizes the banner by stating that it "accompanies its hyperlinks [with] a single statement" about cookie usage. Opp. 14. Not so. The banner goes on to state: "If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use." Preston Decl. ¶ 3, Ex. A. Thus, it "contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) (citation omitted). Further, the links are close to the "I Accept" button. *See Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-cv-4570, 2017 WL 7309893, at *9 (S.D.N.Y. Nov. 20, 2017) (finding agreement enforceable where "[t]ext alerting the user to the existence of" Terms of Use "appeared directly below the 'Submit Order' button and provided a hyperlink"), *report and recommendation adopted as modified*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018). "A reasonable user would know" that by pressing forward in the face of these notices, "he was agreeing to the terms and conditions accessible via the hyperlink." *Meyer*, 868 F.3d at 79-80. To top it off, the email widget provides

"yet another form of notice," *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 550 (S.D.N.Y. 2018), reminding users again that they would be bound by the Privacy Policy and Terms of Use if they signed up. Mot. 4 & n.2.[9]  In short, Mr. Salazar was presented with reasonable notice and gave unambiguous assent by engaging in "conduct that a reasonable person would understand to constitute assent" under the circumstances. *Starke*, 913 F.3d at 289.

### D. The NBA's Privacy Policy Meets Each of the Requirements of the VPPA.

The NBA's Privacy Policy also satisfies the VPPA's consent requirements, providing an additional basis to dismiss all of Mr. Salazar's claims. Mr. Salazar argues that the Privacy Policy is not a valid form of consent under the VPPA because it imposes "legal obligations" on consumers, Opp. 21-22, but that is not the case. The Policy sections at issue do not set forth "legal . . . obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). An "obligation" would place a "legal or moral duty [on Mr. Salazar] to do or not do something," but the cited Policy sections are at most consents allowing the NBA or others to take certain actions (as well as sundry informational notices). *Obligation*, *Black's Law Dictionary* (11th ed. 2019).[10] As for the VPPA's timing requirements, the NBA already explained why those requirements are met. Mot. 22. Mr. Salazar's response consists of asserting without authority that "loading a webpage cannot be deemed proper consent." Opp. 23. But the viewer receives a pop-up banner stating: "If you

---

[9] Mr. Salazar makes much of certain changes to the email widget over time, Opp. 16-19 & n.17, but regardless of those changes (which include the addition of hyperlinks), there is no dispute that he had already received bold, blue hyperlinks to the policies in the cookie banner. And while Mr. Salazar discusses the banner and widget separately, Opp. 15-20, the proper approach is to consider them together: "whether a web user had 'reasonable notice' of contract terms contained in a contract accessible by hyperlink depends on the 'totality of the circumstances.'" *Peiran Zheng*, 2021 WL 2043562, at *5 (quoting *Starke*, 913 F.3d at 297).

[10] As for *Cappello v. Walmart Inc.*, No. 18-cv-6678, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019), that decision was wrong to hold that the VPPA requires a form addressing "*solely*" video-related disclosures—a holding with no basis in (and directly contrary to) the statute's text.

continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use." Preston Decl. ¶ 3, Ex. A. The NBA thus obtains the user's consent "at the time the disclosure is sought." 18 U.S.C. § 2710(b)(2)(B)(ii)(I). Finally, the NBA provides the ability to opt out in a clear and conspicuous manner. Mr. Salazar's contrary argument primarily castigates the NBA for making it *too easy* to opt out of all disclosures (as opposed to "case-by-case" opt-outs). Opp. 24. This specious argument—which speaks volumes about how genuine and serious Mr. Salazar's privacy concerns are—fails. Among other things, a user wishing to opt out on a "case-by-case" basis can toggle the "Do Not Sell My Personal Information" opt-out switch on or off whenever, and as often, as desired.

## CONCLUSION

For the foregoing reasons and those set forth in the NBA's opening Memorandum, the Court should dismiss the Complaint in its entirety.

Dated: January 13, 2023

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

By: */s/ Hilary L. Preston*

| | |
|---|---|
| Matthew X. Etchemendy | Hilary L. Preston |
| (*pro hac vice pending*) | Palmina M. Fava |
| 2200 Pennsylvania Avenue, NW | Marisa Antonelli |
| Suite 500 West | 1114 Avenue of Americas |
| Washington, DC 20037 | 32nd Floor |
| Telephone: (202) 639-6740 | New York, NY 10036 |
| Facsimile: (202) 879-8940 | Telephone: (212) 237-0000 |
| metchemendy@velaw.com | Facsimile: (212) 237-0100 |
| | hpreston@velaw.com |
| | pfava@velaw.com |
| | mantonelli@velaw.com |

*Counsel for National Basketball Association*