UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL SALAZAR,

Plaintiff,

-against-

NATIONAL BASKETBALL
ASSOCIATION,

Defendant.

No. 1: 22-cv-07935 (JLR)

<u>**OPINION AND ORDER**</u>

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Michael Salazar ("Plaintiff") brings this putative class action alleging that Defendant National Basketball Association ("Defendant" or the "NBA") violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. *See generally* ECF No. 1 ("Compl."). Plaintiff contends that he has digitally subscribed to NBA.com since 2022 and has had a Facebook account since about 2010. *Id.* ¶ 12. In this lawsuit, Plaintiff brings one claim alleging that his personal viewing information from the NBA.com site (along with his Facebook ID, which he alleges is personally identifiable information) was disclosed to third party Facebook without his knowledge or consent in violation of the VPPA. *Id.* at ¶¶ 12, 49, 66. Plaintiff brings this action individually and on behalf of hundreds of thousands of similarly situated individuals throughout the country. *Id.* ¶ 52. Defendant moves to dismiss the Complaint in its entirety arguing that Plaintiff does not have standing, the Complaint fails to state a claim, and Plaintiff expressly waived his right to bring a class action. *See generally*, ECF No. 20 ("Mot."); ECF No. 21 ("Br."). For the reasons stated below, Defendant's motion to dismiss for lack of standing under Federal Rule of Civil Procedure ("Rule") 12(b)(1) is DENIED, but its motion to dismiss for failure to state a claim under Rule 12(b)(6) is GRANTED.

## BACKGROUND[1]

### I.      Factual Background

### <u>The NBA's Website and App</u>

Defendant NBA is a major American sports league headquartered in New York, New York.  Compl. ¶ 13.  The NBA maintains a website called NBA.com that has approximately 14.5 million unique monthly visitors.  *Id. ¶¶* 13, 21.  On NBA.com, viewers can watch video content under a section of the website fittingly titled, "Videos."  *Id.* ¶ 13.  The NBA also has a phone application ("App") that is downloadable on Android and iPhone devices.  *Id. ¶* 21.

An individual may register on NBA.com by signing up for an online newsletter.  *Id.* ¶ 20. To sign up, an individual provides personal information, including an email address.  *Id.*  When individuals sign up for this digital subscription, they provide the NBA with their IP address, which is an individualized number assigned to "all information technology connected devices." *Id.* ¶ 22.  The IP address provides the NBA with the user's city, zip code, and physical location. *Id.*

### <u>The NBA's Data Policies</u>

NBA.com has a Privacy Policy that states the website collects "Personal Information" from users.  *Id.* ¶ 27.  The relevant part of the policy lists the types of data collected as follows:

> This data will vary, but typically consists of name, email address, postal address, phone number and other similar contact data.  We also receive data from the communications you send to us, such as customer service inquiries, product reviews and other feedback regarding the Services.

---

[1] Unless otherwise noted, the facts stated herein are taken from the Complaint, which the Court accepts as true, and material referenced in the Complaint.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013).

User credentials, such as username, password, password hints and similar security information used to create an account and authenticate users of the Services.

Demographic data, such as age, gender, country and language preference.

Payment data, such as credit card information and billing address.

Device data, such as type of device, operating system and other software installed on the device, device settings, IP address, device identifiers and error reports.

Usage data, such as the programs and features you access, items you purchase, and the timing, frequency and duration of your interactions through the Services.

Location data, such as IP addresses received from your device.

Information about your interests and preferences, such as your favorite teams and players, your home city or your communications preferences.  In addition to what you provide directly, we may infer your interests and preferences from other data we collect, such as the content and advertisements you interact with while using the Services.

*Id.*  Plaintiff alleges that when an individual creates an account with NBA.com, Defendant does not disclose in the Privacy Policy (or Terms of Service) that it will share personal data with third parties, nor are parties asked to consent to this practice.  *Id.* ¶¶ 24, 26, 29.

### Defendant's Data Collection and Disclosure

Plaintiff alleges that Defendant collects and shares data and personal information of its users with third parties through cookies, software development kits ("SDKs"), and tracking pixels.  *Id.* ¶ 3.  Specifically here, Plaintiff claims that the NBA installed Facebook's tracking pixel on NBA.com.  *Id.* ¶ 32.  Therefore, when a digital subscriber uses NBA.com and watches videos, "the website sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched."  *Id.*  This Personal Viewing Information ("PVI") is comprised of two sources of data: (1) personally

identifiable information including a Facebook ID ("FID"); and (2) "Video Media" meaning "the computer file containing video and its corresponding URL viewed." *Id.* at p. 1.  An FID is "a unique and persistent identifier that Facebook assigns to each user." *Id.* ¶ 33.  Using an FID, anyone can locate a user's Facebook profile and name. *Id.* ¶¶ 33-34.  NBA.com, "through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser." *Id.* ¶ 33.  Facebook, in turn, uses the data to show the user targeted ads. *Id.* ¶ 30.

Defendant purposefully used Facebook's pixel code on NBA.com and the App, knew that PVI would be disclosed to Facebook, and financially benefited from it. *Id.* ¶¶ 33, 35.  Plaintiff alleges that the pixel "enabled NBA.com and accompanying app to show targeted advertising to its digital subscribers based on the products those digital subscriber's [sic] had previously viewed on the website or app, including Video Media consumption for which Defendant received financial remuneration." *Id.* ¶ 35.  The PVI is not anonymized and therefore Facebook can either add the data to the information it already has for specific users or use the data to generate new user profiles. *Id.* ¶ 38.

### Plaintiff's Use of NBA.com

Plaintiff, a resident of California, signed up for a digital subscription to NBA.com in 2022. *Id.* ¶¶ 12, 46.  To become a digital subscriber, Plaintiff provided NBA.com with his email address, his IP address, and cookies associated with his device. *Id.* ¶ 46.  As a digital subscriber, Plaintiff receives emails and other communications from NBA.com. *Id.*  Plaintiff also currently uses a Facebook account that he has had since 2010. *Id.* ¶¶ 12, 47.  Since 2022, Plaintiff has watched videos "through NBA.com and/or the App" while logged into his Facebook account. *Id.*  By doing so, Plaintiff alleges that his PVI was disclosed to Facebook through the

4

aforementioned process.  *Id.* ¶¶ 12, 48.  Plaintiff contends that he "never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook."  *Id.* ¶ 48.  Plaintiff alleges he was never provided written notice that his PVI would be disclosed, nor did Plaintiff receive any written notice that he could opt out of the disclosure of his PVI.  *Id.*  "Plaintiff did not discover that Defendant disclosed his [PVI] to Facebook until August 2022."  *Id.* ¶ 49.

## II.    Procedural Background

Plaintiff initiated this putative class action on September 16, 2022.  *See* Compl. Defendant moved to dismiss the action on December 2, 2022.  *See* Mot.  In support of the Motion to Dismiss, Defendant filed a Memorandum of Law ("Br."), and a declaration with accompanying exhibits (ECF No. 22 ("Preston Decl.")).  Plaintiff filed his opposition to the Motion to Dismiss on December 23, 2022 (ECF No. 27 ("Opp.")), along with a declaration and exhibits (ECF No. 29 ("Murphy Decl.")).  Defendant filed its reply brief on January 13, 2023. ECF No. 32 ("Reply").

The parties then periodically sent the Court supplemental authority, and responses to those submissions, seemingly whenever a new VPPA decision was issued anywhere in the country.  Specifically, on March 13, 2023, Plaintiff filed a letter containing supplemental authority.  ECF No. 41.  Defendant responded to that authority on March 17, 2023.  ECF No. 42. Defendant filed two additional letters with supplemental authority on April 28, 2023 (ECF No. 42) and June 29, 2023 (ECF No. 44).  Plaintiff responded to the June 29, 2023 letter on July 5, 2023.  ECF No. 45.  On July 14, 2023, Defendant filed another supplemental letter to which Plaintiff filed a response on July 19, 2023.  ECF Nos. 46, 47.  Additional submissions were

provided on July 20, 2023 and July 24, 2023.  ECF Nos. 48, 49.  Defendant submitted an

additional letter on August 4, 2023.  ECF No. 50.

## LEGAL STANDARD

### I.      Motion to Dismiss Standard

Defendant moves to dismiss under Rules 12(b)(1) and 12(b)(6).  "A district court

properly dismisses an action under [Rule] 12(b)(1) for lack of subject matter jurisdiction if the

court 'lacks the statutory or constitutional power to adjudicate it . . . .'"  *Cortlandt St. Recovery*

*Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quoting *Makarova v. United*

*States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "A motion to dismiss for lack of Article III standing

challenges the subject-matter jurisdiction of a federal court, and, accordingly, is properly brought

under [Rule] 12(b)(1)."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) (citing

*Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or

fact-based."  *Carter*, 822 F.3d at 56.  A motion "based solely on the allegations of the complaint

or the complaint and exhibits attached to it" is a facial challenge.  *Id.*  On a facial challenge, the

court must accept as true all material allegations in the complaint and draw all reasonable

inferences in favor of the plaintiff.  *Id.* at 56-57.  Defendants have raised a facial challenge here.

"When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter

jurisdiction, and also moves to dismiss on other grounds, the Court must consider the Rule

12(b)(1) motion first."  *Bellocchio v. Garland*, 614 F. Supp. 3d 11, 17 (S.D.N.Y. 2022); *see*

*Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (noting that standing is a "threshold

question in every federal case" (citation omitted)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, the facts must be sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  On a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal brackets omitted).  The court shall not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

"In considering a motion to dismiss for failure to state a claim under [Rule]12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (internal citation and quotation marks omitted).  "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

7

## II.       Video Privacy Protection Act

The Video Privacy Protection Act ("VPPA") was passed in 1988 in response to the

*Washington City Paper*'s publication of a list of 146 films that the family of Supreme Court

nominee Robert Bork had rented from a video store.  *See In re Nickelodeon Consumer Priv.*

*Litig.*, 827 F.3d 262, 278 (3d Cir. 2016).  The VPPA "creates a private right of action for

plaintiffs to sue persons who disclose information about their video-watching habits."  *Id.*  The

VPPA states that "[a] video tape service provider who knowingly discloses, to any person,

personally identifiable information concerning any consumer of such provider shall be liable to

the aggrieved person . . . ."  18 U.S.C. § 2710(b)(1).  "To state a claim under § 2710(b), a

plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant

disclosed 'personally identifiable information concerning any consumer' to 'any person,' (3) the

disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the

statute."  *Martin v. Meredith Corp.*, No. 22-cv-04776 (DLC), 2023 WL 2118074, at *3

(S.D.N.Y. Feb. 17, 2023) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)).

## DISCUSSION

## I.       Standing

Before reaching the merits of the VPPA claim, the Court will address Defendant's

argument that Plaintiff lacks standing because he has not suffered an injury in fact.  Br. at 9.

Article III of the U.S. Constitution states that '[t]he judicial Power of the United States' extends

only to certain 'Cases' and 'Controversies.'"  *Lacewell v. Off. of Comptroller of Currency*, 999

F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III §§ 1-2).  "One element of the case-or-

controversy requirement is that plaintiffs must establish that they have standing to sue."  *Clapper*

*v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citation and quotation marks omitted).

Satisfying the cases and controversies requirement, including standing, is a "threshold question in every federal case." *Mahon*, 683 F.3d at 62 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  To establish standing a plaintiff must demonstrate "(1) an 'injury in fact', (2) a 'causal connection' between that injury and the conduct at issue, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'"  *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation marks omitted).

The burden lies with a plaintiff to demonstrate standing since the plaintiff is the party "invoking federal jurisdiction."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). Importantly, in the context of statutory violations, the Supreme Court clarified in *TransUnion* that a plaintiff does not have standing unless the plaintiff has suffered concrete harm pursuant to Article III.  141 S. Ct. at 2205.  The Supreme Court held that while Congress may create statutory causes of action, "under Article III, an injury in law is not an injury in fact" and "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.*  To allege a concrete harm, the plaintiff must set forth an injury that "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *Id*. at 2204 (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)).  An "exact duplicate in American history and tradition" is not required.  *Id.* at 2204.  Traditional harms include "traditional tangible harms, such as physical harms and monetary harms" and "various intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion."  *Id.*

Here, the parties dispute whether Plaintiff has established the first element of the standing test: injury in fact.  Defendant argues that Plaintiff lacks standing in light of *TransUnion LLC*,

141 S. Ct. at 2203-07.  Br. at 9-10.  According to Defendant, Plaintiff is pleading only a statutory

injury, but has not articulated an actual injury in fact.  *Id.*  Defendant contends that Plaintiff has

not articulated any tangible harm, such as monetary loss, nor any credible theory of intangible

harm such as reputational harm or embarrassment given that the allegations state that Facebook

was simply provided with truthful information that was not alleged to be harmful to Plaintiff's

reputation.  *Id.* at 11.

Plaintiff responds that he was harmed and has standing because he has pleaded that the

NBA disclosed Plaintiff's private PVI to third parties, without his consent, and the plaintiff class

cannot "defend themselves against the highly personal ways NBA.com has used and continues to

use data."  Opp. at 3.  Plaintiff alleges that this disclosure of personal information to third parties

in contravention of the VPPA allegedly violated Plaintiff's privacy rights, which has long been

sufficient for alleged concrete, particularized injury under Article III.  *Id.*

The Court agrees that prior to *TransUnion*, courts have consistently found that plaintiffs

satisfy the concreteness requirement of Article III standing where they allege a deprivation of

their privacy rights under the VPPA.  *See Austin-Spearman v. AMC Network Entm't LLC*, 98 F.

Supp. 3d 662, 666-67 (S.D.N.Y. 2015) ("[E]very court to have addressed this question has

reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to

confer standing through its deprivation[.]") (collecting cases).  The question is whether

*TransUnion* now requires a different conclusion.  The Court holds that it does not.

Under *TransUnion,* the Court must ask whether Plaintiff suffered a concrete harm by

looking to traditionally recognized injuries.  *See* 141 S. Ct. at 2203-07.  Here, Plaintiff alleges

that NBA.com shared private information about, among other things, his video viewership to a

third party without his consent or knowledge, resulting in targeted advertisements being sent to

him.  Compl. ¶¶ 5-8, 30, 35; *see* Opp. at 3.  Several courts have held these allegations to be

sufficient to establish concrete injury (and standing) post-*TransUnion* because the "disclosure of

private information is a harm that courts have traditionally considered to be redressable."  *Carter*

*v. Scripps Networks, LLC*, --- F.Supp.3d ----, No. 22-cv-02031 (PKC), 2023 WL 3061858, at *3

(S.D.N.Y. Apr. 24, 2023); *see Martin*, 2023 WL 2118074, at *2 ("[Plaintiff's] allegations that

the defendants disclosed his private information to a third party without his consent are sufficient

to confer standing."); *Salazar v. Glob.*, No. 3:22-cv-00756, 2023 WL 4611819, at *7 (M.D.

Tenn. July 18, 2023) (recognizing concrete harm of involving "a clear *de facto* injury, i.e., the

unlawful disclosure of legally protected information").  In fact, *TransUnion* specifically

mentioned "disclosure of private information" as one of the intangible harms that was

historically recognized as a legal injury.  *TransUnion LLC*, 141 S. Ct. at 2204; *Bohnak v. Marsh*

*& McLennan Cos., Inc.*, 580 F. Supp. 3d 21, 29 (S.D.N.Y. 2022) (noting that among the

traditionally recognized privacy torts are public disclosure of private information and intrusion

upon seclusion).

  Defendant avers that the Court should find that there is no standing here notwithstanding

these cases because Plaintiff has not alleged the disclosure of private information *to the public*.

Br. at 11.  The Court does not agree.  Whether the information that was transmitted to Facebook

was disseminated publicly or not, the *TransUnion* Court also referenced "intrusion upon

seclusion" as an injury "with a close relationship to harms traditionally recognized as providing a

basis for lawsuits in American courts" that could form a basis for Article III standing.

*TransUnion*, 141 S. Ct. at 2204.  Intrusion upon seclusion occurs when an individual

"intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his

private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."

Restatement (Second) of Torts § 652B (1977).  An example highlighted in the Restatement

(Second) was an intrusion into someone's privacy "by opening [a plaintiff's] private and

personal mail."  *Id.* cmt. b.  "The intrusion itself makes the defendant subject to liability, even

though there is no publication or other use of any kind of the . . . information outlined."  *Id.*

Plaintiff's claim that Defendant purposefully shared his private viewing information with a third

party without Plaintiff's knowledge or consent is akin to that type of intrusion into his privacy.

*See Feldman v. Star Trib. Media Co. LLC*, No. 22-cv-01731 (ECT) (TNL), 2023 WL 2388381,

at *4 (D. Minn. Mar. 7, 2023) (finding that the plaintiff's claims mirrored the tort of intrusion

upon seclusion because the plaintiff "alleges that his video viewing history was his private

concern, that the Star Tribune intruded by sharing this history with Facebook, and that this

sharing would be offensive to a reasonable person").

In a supplemental letter, Defendant argues that a comparison to the tort of intrusion upon

seclusion is inappropriate because Plaintiff failed to plead that the conduct in question would be

"highly offensive to a reasonable person."  ECF No. 42 at 1-2.  At the pleading stage, Plaintiff

has set forth enough to allege that was offensive to a reasonable person.  *See Lujan*, 504 U.S.

at 561 ("At the pleading stage, general factual allegations of injury resulting from the

defendant's conduct may suffice, for on a motion to dismiss [courts] 'presume that general

allegations embrace those specific facts that are necessary to support the claim.'" (quotation

marks and alteration omitted)).  For example, Plaintiff alleges that he never consented to nor was

provided with any written notice that Defendant was sharing his PVI (Compl. ¶ 48); Plaintiff

takes issue with the "automatic and invisible" dissemination of his personal information that

prevents him and the class from "defend[ing] themselves against the highly personal ways" that

the Defendant is using the data to "make money for itself" (*id.* ¶ 7); and finally, Plaintiff alleges

that the tracking pixel functionality is not necessary for the functioning of the NBA website but instead was employed without his consent "sole[ly for the] purpose of enriching Defendant and Facebook" (*id.* ¶ 44).  A reasonable person could find it offensive that private and personal details of their viewing preferences were shared with a third party without their consent so that commercial parties could profit from targeted advertisements that were then sent to them.[2]

Defendant next contends that Plaintiff's injury amounts only to Facebook "learning something truthful about him" and there is no injury in fact where someone communicates truthful information about another.  Br. at 11.  Not so.  The privacy claims outlined in the Restatement such as invasion of privacy, intrusion upon seclusion, and appropriation of another's likeness, do not hinge on the dissemination of false information, but rather the intrusion into the claimant's privacy even if truthful information is gathered or disseminated.  *See* Restatement 2d Torts § 652A (1977).

Finally, Defendant claims that Plaintiff invokes the "empty labels" of "right to privacy" or "loss of privacy" without identifying a concrete injury, akin to a blanket claim of a "right to

---

[2] The Court does not find the Fair Debt Collection Practices Act ("FDCPA") cases outside of this Circuit cited by Defendant to be persuasive here with respect to the historic analogue of the tort of intrusion upon seclusion.  Not only do they examine injury under a different statute and different factual circumstances, but most do not concern intrusion upon seclusion or an analogue, like here.  *See Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (holding that the plaintiff did not allege a concrete harm because the harm alleged did not resemble the common law analogue plaintiff identified: the tort of public disclosure); *Glick v. CMRE Fin. Servs., Inc.*, No. 21-cv-07456 (NSR), 2022 WL 2475690, at *1, *3 (S.D.N.Y. July 6, 2022) (finding the plaintiff lacked standing because the injury was not comparable to the common law tort of disclosure of private information since the defendant did not disclose information to the public); *Sputz v. Alltran Fin., LP*, No. 21-cv-04663 (CS), 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) (same).  Finally, *Shields v. Pro. Bureau of Collections of Maryland, Inc.*, also examined the tort of public disclosure, and rejected a link to the tort of intrusion upon seclusion in a single sentence (without analysis) because the plaintiff never alleged any intrusion in her "private solitude." 55 F.4th 823, 829 (10th Cir. 2022).  Indeed, the same court earlier concluded there was standing for an FDCPA claim based on an intrusion upon seclusion analysis.  *See Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021).

travel free from discrimination" that was found to be insufficient in *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443-44 (2d Cir. 2022).  Br. at 12.  *Harty* is inapposite here.  In *Harty*, the plaintiff sued for a violation of the Americans with Disabilities Act (ADA) because he visited a hotel's website only to discover that the hotel and its website were noncompliant with the ADA. *Harty*, 28 F.4th at 440.  The Second Circuit held that the plaintiff did not plead a concrete injury for purposes of standing because, despite a "right to travel free from discrimination," the plaintiff had no plans to actually travel to the location in question.  *Id.* at 443.  In comparison, here, Plaintiff's alleged injury has occurred: Plaintiff's private and personal information was disseminated to a third party for purposes of targeted advertising without Plaintiff's consent or knowledge.

Therefore, Plaintiff has adequately pleaded standing and Defendant's motion to dismiss pursuant to Rule 12(b)(1) is denied.

## II.     Failure to State a Claim

Defendant next contends that Plaintiff has failed to plead a plausible claim under the VPPA because "he fails to allege facts that qualify him as a protected consumer; . . . he fails to allege facts showing the NBA disclosed PII; . . . or did so knowingly; and even if it did, the facts alleged indicate the disclosures were subject . . . to a consent exception."  Br. at 13.

### A.  VPPA "Consumer"

The parties disagree as to whether Plaintiff qualifies as a consumer receiving the protections of the VPPA.  The VPPA defines consumer as "any renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  Neither party asserts that Plaintiff is a "renter" or "purchaser," but they instead focus on whether Plaintiff qualifies as a "subscriber."  Br. at 13-16; Opp. at 7-9.  Defendant argues that Plaintiff does not

14

qualify as a "subscriber" of goods or services from a video tape service provider because Plaintiff only signed up for email newsletters – newsletters which were not alleged to contain video content and were not necessary to view the videos on the NBA website.  Br. at 13-16. Plaintiff argues that he has adequately alleged that he is a subscriber of a "good or service" under the VPPA.  Opp. at 7.  Specifically, Plaintiff argues that he has sufficiently pleaded a VPPA claim as a consumer given that he subscribed to NBA.com newsletters, he provided personal information to do so, and NBA.com provides video services.  *Id.* at 7-9.  This is sufficient to qualify as a "subscriber" under the VPPA, according to Plaintiff.  *Id.*  The Court does not agree with Plaintiff based on the language of the VPPA.

"When interpreting the meaning of a statute . . . the starting point of inquiry is of course the language of the statute itself."  *Panjiva, Inc. v. U.S. Customs & Border Prot.*, 975 F.3d 171, 176 (2d Cir. 2020) (quoting *In re Edelman*, 295 F.3d 171, 177 (2d Cir. 2002)).  "If the statutory language is unambiguous, we construe the statute according to the plain meaning of its words." *Ray v. Ray*, 22 F.4th 69, 73 (2d Cir. 2021).  The plain meaning is determined by "looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."  *U.S. ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018) (internal citation omitted).  Only if the terms are ambiguous or unclear does a court look to "legislative history and other tools of statutory interpretation."  *Panjiva, Inc.*, 975 F.3d at 176 (internal citation omitted).

To understand the plain meaning of the disputed term "subscriber," the Court begins with dictionary definitions.  The verb form of subscriber – "subscribe" – is defined as "to enter one's name for a publication or service" or "to receive or have access to something (such as a periodical or service) as part of an arrangement to receive a certain number of regular deliveries or a certain period of continuous access especially by prepayment."  *Subscribe*, Merriam-

Webster.com, http://www.merriamwebster.com/dictionary/subscribe (last visited August 4, 2023).  Other courts have looked to dictionary definitions for "subscriber," which include a person who "registered to pay for and receive a periodical, service, theater tickets, etc. for a specified period of time."  *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255-56 (11th Cir. 2015) (internal citations omitted); *see Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (collecting definitions).

At least one court in this district has summarized "subscriber" as requiring an "ongoing relationship between provider and subscriber, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange."  *Austin-Spearman*, 98 F. Supp. 3d at 669.  The Eleventh Circuit has similarly stated that a "common thread is that 'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Ellis*, 803 F.3d at 1256.

The Court also considers how the term "subscriber" is contextualized within the statute, taking care "not to construe each phrase literally or in isolation."  *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) (internal citation and quotation marks omitted). A "subscriber" is one type of "consumer," a statutorily defined term.  *See* 18 U.S.C. § 2710(a)(1) (defining "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider").  Importantly, the definition of "consumer" relies on the key phrase "video tape service provider."  *Id.*  In addition, the liability clause of the VPPA also uses the term "video tape service provider."  *See* 18 U.S.C. § 2710(b)(1) ("[A] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . .").  And a video tape

service provider is defined under the VPPA as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar *audio visual materials* . . . ." 18 U.S.C. § 2710(a)(4) (emphasis added).  A consumer under the VPPA – and necessarily, a "renter, purchaser, or *subscriber*" under the VPPA – consumes (or rents, purchases, or subscribes to) audio visual materials, not just any products or services from a video tape services provider.

This is consistent with the ruling of another court in this district.  In *Carter*, the court found that "[i]n the statute's full context, a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large."  *Carter*, 2023 WL 3061858, at *6.  This is because "the scope of a 'consumer' . . . is cabined by the definition of 'video tape service provider,' with its focus on the rental, sale or delivery of audio visual materials."  *Id.*  In turn, the VPPA "provides for an action by a renter, purchaser of subscriber of audio visual materials, and not a broader category of consumers."  *Id.*

In light of this interpretation, the Court does not find the statutory language, or the term "subscriber," ambiguous, but if it had, legislative history supports this reading.  As the *Carter* court noted:

> The 1988 Senate Report notes that the definition of PII at section 2710(a)(3) is drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill.  For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products."

*Id.* (quoting S. Rep. No. 100-599, 12).  This supports the Court's interpretation that the VPPA only applies to consumers (including subscribers) of audio video services.

In light of the statutory framework, the Court agrees with Defendant's argument that Plaintiff does not plausibly allege that he was a subscriber of Defendant's video services. Br. 13-16. Plaintiff alleges he had a digital subscription to NBA.com in 2022. Compl. ¶ 12. Registering for NBA.com requires a user to sign up for an online newsletter and provide an email address. *Id.* ¶ 20. As part of the subscription, Plaintiff alleges that he received "emails and other communications from NBA.com." *Id.* ¶ 46. Plaintiff alleges that he "used his digital subscription to view videos on NBA.com or on the NBA app," *id.* ¶ 12, and that "[a]fter becoming a digital subscriber, viewers have access to a variety of NBA.com Video Media on Defendant's digital platform," *id.* ¶ 25, but he does not allege that the newsletters contained videos. Rather, the Complaint includes screenshots of how an individual can watch videos on NBA.com. *Id.* ¶ 39. The screenshot of NBA.com shows an option to "Sign In," located on the top right corner of the screen, demonstrating that viewing the video does not require a viewer to be a subscriber or have an account to see the videos. *Id.* ¶¶ 39-40. Plaintiff further describes the objectionable process in the Complaint as a process whereby a user "clicks on and watches the video in the article" and then "NBA.com sends the content name of the video digital subscriber watched, the URL, and the digital subscriber's FID to Facebook." *Id.* ¶ 40. There is no allegation that a user must log in to watch the video, and Plaintiff does not allege that the video content he accessed was exclusive to a subscribership.

Again, the Court agrees with the *Carter* court's analysis that reviewed a similar newsletter arrangement with a website. There, the court observed that "[t]he newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers." *Carter*, 2023 WL 3061858, at \*6. Thus, because the

18

complaint did not support a claim that the "the plaintiffs acted as 'subscribers' when they viewed the videos on the hgtv.com, it d[id] not plausibly allege they were 'consumers' under the VPPA." *Id.* at *7. The same result holds here. Plaintiff had the same access to videos on the NBA.com site as any other visitor to the site. *See id.* at *6 ("Plaintiffs were free to watch or not watch hgtv.com videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site.").

Because Plaintiff does not allege that his newsletter subscription allowed him access to the videos on the NBA.com site that any member of the public would not otherwise have, Plaintiff has alleged that he was a "subscriber[] to newsletters, not [a] subscriber[] to audio visual materials." *Id.* at *6; *cf. Austin-Spearman*, 98 F. Supp. 3d at 669 (concluding that subscriber relationship implies a mutual "exchange" of value). Several other courts are in accord, including one that recently rejected a similar VPPA claim brought by the same Plaintiff here. *See Salazar*, 2023 WL 4611819, at *11 (adopting *Carter* analysis in support of holding that the plaintiff who signed up for a website newsletter was not a subscriber under the VPPA); *see also Gardener v. MeTV*, No. 22-cv-05963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) (finding that the plaintiffs were not subscribers under the VPPA because the plaintiffs' subscription to a newsletter was "unconnected to their ability to access video content" that was otherwise available on the website); *Tawam v. Feld Ent., Inc.*, No. 23-cv-00357 (S.D. Cal. July 28, 2023), ECF No. 21 at 9 (holding that the plaintiffs were not subscribers because they "signed up for an email mailing list provided by defendant and separately viewed videos on defendant's website").

Plaintiff asserts in a supplemental letter filed on July 24, 2023, that the Complaint alleges that the NBA newsletters contain video content, citing to paragraphs 20-26 and 33-35 of the Complaint. ECF No. 49 at 1. However, these paragraphs do not plead that the newsletters

19

contained videos.  Even if the Complaint did allege that the newsletter contained *links* to videos

on the NBA.com website as Plaintiff asserts in a supplemental letter, *see* ECF No. 49 at 1

("[D]iscovery in this matter will demonstrate that the NBA's newsletters direct its subscribers to

video content[.]"), links to video content which is generally accessible on the NBA.com website

are insufficient to create a subscribership relationship (or exchange of value) vis-à-vis video

services given the lack of allegations regarding exclusive content or enhanced access.  *See*

*Carter*, 2023 WL 3061858, at *6 (rejecting VPPA claim because "the Complaint does not

include facts that plausibly allege that their status as newsletter subscribers was a condition to

accessing the site's videos, or that it enhanced or in any way affected their viewing

experience").[3]

 In conclusion, the Court does not find that Plaintiff's subscription to Defendant's

newsletter rendered him a consumer of goods or services from a video tape service provider

under the VPPA.[4]  As such, Plaintiff's claim under the VPPA is dismissed.

---

[3] Plaintiff relies heavily on *Lebakken v. WebMD, LLC*, --- F. Supp. 3d ----, No. 22-cv-00644
(TWT), 2022 WL 16716151, at *3 (N.D. Ga. Nov. 4, 2022). Opp. Br. at 8-9.  The Court does not
find *Lebakken* persuasive because its subscribership analysis was not sufficiently tethered to
video services.  *See Salazar*, 2023 WL 4611819, at *12 (declining to follow *Lebakken* because
"[u]nlike the court in *Carter*, the court in [*Lebakken*] did not engage in any meaningful statutory
interpretation of the VPPA nor did it consider . . . the ramifications of allowing VPPA claims
based on 'goods or services' that are not audio-visual in nature").

[4] With respect to Plaintiff's passing allegations regarding an "App" (Compl. ¶ 12, 47), Defendant
points out that "Mr. Salazar does not allege he downloaded any such application, or even specify
what application he is referring to."  Br. at 13 n. 7.  The Court agrees, and Plaintiff's brief in
opposition to the motion to dismiss does not address any mobile application nor clarify or defend
any claims related to an App.  Thus, the Court finds, without opposition from Plaintiff, that no
such claim has been adequately pleaded.

### B.  Remaining Pleading Arguments

Defendant also urges the Court to dismiss the Complaint because the NBA did not "knowingly disclose" any personally identifiable information and Plaintiff consented to any disclosures.  Br. at 16-23.  Given that Plaintiff has not pleaded that he is a "consumer" under the VPPA, the Court need not reach Defendant's alternative arguments.

### III.    Leave to Amend

Without providing any specificity whatsoever in his opposition brief, Plaintiff includes a blanket request for leave to amend his Complaint "to address any issues the Court raises in its Order."  Opp. at 25 n.19.  Leave to amend "shall be freely given when justice so requires."  Rule 15(a).  However, "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007).   Plaintiff had the opportunity to view Defendant's detailed motion to dismiss and numerous letters to the Court with supplemental authority and argument, and has provided no basis for a proposed amendment.  To seek leave to amend, a plaintiff must at least "provide some indication of the substance of the contemplated amendment before a court could entertain the request."  *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 624 (S.D.N.Y. 2014); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.").  In reviewing the aforementioned materials, the only basis that the Court can discern as a potential proposed amendment is the reference in Plaintiff's July 24, 2023 letter stating that "discovery in this matter will demonstrate that the NBA's newsletters direct its subscribers to video content."  ECF No. 49 at 1.  But even if the Court were to construe this letter as a request

21

to amend the Complaint to include an allegation that the newsletter included a link to video content on the NBA.com website, amendment would be futile because Plaintiff still would not state a claim under the VPPA.  *See supra* at 19-20.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Complaint under Rule 12(b)(1) is denied, but the motion to dismiss for failure to state a claim under Rule 12(b)(6) is GRANTED.  The Clerk of Court is respectfully requested to close this case.

Dated: August 7, 2023
        New York, New York

SO ORDERED.

_Jennifer Rochon_
JENNIFER L. ROCHON
United States District Judge