# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SALAZAR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL BASKETBALL ASSOCIATION,<br><br>Defendant. | Case No. 1:22-cv-07935-JLR |

## MEMORANDUM OF LAW IN SUPPORT OF
## NATIONAL BASKETBALL ASSOCIATION'S MOTION TO DISMISS
## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

**VINSON & ELKINS L.L.P.**

Matthew X. Etchemendy*
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6740
Facsimile: (202) 879-8940
metchemendy@velaw.com

*Admitted pro hac vice*

Hilary L. Preston
Marisa Antonelli
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
mantonelli@velaw.com

*Counsel for National Basketball Association*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A.   The NBA Offers a Variety of Content to Users, Including Email Newsletters. .............................................................................................3

    B.   The FAC Does Not Allege that the NBA Possessed Mr. Salazar's FID, Which His Own Device and Browser Disclosed to Facebook. .............................3

    C.   Mr. Salazar Twice Accepted the NBA's Privacy Policy and Terms, Including Its Class Action Waiver, When Using NBA.com and Signing Up for the Newsletter. ....................................................................................5

PROCEDURAL HISTORY........................................................................................7

LEGAL STANDARD................................................................................................8

ARGUMENT .........................................................................................................10

   I.   Mr. Salazar Does Not Allege Facts Supporting a VPPA Claim. ....................10

    A.   The NBA Respectfully Disagrees with the Second Circuit's Ruling on Mr. Salazar's Standing and His VPPA "Consumer" Status. ...........................11

    B.   The NBA Did Not "Knowingly Disclose" Any PII. .............................................11

       1.   The FAC Does Not Allege that the NBA Possessed, Let Alone Disclosed, Mr. Salazar's PII. .......................................................11

       2.   The NBA Did Not "Knowingly" Disclose PII..............................................15

   II.   Mr. Salazar Waived the Right to Bring Class Claims. ...................................16

       1.   Mr. Salazar Consented to the NBA's Terms. ...........................................16

       2.   The Class Action Waiver in the NBA's Terms Is Enforceable. ...................19

CONCLUSION......................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdullayeva v. Attending Homecare Servs. LLC*,
928 F.3d 218 (2d Cir. 2019) ................................................................ 19

*Alex v. NFL Enters. LLC*,
No. 22-cv-9239, 2023 WL 6294260 (S.D.N.Y. Sept. 27, 2023),
*appeal pending*, No. 23-7455 (2d Cir. filed Oct. 23, 2023) ..................... 11

*Alexandre v. Alcon Lab'ys, Inc.*,
No. 22-cv-8859, 2024 WL 623707 (S.D.N.Y. Feb. 14, 2024) ................. 9

*ASARCO LLC v. Goodwin*,
756 F.3d 191 (2d Cir. 2014) ................................................................ 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 8, 9

*Aubrey v. New Sch.*,
624 F. Supp. 3d 403 (S.D.N.Y. 2022) ................................................. 9

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................. 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 8

*Buechler v. Gannett Co., Inc.*,
No. 22-cv-1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ................. 13

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ......................................................................... 14

*Chutich v. Green Tree Acceptance, Inc.*,
No. 88-cv-869, 1993 WL 173813 (D. Minn. Apr. 19, 1993) ................. 12

*Coleman v. brokersXpress, LLC*,
375 F. App'x 136 (2d Cir. 2010) ....................................................... 21

*Convergys Corp. v. NLRB*,
866 F.3d 635 (5th Cir. 2017) ............................................................ 20

*Dominguez v. Bd. of Ed. of Yonkers City Sch. Dist.*,
No. 23-cv-2460, 2024 WL 3427217 (S.D.N.Y. July 16, 2024) ..... 9, 13, 16

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) .............................................................. 17

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ............................................................ 12

*Frawley v. Nexstar Media Grp., Inc.*,
No. 23-cv-2197, 2024 WL 3798073 (N.D. Tex. July 22, 2024) ............ 15

*Gardener v. MeTV*,
    681 F. Supp. 3d 864 (N.D. Ill. 2023) ................................................................... 11

*Golden v. NBCUniversal Media, LLC*,
    688 F. Supp. 3d 150 (S.D.N.Y. 2023) ................................................................... 9

*Griffith v. Steiner Williamsburg, LLC*,
    760 F. Supp. 2d 345 (S.D.N.Y. 2010) ................................................................... 14

*Horton v. Dow Jones & Co.*,
    804 F. App'x 81 (2d Cir. 2020) ................................................................... 19, 20, 21

*In re Eaton Vance Mut. Funds Fee Litig.*,
    380 F. Supp. 2d 222 (S.D.N.Y. 2005) ................................................................... 21

*In re Hulu Priv. Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................................... 15

*In re Hulu Priv. Litig.*,
    No. 11-cv-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ........................... 15

*In re Thelen LLP*,
    736 F.3d 213 (2d Cir. 2013) ................................................................... 9

*In re UBS Auction Rate Secs. Litig.*,
    No. 08-cv-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................... 10

*Kuzenski v. Uproxx LLC*,
    No. 23-cv-945, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) ........................... 11

*Lamb v. Forbes Media LLC*,
    No. 22-cv-6319, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ........................... 11

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004) ................................................................... 14

*Lee v. Insomnia Cookies LLC*,
    No. 23-cv-6321, 2024 WL 1051954 (W.D.N.Y. Mar. 11, 2024) ........................... 20, 21

*Lewis v. Pelham Country Club*,
    No. 23-cv-6500, 2024 WL 4275588 (S.D.N.Y. Sept. 24, 2024) ........................... 9

*Li v. Georges Media Grp.*,
    No. 23-cv-1117, 2024 WL 1550368 (E.D. La. Mar. 7, 2024) ........................... 18

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ................................................................... 10

*McCausland v. Gray Media Grp., Inc.*,
    No. 22-cv-7539, 2024 WL 1374765 (S.D.N.Y. Mar. 31, 2024) ........................... 11

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ................................................................... 17, 18

*Mollett v. Netflix, Inc.*,
    795 F.3d 1062 (9th Cir. 2015) ................................................................... 13, 16

*Orozco v. Fresh Direct, LLC*,
  No. 15-cv-8226, 2016 WL 5416510 (S.D.N.Y. Sept. 27, 2016) .............................................. 10

*Parisi v. Goldman, Sachs & Co.*,
  710 F.3d 483 (2d Cir. 2013) .................................................................................................... 20

*Peiran Zheng v. Live Auctioneers LLC*,
  No. 20-cv-9744, 2021 WL 2043562 (S.D.N.Y. May 21, 2021) ......................................... 18, 19

*Salazar v. Nat'l Basketball Ass'n*,
  118 F.4th 533 (2d Cir. 2024) ...................................................................................... 1, 8, 11, 14

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017) .................................................................................... 12

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) .................................................................................................... 19

*T.K. Through Leshore v. Bytedance Tech. Co.*,
  No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022), *appeal dismissed*, No. 22-
  1686 (7th Cir. Aug. 22, 2022) .................................................................................................. 21

*Troeger v. JetBlue Airways Corp.*,
  No. 23-cv-10859, 2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024) .............................................. 8

*Tsadilas v. Providian Nat'l Bank*,
  786 N.Y.S.2d 478 (1st Dep't 2004) .......................................................................................... 21

*U.S. Bank, Nat'l Ass'n v. UBS Real Est. Sec. Inc.*,
  205 F. Supp. 3d 386 (S.D.N.Y. 2016) ...................................................................................... 21

*U1it4Less, Inc. v. FedEx Corp.*,
  No. 11-cv-1713, 2015 WL 3916247 (S.D.N.Y. June 25, 2015) .............................................. 20

*United States v. Sylvester*,
  605 F.2d 474 (9th Cir. 1979) .................................................................................................... 13

*Wetzler v. F.D.I.C.*,
  38 F.3d 69 (2d Cir. 1994) ........................................................................................................ 14

*Willingham v. Global Payments, Inc.*,
  No. 12-cv-1157, 2013 WL 440702 (N.D. Ga. Feb. 5, 2013) .................................................. 16

*Wilson v. Veritas Consulting Grp. Inc.*,
  No. 21-cv-8318, 2022 WL 4227145 (S.D.N.Y. Sept. 13, 2022) .............................................. 10

*Worix v. MedAssets, Inc.*,
  869 F. Supp. 2d 893 (N.D. Ill. 2012 ........................................................................................ 16

**Statutes**

10 U.S.C. § 949p-5 .................................................................................................................... 14

15 U.S.C. § 6821 ........................................................................................................................ 14

18 U.S.C. § 2710 ................................................................................................................... 11, 21

18 U.S.C. § 2710(b)(1) ................................................................................................ 2, 12, 15

18 U.S.C. App. 3 § 5 ................................................................................................................ 14

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................................................. 7

Fed. R. Civ. P. 12(b)(6)................................................................................................ 1, 7, 8, 9

Fed. R. Civ. P. 23 .................................................................................................................... 20

Fed. R. Evid. 201 ...................................................................................................................... 9

Defendant National Basketball Association ("NBA") submits this memorandum of law in support of its motion to dismiss the First Amended Complaint filed by Michael Salazar ("Mr. Salazar"), Dkt. No. 61 (the "FAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In this action, Mr. Salazar seeks to capitalize on his routine internet browsing activities by claiming that the NBA violated the Video Privacy Protection Act ("VPPA")—a 1988 law intended to prevent "video tape service providers" from disclosing their customers' personally identifiable information ("PII") without consent. The PII allegedly disclosed here is Mr. Salazar's Facebook ID ("FID")—a numerical identifier Facebook generates for each account holder—combined with the titles of videos he watched on NBA.com. Mr. Salazar claims the VPPA was violated because, while he was watching NBA.com videos and had logged in to Facebook, a Facebook cookie on his *own device's browser* sent Facebook his FID and video-viewing information. For many reasons, including that there is no allegation the NBA ever possessed Mr. Salazar's PII, or knew what, if any, data was contained in his Facebook cookies, Mr. Salazar fails to state a claim.

The parties return to this Court after the Second Circuit's decision in *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024), which disagreed with this Court's holding (and similar rulings from at least two dozen other district courts across the country) that Mr. Salazar's free NBA.com newsletter membership was insufficient to qualify him as a "consumer" entitled to VPPA protection. While the NBA believes this Court's prior decision was correct and is seeking further review of the issue in the U.S. Supreme Court, Mr. Salazar's claims fail on other, independent grounds. Accordingly, the Court should again dismiss this action with prejudice, and it can and should do so on grounds unaddressed by, and thus not inconsistent with, the Second Circuit's ruling.

1

Despite having the opportunity to amend his complaint, Mr. Salazar still does not allege facts supporting the VPPA's required elements.  First, the FAC fails to plausibly allege that the NBA "disclose[d]" Mr. Salazar's PII in violation of the VPPA.  18 U.S.C. § 2710(b)(1).  Indeed, the FAC does not allege that the NBA ever even *possessed* Mr. Salazar's FID; therefore, the NBA could not possibly have disclosed it.  To the contrary, the FAC confirms that *Mr. Salazar's own browser* transmitted Mr. Salazar's FID and video-viewing history to Facebook via a Facebook cookie that the NBA cannot control, read, or even access, and which Mr. Salazar was free to delete if he did not want his information transmitted.  The VPPA's text, in which Congress—in contrast to other federal privacy and similar statutes—intentionally limited the VPPA's reach to disclosures made *by the defendant*, makes clear that the NBA's limited role in this disclosure does not give rise to liability.

Second, even if Mr. Salazar could sufficiently plead that the NBA disclosed his PII to Facebook (he cannot), the FAC pleads no facts supporting Mr. Salazar's threadbare contention that the NBA made such disclosures "knowingly."  Notwithstanding the allegation that the NBA understood the "functionality of the [Facebook Pixel]" generally, *see* FAC ¶ 123, Mr. Salazar does not allege that the NBA knows what data is contained in a particular user's Facebook cookies.  Nor does he allege that the NBA has any control over the numerous contingencies required to cause the disclosure of a user's PII to Facebook, such as whether the user (1) has a Facebook account that contains PII, (2) had a Facebook cookie installed on his browser, and (3) was logged in (or recently logged in) to Facebook when he browsed NBA.com.  No factual discovery will alter these fatal legal flaws.

Finally, Mr. Salazar's effort to pursue these claims on a class basis must be rejected. Mr. Salazar consented to the NBA's Terms of Use ("Terms"), which include an unambiguous and enforceable agreement requiring that any disputes must be resolved on an individual basis and that

neither Mr. Salazar nor the NBA will bring any claims as part of a "purported class . . . proceeding." While the FAC makes much of changes to the Terms' disclosure in the NBA's newsletter sign-up widget after September 2022, the NBA's pop-up banner in place at that time provided clear and conspicuous notice of the Terms through a hyperlink in bold, blue, and underlined font. Mr. Salazar does not and cannot allege otherwise.  Because Mr. Salazar waived the ability to bring claims on a class basis, he should not be permitted to pursue his claims on behalf of a class here.

## FACTUAL BACKGROUND

### A.    The NBA Offers a Variety of Content to Users, Including Email Newsletters.

The NBA operates a men's professional basketball league in North America.  The NBA's website, NBA.com, features a broad selection of video content and non-video offerings, including digital news, league standings and analysis, and team updates.  *Cf. id.* ¶ 17; *see also id.* ¶ 127. Mr. Salazar alleges that he watched prerecorded video content on NBA.com and also became a "digital subscriber" of the site by "sign[ing] up for an online newsletter."  *Id.* ¶¶ 32, 135, 142.  This sign-up consisted of providing his email address to a mailing list.  *Id.* ¶ 32.  In signing up for the newsletter, Mr. Salazar alleges that he received "emails and other communications from NBA.com."  *Id.* ¶ 135.

### B.    The FAC Does Not Allege that the NBA Possessed Mr. Salazar's FID, Which His Own Device and Browser Disclosed to Facebook.

The FAC alleges that, while Mr. Salazar was logged in (or had recently logged in) to Facebook and was watching videos on NBA.com, his FID and the URL video link for videos he viewed were combined and shared with Facebook.  *Id.* ¶ 16.  Mr. Salazar alleges that this disclosure occurred because the NBA installed the Facebook Pixel (a piece of code) on its website, which enables data sharing with Facebook for purposes of targeted advertising.  *Id.* ¶¶ 93, 111.

The only identifying information Mr. Salazar alleges was transmitted to Facebook was his FID—a numerical identifier created by Facebook that links to each user's Facebook page. *See id.* ¶ 121; *see also id.* ¶ 128 (HTTP request showing FID "100003190670927" in the "c-user" field transmitted to Facebook). Nowhere does the FAC allege that the NBA ever actually possessed FID information. *Cf. id.* ¶ 124 (alleging "database" of certain information, without mention of FIDs). Nor does the FAC allege that the disclosure to Facebook includes any personal information in the NBA's possession—no names, email addresses, IP address data, or any other information purportedly collected when Mr. Salazar signed up for the newsletter. *See id.* ¶¶ 32, 34-35.

According to the FAC, the FID disclosure originated with Mr. Salazar's own device browser and was made by that browser directly to Facebook. *Id.* ¶ 121; *see also id.* ¶ 128 (information is "sent *from the device* to Facebook" (emphasis added)). The FID that Mr. Salazar alleges was transmitted originates exclusively from the FID cookie, a text file on a user's device or browser that is unique to that device or browser. *See id.* ¶ 121 (discussing "FID cookies"); Decl. of Hilary L. Preston in Supp. of NBA's Mot. to Dismiss Pl.'s First Am. Compl. ("Preston Declaration" or "Preston Decl."), Ex. A at 6 (Section 6 of NBA Privacy Policy explaining that "[c]ookies are small text files that are unique to [a user's] device or browser").[1] The FID cookie is created and operated by *Facebook*, not the NBA. *See* FAC ¶ 97 ("[The Meta Pixel] relies on Facebook cookies . . . . (alteration in original) (quoting Meta for Developers, Get Started, Meta (2024), available at https://developers.facebook.com/docs/meta-pixel/get-started)). Each cookie stored on a user's web browser has a "[h]ost," which is "the domain name of the site that ultimately

---

[1] As explained in the Legal Standard section below, the Court can consider basic facts about how cookies operate from the sources cited in this section because they are incorporated by reference into the FAC, central to Mr. Salazar's allegations, and/or capable of being judicially noticed.

sets the cookie." Preston Decl., Ex. B.[2]  Critically, "[o]nly the host domain can retrieve and read the contents of the cookie once it has been set." *Id.* (emphasis added).  Mr. Salazar, like any Facebook user, is free to delete Facebook cookies at any time, which prevents the disclosure of any browsing data to Facebook through this mechanism. *See id.*, Ex. C (explaining that browsers enable users to prevent cookies from being placed on their computer and to delete cookies already present there).

### C.    Mr. Salazar Twice Accepted the NBA's Privacy Policy and Terms, Including Its Class Action Waiver, When Using NBA.com and Signing Up for the Newsletter.

All NBA.com users consent to the league's policies when they navigate to NBA.com.  A pop-up banner immediately appears that states:  "If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use." Preston Decl., Ex. D (screenshots of pop-up).[3]  If a user closes the pop-up, it will automatically reappear the next time the user visits the site.  The Cookie Policy, Privacy Policy, and Terms are all hyperlinked, allowing users to review the disclosure terms prior to accessing any content on NBA.com.  Screenshots of this notice, as seen on desktop and mobile browsers, are below:

---

[2] The information in Exhibits B and C is made available through the FAC's cited NBA.com archive (*see infra* note 3) by clicking on the "Manage Cookies" tab in the NBA.com footer.  Upon clicking on the tab, the user is provided with information about the NBA's use of cookies, as well as a link to a third party source (Cookiepedia) explaining in further detail how cookies work (available at https://web.archive.org/web/20220901052025mp_/https://cookiepedia.co.uk/giving-consent-to-cookies).  The quoted language here is on the "Types of Cookies" page (Exhibit B).

[3] The screenshots attached as Exhibit D are archived desktop and mobile versions of the NBA.com pop-up banner from September 1, 2022 at 5:27:09 a.m., made available through the Internet Archive Wayback Machine ("Wayback Machine") at the following link: https://web.archive.org/web/20220901052709/https://www.nba.com/.  The FAC twice cites this exact Wayback Machine capture, *see* FAC ¶¶ 40, 43, based on the supposition that September 1, 2022 represents "the relevant time period before this matter was commenced." *Id.* ¶ 40.



## Cookie Policy

We use cookies to provide you with the best online experience. If you continue browsing, we consider that you accept our Cookie Policy, and also agree to the terms of our Privacy Policy and Terms of Use.

I Accept                    X

*(Banner on Desktop Browser)*



*(Banner on Mobile Browser)*

*See id.* Moreover, a user who signs up for an email newsletter, as Mr. Salazar alleges to have done, is *again* given notice of—and must agree to—the Terms when submitting his or her email address.[4]

The NBA's Terms include a prominent agreement not to participate in a class action or act in a representative capacity, with a section heading in bold text and all caps reading "**CLASS ACTION WAIVER.**" Preston Decl., Ex. E at 18. Under that heading, the Terms provide that the parties agree to "resolve any disputes, claims or controversies on an individual basis, and that

---

[4] As the FAC's cited Wayback Machine archive shows, this newsletter widget also appeared on the NBA's homepage. *See* FAC ¶ 40. This widget was located near the bottom of the homepage, in close proximity to a footer containing various NBA policies, including the Terms.

any claims brought under these Terms of Use in connection with the Site will be brought in an individual capacity, and not on behalf of, or as part of, any purported class, consolidated, or representative proceeding." *Id.*

## PROCEDURAL HISTORY

Mr. Salazar filed his putative class action complaint in this case on September 16, 2022. Dkt. No. 1 (the "Original Complaint"). On December 2, 2022, the NBA moved to dismiss the Original Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on several grounds, including that (i) Mr. Salazar lacked Article III standing because he failed to adequately allege any injury in fact, and (ii) the Original Complaint failed to state a claim upon which relief can be granted because Mr. Salazar (a) failed to plausibly allege that he is a "consumer" under the VPPA, (b) failed to plausibly allege that the NBA knowingly disclosed his PII to a third party, and (c) consented to the alleged disclosures at issue. Dkt. No. 21. The motion also argued that Mr. Salazar waived the right to bring class action claims. *Id.* Mr. Salazar responded to the NBA's motion to dismiss on December 23, 2022, Dkt. No. 27, and the NBA filed a reply brief in further support of its motion on January 13, 2023.[5] Dkt. No. 32.

On August 7, 2023, this Court granted the NBA's motion, dismissing Mr. Salazar's Original Complaint with prejudice on the ground that he failed to plausibly allege status as a VPPA "consumer." Dkt. No. 51 at 14-20. The Court reasoned that (1) the VPPA's "consumer" definition applies only to individuals who rent, purchase, or subscribe to a video tape service provider's "audio visual materials," and (2) Mr. Salazar's allegations that he signed up for an online newsletter—which he did not (and still does not) assert granted him access to any video content

---

[5] While its motion to dismiss was pending, the NBA moved to stay discovery pending resolution of the motion, Dkt. No. 23, which the Court granted on December 22, 2022. Dkt. No. 26.

that is not otherwise "generally accessible" on the NBA's website—failed to qualify as a subscription to audio visual materials. *Id.* In light of its holding that Mr. Salazar was not a VPPA "consumer," the Court declined to reach the NBA's other Rule 12(b)(6) arguments. *See id.* at 21. Mr. Salazar filed a notice of appeal on August 10, 2023. Dkt. No. 53.

On October 15, 2024, the Second Circuit vacated this Court's judgment, holding that Mr. Salazar plausibly alleged his "consumer" status under the VPPA. The Second Circuit concluded that the "phrase 'goods or services' in the VPPA's definition of 'consumer' is not cabined to only audiovisual 'goods or services,'" and therefore found that the NBA's online newsletter was a qualifying "good or service" for the VPPA's "consumer" requirement. *Salazar*, 118 F.4th at 550. Accordingly, the Second Circuit held that Mr. Salazar sufficiently pled consumer status by alleging that he signed up for this newsletter and provided the NBA with his personal information (such as his email address and IP address) in doing so. *See id.* at 552. The Second Circuit remanded the case for the Court to "address the NBA's alternative arguments in the first instance." *Id.* at 553. Following remand, the Court adopted the parties' proposal for Mr. Salazar to file an amended complaint and for the NBA to file a renewed motion to dismiss. Dkt. No. 58. Mr. Salazar filed his FAC on December 13, 2024 in accordance with that briefing schedule.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard set forth by *Twombly* and *Iqbal*, surviving a motion to dismiss under Rule 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Troeger v. JetBlue Airways Corp.*, No. 23-cv-10859, 2024 WL 5146185, at *8 (S.D.N.Y. Dec. 17, 2024) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

Claims that are merely possible or conceivable are subject to dismissal. *Iqbal*, 556 U.S. at 679-80; *see also Lewis v. Pelham Country Club*, No. 23-cv-6500, 2024 WL 4275588, at *3 (S.D.N.Y. Sept. 24, 2024) (stating that "a complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level' (alteration in original) (citation omitted)). In ruling on a motion to dismiss, the Court need not "credit conclusory allegations or legal conclusions couched as factual allegations," *Dominguez v. Bd. of Ed. of Yonkers City Sch. Dist.*, No. 23-cv-2460, 2024 WL 3427217, at *3 (S.D.N.Y. July 16, 2024) (internal quotation marks omitted), and a plaintiff "armed with nothing more than conclusions," "labels," or "[t]hreadbare recitals of the elements of a cause of action" fails to state a claim. *Iqbal*, 556 U.S. at 678-81 (citation omitted).

A court resolving a motion under Rule 12(b)(6) may refer to appropriate documents outside the pleadings, which include "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). The Court also may take judicial notice of facts that are capable of accurate and ready determination from sources whose accuracy cannot be reasonably questioned, including publicly available information found on a website.[6] *Alexandre v. Alcon Lab'ys, Inc.*, No. 22-cv-8859, 2024 WL 623707, at *3 (S.D.N.Y. Feb. 14, 2024) (citing Fed. R. Evid. 201). When allegations in a complaint are contradicted by documents attached thereto, documents incorporated by reference therein, or matters of public record, such allegations are not entitled to the presumption of truth on a motion to dismiss. *See, e.g.*, *Matusovsky v. Merrill*

---

[6] This includes, among other things, publicly available online materials archived via the Wayback Machine. *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 408 (S.D.N.Y. 2022); *see also Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 165 n.14 (S.D.N.Y. 2023) (taking judicial notice of archived webpage in VPPA case, which the court reviewed and found was "consistent with [the defendant's] representation" about the site).

*Lynch*, 186 F. Supp. 2d 397, 399-400 (S.D.N.Y. 2002) (rejecting allegations in a complaint that plainly contradicted a release and waiver incorporated into the complaint).

Here, the Court can consider all of NBA.com's content, including archived versions of that content, because it is incorporated by reference into the FAC and/or is central to Mr. Salazar's allegations.[7]  *See Orozco v. Fresh Direct, LLC*, No. 15-cv-8226, 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016) (assessing the "totality" of a website "incorporated by reference" into a complaint "at the center of Plaintiff['s] allegations" in resolving a motion to dismiss).  For instance, (1) the NBA.com homepage as of September 1, 2022, (2) the June 28, 2021 version of the NBA's Terms, and (3) the February 24, 2022 version of the NBA's Privacy Policy—which are attached as exhibits to the accompanying Preston Declaration—are explicitly incorporated by reference in, or are integral to, the FAC.  *See* FAC ¶¶ 40-48 (discussing Wayback Machine archives of NBA.com as of September 1, 2022); *id.* ¶ 50 (referencing "[t]he June 28, 2021 version of the NBA's 'Terms and Conditions' in effect on September 1, 2022"); *id.* ¶ 49 (referencing "[t]he February 24, 2022 version of the NBA's Privacy Policy").  Thus, these documents are part of the pleadings for purposes of the NBA's Rule 12(b)(6) motion.  *See Wilson v. Veritas Consulting Grp. Inc.*, No. 21-cv-8318, 2022 WL 4227145, at *1 (S.D.N.Y. Sept. 13, 2022).

## ARGUMENT

## I.    Mr. Salazar Does Not Allege Facts Supporting a VPPA Claim.

To plead a plausible claim under the VPPA, a plaintiff must allege facts showing that (1) the defendant is a "video tape service provider," (2) the plaintiff is a "consumer," (3) the defendant "disclose[d]" the plaintiff's PII to "any person," (4) the disclosure was made

---

[7] The Court also could consider this information through the doctrine of judicial notice.  *See In re UBS Auction Rate Secs. Litig.*, No. 08-cv-2967, 2010 WL 2541166, at *15 (S.D.N.Y. June 10, 2010) ("The Second Circuit, and several district courts in this Circuit, have found it appropriate to take judicial notice of the contents of a party's website for the fact of its publication.").

"knowingly," and (5) the disclosure was not authorized by another part of the statute.  18 U.S.C. § 2710; *Alex v. NFL Enters. LLC*, No. 22-cv-9239, 2023 WL 6294260, at \*3 (S.D.N.Y. Sept. 27, 2023), *appeal pending*, No. 23-7455 (2d Cir. filed Oct. 23, 2023).  Because the FAC fails to allege facts supporting the second, third, and fourth elements of a VPPA claim, it must be dismissed.

### A.     The NBA Respectfully Disagrees with the Second Circuit's Ruling on Mr. Salazar's Standing and His VPPA "Consumer" Status.

Consistent with more than two dozen district court decisions across the country,[8] this Court previously held that Mr. Salazar failed to plausibly allege that he was a "consumer" of the NBA's "goods or services," and therefore entitled to VPPA protection, because his alleged subscription to a NBA.com newsletter was not a subscription to "audio visual materials."  Dkt. No. 51 at 16-20; *supra* Procedural History.  As discussed above, the Second Circuit disagreed—concluding that Mr. Salazar plausibly alleged consumer status by virtue of his alleged newsletter subscription on NBA.com.  *Salazar*, 118 F.4th at 550-53.  The Second Circuit also held that Mr. Salazar plausibly alleged a sufficient harm to confer standing and affirmed this Court's denial of the NBA's motion to dismiss under Rule 12(b)(1).  *Id.* at 544.  The NBA believes that the Second Circuit's rulings were in error and is proceeding to seek review of these issues in the U.S. Supreme Court.

### B.     The NBA Did Not "Knowingly Disclose" Any PII.

#### 1.     The FAC Does Not Allege that the NBA Possessed, Let Alone Disclosed, Mr. Salazar's PII.

The plain text of the statute makes clear that VPPA claims may only be brought against a defendant "who knowingly discloses" the PII at issue (18 U.S.C. § 2710(b)(1))—*i.e.*, the defendant must be *the party doing the disclosing*.  Here, with respect to the PII disclosure that forms the basis

---

[8] *See, e.g.*, *McCausland v. Gray Media Grp., Inc.*, No. 22-cv-7539, 2024 WL 1374765, at \*8 (S.D.N.Y. Mar. 31, 2024); *Kuzenski v. Uproxx LLC*, No. 23-cv-945, 2023 WL 8251590, at \*5-6 (C.D. Cal. Nov. 27, 2023); *Lamb v. Forbes Media LLC*, No. 22-cv-6319, 2023 WL 6318033, at \*13 (S.D.N.Y. Sept. 28, 2023); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill. 2023).

of Mr. Salazar's allegations—the purported disclosure of his FID to Facebook while he was viewing NBA.com videos—Mr. Salazar fails to plausibly allege that the NBA ever *possessed*, let alone disclosed, the PII at issue.

The FAC contains no plausible allegation that the NBA ever possessed Mr. Salazar's FID. The NBA cannot disclose what it does not possess, so Mr. Salazar's claim fails on that basis alone. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (rejecting VPPA claim where defendant never possessed the information necessary to actually identify plaintiff); *Chutich v. Green Tree Acceptance, Inc.*, No. 88-cv-869, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[A] corporation cannot disclose what it does not know . . . ."). The only source of FID information alleged in the FAC is "one or more personally identifiable FID cookies *on [Mr. Salazar's] browser*," *i.e.*, his own computer. FAC ¶ 121 (emphasis added); *see also Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 664 (S.D.N.Y. 2015) ("[T]hrough its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID."). FID information exists on a user's browser, where it is placed *by Facebook* when the user logs into Facebook. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) (noting that "Facebook puts cookies on visitors' computers," such as the "c_user cookie," a "unique identifier" containing a user's FID); FAC ¶ 16 (noting Mr. Salazar was a newsletter subscriber and viewed video media on NBA.com "while logged into his Facebook account or having been recently logged into his Facebook account"). The NBA cannot retrieve, access, or read the information contained on Facebook's cookie, and there is no allegation to the contrary in the FAC. *See supra* Factual Background, Section C.

Even according to the FAC, the alleged transfer of PII was made by Mr. Salazar's *own browser*, not the NBA. As the FAC explains, code "return[ed]" by Facebook causes "the digital subscriber['s] identity and viewed Video Media to be transmitted to Facebook by the user's

12

browser." FAC ¶¶ 110, 121. The only example web session that the FAC provides of alleged disclosures in violation of the VPPA clarifies the point. *Id*. ¶¶ 127-28. Mr. Salazar shows an HTTP request allegedly demonstrating the disclosure of the content name of the video and the FID. *Id.* ¶ 128. As the caption explains, this HTTP request is "sent *from the device* to Facebook," not from the NBA. *Id.* (emphasis added). Mr. Salazar's own example therefore shows the complained-of disclosure is made by his device's browser, not the NBA.[9] *See Buechler v. Gannett Co., Inc.*, No. 22-cv-1464, 2023 WL 6389447, at *4 (D. Del. Oct. 2, 2023) (dismissing Facebook Pixel-related VPPA claim for failure to allege that the defendant disclosed PII where the allegations "appear[ed] to establish that the subscriber-users themselves and/or Facebook—not [defendant]—implement the 'Tracking Methods' . . . that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook"); *cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066-67 (9th Cir. 2015) (rejecting VPPA claim where the alleged disclosure of PII to third parties resulted from the plaintiffs' own decision to give those parties access to their Netflix accounts).

At most, Mr. Salazar alleges that the NBA caused his browser to disclose PII by installing the Facebook Pixel on NBA.com. But the VPPA imposes liability only on a party that "discloses" PII—not a party that merely "causes" disclosure, by some other entity, of information the defendant does not possess. The difference between "disclosing" and "causing" a disclosure is significant. *See United States v. Sylvester*, 605 F.2d 474, 475 (9th Cir. 1979) (holding that a statute reaching "one who 'causes [wildlife] to be sold in interstate or foreign commerce'" is "far more broadly worded" than if the statute applied only to a person who "sells" wildlife). When interpreting statutory language, courts must honor the precise words used and assume that

---

[9] For this reason, the Court should look past the FAC's conclusory allegations to the contrary (*e.g.*, FAC ¶ 146). *See Dominguez*, 2024 WL 3427217, at *3 (explaining that courts need not "credit conclusory allegations or legal conclusions couched as factual allegations").

Congress intended them as written.  *Griffith v. Steiner Williamsburg, LLC*, 760 F. Supp. 2d 345,

355 (S.D.N.Y. 2010)); *see also Wetzler v. F.D.I.C.*, 38 F.3d 69, 73 (2d Cir. 1994) ("In ascertaining

what the words in a statute mean, we start with the familiar maxim that one must look first to the

words Congress used because 'a court should presume that the statute says what it means.'"

(citation omitted)).  This is especially true when Congress has chosen in other data privacy and

similar statutes to extend liability to those who merely cause a disclosure.  *See, e.g.*, 15 U.S.C.

§ 6821 (prohibiting any person to "*cause to be disclosed* . . . customer information of a financial

institution" (emphasis added)); 18 U.S.C. App. 3 § 5  ("defendant reasonably expects to disclose

*or to cause the disclosure* of classified information" (emphasis added)); 10 U.S.C. § 949p-5

("accused reasonably expects to disclose, *or to cause the disclosure of*, classified information"

(emphasis added)).  Congress "knew how" to "impose . . . liability" for causing a disclosure "when

it chose to do so"—but under the VPPA, "it did not."  *Cent. Bank of Denver, N.A. v. First Interstate

Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994).

      Mr. Salazar has argued in prior briefing that the NBA "opened a digital door" by installing

Facebook Pixel code on its website.  *See* Dkt. No. 27 at 9-10.  But this metaphor does not change

the fact that the NBA is not plausibly alleged to have *made* the disclosure at issue in this case, as

the statute requires.  As Mr. Salazar previously emphasized in his Second Circuit briefing, courts

"must review the language actually present in the statute, not . . . language Congress might have

used but did not."  Br. of Appellant at 19 (Dkt. No. 42), *Salazar*, 118 F.4th 533 (citing *Lamie v.

U.S. Trustee*, 540 U.S. 526, 534-36 (2004)).  And to the extent Mr. Salazar's argument-from-

metaphor can be read as an argument against construing the "disclosure" requirement strictly—it

ignores that, precisely because the alleged disclosure was made by Mr. Salazar's own browser,

Mr. Salazar was fully capable of preventing that disclosure (notably, by deleting his Facebook

"FID cookies," *see* Preston Decl., Ex. C).  Mr. Salazar's effort to stretch the VPPA far beyond the circumstances it was intended to cover should fail.

### 2.    The NBA Did Not "Knowingly" Disclose PII.

Even if the NBA disclosed PII to Facebook (which it did not), such a disclosure was not done "knowingly."  To violate the VPPA, a defendant must "knowingly disclose[]" PII.  18 U.S.C. § 2710(b)(1).  Courts interpreting the VPPA have explained that the word "'[k]nowingly' means consciousness of transmitting the private information.  It does not merely mean transmitting the code." *Frawley v. Nexstar Media Grp., Inc.*, No. 23-cv-2197, 2024 WL 3798073, at *8 (N.D. Tex. July 22, 2024) (quoting *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015)). Therefore, "[i]f [the NBA] did not know that it was transmitting both an identifier and the person's video watching information, then there is no violation of the VPPA." *In re Hulu Priv. Litig.*, No. 11-cv-03764, 2014 WL 1724344, at *15 (N.D. Cal. Apr. 28, 2014).

Here, the FAC alleges that the NBA's knowledge is evidenced by "the functionality of the pixel" because it "enabled NBA.com and [the] accompanying app to show targeted advertising." FAC ¶ 123.  But regardless of whether the NBA understands how the Facebook Pixel operates as a general matter, nothing is alleged to suggest that the NBA has knowledge of the data contained in a particular user's FID cookie (or even that the NBA was capable of accessing this data).  As explained in Section I.B.1, this is a cookie created and operated by Facebook, that only Facebook can retrieve and access.  Thus, even if the disclosure by Mr. Salazar's browser could be "attributed" to the NBA based on the mere assertion that the NBA *caused* it, that still falls short of alleging a "knowing" disclosure where there is no allegation that the NBA is privy to or has access to the PII being disclosed.  As courts interpreting the Electronic Communications Privacy Act ("ECPA")— an analogous federal privacy statute "on which the VPPA was modeled," *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1095—have explained, the fact that a defendant merely "contributed" to the

disclosure of sensitive data by a third party is insufficient to establish that the defendant "knowingly divulge[d]" (or in the case of the VPPA, "knowingly disclose[d]") it. *See Willingham v. Global Payments, Inc.*, No. 12-cv-1157, 2013 WL 440702, at *12 (N.D. Ga. Feb. 5, 2013); *see also Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893, 896 (N.D. Ill. 2012) (concluding plaintiff failed to plausibly allege an ECPA claim based on allegations that the defendant's actions "created or contributed" to a "*risk*" that data would be disclosed by a third party).

Nor does the FAC allege knowledge on the part of the NBA that Mr. Salazar (1) had a Facebook account (and to the extent he did, that his Facebook account contained information sufficient to identify him), (2) had a Facebook cookie installed on his browser, or (3) was logged in to Facebook when he browsed NBA.com. Absent these circumstances, there would have been no disclosure of Mr. Salazar's PII to Facebook. The lawfulness of a disclosure "cannot depend on circumstances outside of [the NBA's] control." *Mollett*, 795 F.3d at 1066. Mr. Salazar's allegation that the NBA knows the end result of the Facebook Pixel's operation (*i.e.*, the ability to target advertising) does not show that the NBA knew that each of these contingencies would occur. *See Dominguez*, 2024 WL 3427217, at *3 (stating that courts should generally look only to the allegations actually made on the face of the complaint).

## II.    Mr. Salazar Waived the Right to Bring Class Claims.

Even if the Court declines to dismiss the FAC in its entirety, it should nevertheless dismiss Mr. Salazar's claims to the extent he purports to bring them on behalf of a class. Mr. Salazar consented to the NBA's Terms, including the clear, unambiguous, and enforceable class action waiver found therein.

### 1.    Mr. Salazar Consented to the NBA's Terms.

When users like Mr. Salazar visit NBA.com, they are immediately presented with a prominent pop-up banner. *See* Preston Decl., Ex. D; *see also supra* Factual Background,

Section C.  In order to view the site unobstructed, the user is required to agree to several NBA policies, including the Terms, or close the banner.  *See* Preston Decl., Ex. D.  The pop-up banner states in no uncertain terms:  "If you continue browsing, we consider that you accept our Cookie Policy, and *also agree to the terms of our Privacy Policy and Terms of Use*."  *Id.* (emphasis added). Each policy referenced in the banner is conspicuously hyperlinked, evidenced by the use of bold, blue, and underlined text against an all-white background and surrounding gray text.  *Id.*  While the FAC makes much of alleged changes to NBA.com since September 1, 2022, *see* FAC ¶¶ 40, 43-45, 49-50 (which Mr. Salazar deems to be "the relevant time period before this matter was commenced," *id.* ¶ 40), the FAC does not—and cannot—dispute the fact that this bold, blue, underlined, and hyperlinked disclosure in the pop-up banner has been in place since at least that time.  *See* Preston Decl., Ex. D.  Accordingly, any user visiting NBA.com during the relevant time period identified by the FAC would have either (i) affirmatively agreed to the NBA's Terms by selecting "I Accept" or (ii) agreed to the Terms by pressing forward in his or her use of the site after having viewed the Terms.  Both methods are sufficient to constitute acceptance.  *See Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) (explaining that an internet user need not explicitly say "I agree" to online terms and can also accept such terms through his or her conduct).

The Second Circuit repeatedly has enforced web terms and conditions that, like the NBA's Terms, are presented in a clear and conspicuous manner on the defendant's website.  *See id.* at 705-07 (enforcing online terms where the website's interface was "uncluttered," the hyperlinks were "set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces' backgrounds," and "the interface include[d] language signaling to users that they [would] be agreeing to Klarna's terms through their conduct"); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-78 (2d Cir. 2017) (enforcing online terms where "the

17

hyperlinks [were] in blue and underlined" and "reasonably conspicuous" in close proximity to a "Register" button clicked by the plaintiff). Courts in this district and elsewhere also have enforced web terms and conditions that are hyperlinked in pop-up banners on the homepage of a defendant's website. *See Peiran Zheng v. Live Auctioneers LLC*, No. 20-cv-9744, 2021 WL 2043562, at *5 (S.D.N.Y. May 21, 2021) (enforcing hyperlinked terms and conditions presented in blue, underlined font within a pop-up banner stating that "[b]y using LiveAuctioneers, you agree to our Terms & Conditions, Privacy Policy, and Cookie Policy"); *Li v. Georges Media Grp.*, No. 23-cv-1117, 2024 WL 1550368, at *2-3 (E.D. La. Mar. 7, 2024) (finding hyperlinked terms and conditions presented in blue font within a pop-up banner enforceable irrespective of whether the plaintiff "actually read" those terms).

After first consenting to the NBA's Terms via the NBA.com pop-up banner, Mr. Salazar again consented to the Terms when he signed up for an online newsletter on NBA.com. FAC ¶ 135. During the relevant time period identified by the FAC, a user could sign up for the NBA's newsletter by entering his or her email address into the newsletter widget found on the NBA's homepage and clicking "Submit." *Id.* ¶ 40. As the FAC shows, just below the widget's "Submit" button was a notice stating that "[b]y clicking "Submit", you agree to the Terms and Conditions and Privacy Policy." *Id.* Thus, Mr. Salazar also was put on notice of the NBA's Terms through the newsletter widget and affirmatively agreed to those Terms when he clicked "Submit." *See Meyer*, 868 F.3d at 78-79 (holding "clear and reasonably conspicuous" notice established where user did "not need to scroll beyond what is immediately visible to find notice" of the relevant terms when creating an account).

The FAC discusses at length the changes to the formatting of the Terms disclosure in the newsletter widget from September 2022 through present, arguing that the disclosure was not clear and conspicuous at the time of Mr. Salazar's newsletter sign-up. *See* FAC ¶¶ 59-60. That

18

argument falls short for two reasons.  First, the prominent placement of the Terms' disclosure in the newsletter widget was sufficient in itself to constitute clear and conspicuous notice in September 2022.[10]  Second, the FAC's new allegations ignore the Terms' disclosure and consent through the pop-up banner—which has remained unchanged since Mr. Salazar's newsletter sign-up—and that the newsletter widget was the *second* time Mr. Salazar was afforded notice of, and consented to, the Terms.  Each disclosure cannot be considered in a vacuum.  *See Peiran Zheng*, 2021 WL 2043562, at *5 (explaining that "whether a web user had 'reasonable notice' of contract terms contained in a contract accessible by hyperlink depends on the 'totality of the circumstances'" (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 297 (2d Cir. 2019)).

## 2.    The Class Action Waiver in the NBA's Terms Is Enforceable.

Because Mr. Salazar consented to the Terms, *see supra* Argument, Section II.1, the only remaining question is whether the class action waiver found in the Terms is enforceable.  It is.

A "complete, clear, and unambiguous" contractual provision "must be enforced according to the plain meaning of its terms."  *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) (citation and alterations omitted).  That principle applies equally to class action waivers under New York law.  *See, e.g.*, *Horton v. Dow Jones & Co.*, 804 F. App'x 81, 84 (2d Cir. 2020) (summary order).  The class action waiver found in the NBA's Terms is unambiguous.  The Terms state in bold text and all caps "**CLASS ACTION WAIVER**." Preston Decl., Ex. E at 18.  Under that heading, the Terms state that the parties agree to "resolve any disputes, claims or controversies on an individual basis, and that any claims brought under

---

[10] The FAC alleges that the hyperlink to the NBA's Terms found in the newsletter widget in effect on September 1, 2022 "appears to redirect the user back to the homepage."  FAC ¶ 43.  But a user who read the disclaimer in the newsletter widget could also access the NBA's Terms by slightly scrolling down to the bottom of the homepage and clicking on the "Terms of Use" tab in the footer.

these Terms of Use in connection with the Site *will be brought in an individual capacity, and not on behalf of, or as part of, any purported class, consolidated, or representative proceeding*." *Id.* (emphasis added).  Courts frequently enforce class action waiver provisions employing similar language.[11]  *See, e.g.*, *Horton*, 804 F. App'x at 84 (enforcing class action waiver in which plaintiff agreed that "class arbitrations and class actions are not permitted and, by entering into this Agreement, you are giving up the ability to participate in a class action"); *Lee v. Insomnia Cookies LLC*, No. 23-cv-6321, 2024 WL 1051954, at *3 (W.D.N.Y. Mar. 11, 2024) (enforcing class action waiver in which plaintiff agreed that "any proceeding to resolve or litigate any dispute covered by this Agreement . . . will be conducted on an individual basis only, and that neither you nor the Company will seek to have any controversy, claim or dispute heard as a class action, a representative action, [or] a collective action" (alternation in original) (emphasis omitted)); *U1it4Less, Inc.*, 2015 WL 3916247, at *1, *6 (S.D.N.Y. June 25, 2015) (enforcing class action waiver in which plaintiff agreed not to sue "as a class plaintiff or class representative" or "participate as an adverse party in any way in a class action lawsuit").

"[P]rinciples of contract law strongly support enforceability" of class action waivers unless (1) "the class action waiver at issue is unconscionable under the applicable state law"; or (2) "the statutory scheme . . . suggests legislative intent or policy reasons weighing against enforcement of such a waiver."[12]  *U1it4Less*, 2015 WL 3916247, at *4.  Neither exception applies in this case.

---

[11] This is true even where the class action waiver is unaccompanied by, or independently enforceable from, an arbitration provision. *See U1it4Less, Inc. v. FedEx Corp.*, No. 11-cv-1713, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015) (rejecting the notion that "class action waivers contained in a provision also containing an arbitration agreement should be treated as more sacrosanct than waivers in context of a contract without an arbitration agreement").

[12] As the Second Circuit and other courts have explained, the right to pursue claims through a class action under Rule 23 is merely a "procedural right . . . ancillary to the litigation of substantive claims." *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013) (citation omitted); *see also Convergys Corp. v. NLRB*, 866 F.3d 635, 639 (5th Cir. 2017) (stating that class action waivers

Courts have repeatedly held that "[u]nder New York law, . . . 'a contractual proscription against class actions is neither unconscionable nor violative of public policy.'"  *Horton*, 804 F. App'x at 84 (quoting *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (1st Dep't 2004)); *see also Lee*, 2024 WL 1051954, at *5.  And, as other courts have concluded, nothing about the VPPA's statutory scheme weighs against enforcement of a class action waiver.  *See* 18 U.S.C. § 2710; *T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-cv-7915, 2022 WL 888943, at *13 (N.D. Ill. Mar. 25, 2022) (granting final approval of a class action settlement of VPPA claims and state law claims and stating, in *dicta*, that a class would "likely have little success challenging the arbitration and class action [waiver] agreement, given the strong presumption in favor of enforceability"), *appeal dismissed*, No. 22-1686 (7th Cir. Aug. 22, 2022).  Thus, Mr. Salazar consented to the NBA's unambiguous and enforceable class action waiver, and the Court should dismiss his class claims with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC in its entirety.  If the Court declines to dismiss the FAC in its entirety, Mr. Salazar should not be permitted to pursue his claims on a classwide basis.  Because Mr. Salazar already has been given an opportunity to amend his complaint, dismissal of the FAC should be with prejudice.  *See Coleman v. brokersXpress, LLC*, 375 F. App'x 136, 137 (2d Cir. 2010) (summary order) (affirming district court's denial of leave to amend when plaintiff had already been "afforded [] one opportunity to amend the complaint"); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying

---

do not impact a party's substantive rights).  As such, unambiguous class action waivers, like other contractual terms, should be enforced as written.  *See U.S. Bank, Nat'l Ass'n v. UBS Real Est. Sec. Inc.*, 205 F. Supp. 3d 386, 412 (S.D.N.Y. 2016) ("Courts will give effect to the contract's language and the parties must live with the consequences of their agreement." (citation omitted)).

leave to amend where plaintiffs were given prior opportunities to cure the defects in their complaints).

Dated:  January 13, 2025

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

By: _/s/ Hilary L. Preston_

Matthew X. Etchemendy*
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6740
Facsimile: (202) 879-8940
metchemendy@velaw.com

*Admitted pro hac vice*

Hilary L. Preston
Marisa Antonelli
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
mantonelli@velaw.com

*Counsel for National Basketball Association*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing memorandum of law complies with this Court's word count requirements and contains 7,259 words, exclusive of the items listed in Local Civil Rule 7.1(c).

*/s/ Hilary L. Preston*
Hilary L. Preston
